

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| Michael H. Wu and Christine T. Wu | ) | |
| Plaintiffs, | ) | |
| - against - | | |
| Prudential Financial, Inc., | | 1:14-cv-05392 |
| Prudential Insurance Company of America, the | | Judge Milton I. Shadur |
| Pruco Life Insurance Company, | | Magistrate Judge Mary M. Rowland |
| AST Investment Services, Inc., | , | |
| Prudential Annuities, Inc., | ) | |
| Prudential Annuities Distributors, Inc., | ) | **JURY TRIAL** |
| Pruco Securities LLC, | ) | **DEMANDED** |
| Global Portfolio Strategies, Inc., | ) | |
| Prudential Bache Securities LLC, | ) | |
| Prudential Investment Management Services LLC, | ) | |
| Prudential Investments LLC, | ) | |
| Prudential Investment Management, Inc., | ) | |
| Prudential Retirement Insurance and Annuity Company, | ) | |
| Jennison Associates LLC, | ) | |
| LSV Asset Management, | ) | |
| Marsico Capital Management LLC, | ) | |
| Quantitative Management Associates LLC, | ) | |
| T. Rowe Price Associates, Inc., | ) | |
| William Blair & Company LLC, | ) | |
| John Robert Strangfeld Jr., | ) | F I L E D |
| Mark Brown Grier, | ) | |
| Richard J. Carbone, | ) | JUL 1 5 2014 |
| Judy Ann Rice, | ) | |
| Christine Marcks, | ) | THOMAS G BRUTON |
| Christopher Hagan, | ) | CLERK, U S DISTRICT COURT |
| Michael Weissberger, | ) | |
| Citigroup, Inc., | ) | |
| Citigroup Global Markets, Inc., | ) | |
| John P. Havens, | ) | |
| Xiao-mei (Linda) Wang, and | ) | |
| Does 1 through 10 | ) | |
| Defendants. | ) | |

---

## COMPLAINT

Plaintiffs, Michael H. Wu and Christine T. Wu, for their complaint against Defendants
Prudential Financial, Inc. (**"PFI"**; NYSE Ticker: "PRU") et al, allege as follows:

## I. SUMMARY

1.  This case involves fraudulent offers, sales, and managements of Prudential
    Variable Annuities ("VAs") by PFI et al, a robust 2-stage arbitrage-based defined
    benefit risk transfer ("DBRT") embezzlement scheme founded and operated by
    PFI et al where VA group poses as both buyer and seller in all transactions
    initiated by such VA group without the knowledge and authorizations of VA
    individuals; PFI subsidiaries pose as broker-dealers, contractual compliance
    reviewers, and registered exchanges; and underlying unregistered funds
    (including hedge funds) of the Prudential Series Fund (**"the Fund"**) pose as
    underlying registered mutual funds of the Advanced Series Trust (**"the Trust"**),
    during all in-house fund transfers, which were conducted between PFI and VA
    individuals in favor of PFI without being entered into order-routing and execution
    systems. On April 13, 2010, Plaintiffs ordered an underlying registered mutual
    fund of **the Trust**, which was documented in the Prudential VA Application Form
    and the Prospectus of "Prudential VAs with Income Benefit", based on what
    Xiao-mei (Linda) Wang misrepresented on March 29, 2010. A Prudential VA
    contract of $100,000 was issued on April 16, 2010. Plaintiffs discovered
    abnormal activities in their VA account; and started to complain with questions
    and ask Defendants to revoke all unauthorized in-house transactions in
    November 2011. Defendants rebutted Plaintiffs' complaint and declined their
    revoking request with hoaxes without answering any question on December 8,
    2011; and then proposed an unfair offer intended to cancel said VA contract on
    January 20, 2012 after Plaintiffs escalated the issue with more questions.
    Plaintiffs insisted to have answers and Defendants replied insincerely from late
    February 2012 to 2Q 2012 per demand of U.S. Securities Exchange and

Commission ("SEC"). Meanwhile Defendants extended the deadline of their offer several times after it was already declined by Plaintiffs on January 24, 2012 and it expired on February 20, 2012; and Plaintiffs proposed a fair counter offer on April 12, 2012, which was turned down by Defendants on June 25, 2012. Plaintiffs keep researching from 3Q 2012 on and discovered the facts constituting the violation in February 2014 that PFI pioneered her VA business with two versions of mutual funds and mispriced "junk bonds" in 2006, where **underlying registered mutual funds** of **the Trust** are offered by underlying Mutual Fund Companies of **the Trust** and **underlying unregistered mutual funds** of **the Fund** are the unregistered funds (including hedge funds), which disguise as underlying registered mutual funds of **the Trust** and are offered by the Prudential Insurance Company of America ("PICA"), the underwriter of **the Fund**. PFI et al pay out greater compensation to sales firms, branch managers, and registered sales representatives for their providing aided and abetted efforts in defrauding customers and prospective customers without telling VA individuals that such registered mutual funds are not available for direct investment by VA individuals. PFI et al gave VA individuals the disguised mutual funds doped with scalable amount of mispriced "junk bonds" without agreements and the knowledge of VA individuals when their VA contracts were issued; repeatedly use such mispriced "junk bonds", such unregistered mutual funds, such registered mutual funds, and such 2-stage arbitrage-based DBRT embezzlement scheme to steal capital funds and market gains of VA individuals during stage 1 of each benefit quarter; and then use synthesized "Pension Plan Risk Transfer" transactions to cook the books, which are separately maintained by underlying Mutual Fund Companies of **the Trust** and underlying authorized broker-dealers of VA individuals respectively, at stage 2 on each benefit quarter.

## II. JURISDICTION AND VENUE

2.    The court has jurisdiction over this action pursuant to Section 22 of the Securities Act of 1933 [15 U.S.C. § 77v], Section 27 of the Exchange Act 0f

1934 [15 U.S.C. § 78aa], Section 44 of the Investment Company Act of 1940 [15 U.S.C. § 80a-44], and Section 214 of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-14].

3.   Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 44 of the Investment Company Act [15 U.S.C. § 80a-44], and Section 214 of the Investment Advisers Act [15 U.S.C. § 80b-14] because Plaintiffs and certain of Defendants may be found in and are inhabitants within the Northern District of Illinois; and certain of the acts, practices and courses of business alleged herein occurred within the Northern District of Illinois.

## III. THE PARTIES

4.   The Plaintiffs, **Michael H. Wu and Christine T. Wu ("Plaintiffs"),** are individuals who are citizens of United States of America ("USA") and reside within this District.

5.   The Defendant, **Prudential Financial, Inc.** ("**PFI**"; NYSE Ticker: "PRU"), is located in Newark NJ, USA; is the owner of Prudential (Fixed and Variable) Annuities business; and has the unregistered hedging equities of the Fund in PFI's proprietary annuities accounts and misprices "junk bonds" in PFI's proprietary fixed income accounts.

6.   The Defendant, **the Prudential Insurance Company of America ("PICA"),** is located in Newark, NJ, USA; and is the trust of the mutual fund family of PFI, one of the underwriters of the Fund, and the principal of registered Prudential accounts of the Trust.

7.   The Defendant, **Pruco Life Insurance Company ("Pruco Life"),** is located in Newark NJ, USA and is one of the underwriters of the Fund.

8.   The Defendant, **AST Investment Services, Inc. ("ASTIS"),** is located in Shelton, CT, USA; and is a broker-dealer and one of the two investment managers of the Trust.

9.    The Defendant, **Prudential Annuities, Inc. ("PAI")**, is located in Shelton, CT, USA; and is the group VAs (i.e., VA group); the publisher of Net Asset Values ("**NAVs**") of underlying registered mutual funds of **the Trust**; the owner of the website, which is used to accept trade orders of VA individuals; and the generator and the distributor of fabricated Trade Confirmations and Quarterly Statements of Prudential VAs.

10.   The Defendant, **Prudential Annuities Distributors, Inc. ("PAD")**, is located in Shelton, CT, USA; and is a broker-dealer and the distributor of Prudential VAs.

11.   The Defendant, **Pruco Securities LLC ("Pruco Securities")**, is located in Newark, NJ, USA; and is a broker-dealer and registered investment adviser.

12.   The Defendant, **Global Portfolio Strategies, Inc. ("Global Portfolio")**, is located in Hartford, CT, USA and is a broker-dealer.

13.   The Defendant, **Prudential Bache Securities LLC ("Prudential Bache")**, is located in New York, NY, USA and is a broker-dealer.

14.   The Defendant, **Prudential Investment Management Services LLC ("PIMS")**, is located in Newark, NJ, USA; and is the distributor of the PFI mutual funds, a registered broker-dealer, and an unregistered national securities exchange.

15.   The Defendant, **Prudential Investments LLC ("PI")**, is located in Newark, NJ, USA; and a broker-dealer and registered investment adviser, one of the two investment managers of the Trust, the mutual fund family of PFI; and the overall manager of the Fund.

16.   The Defendant, **Prudential Investment Management, Inc. ("PIM")**, is located in Newark, NJ, USA; and a broker-dealer, a registered investment adviser, a sub-adviser of the Fund, and a contractual intermediary of the Trust.

17.   The Defendant, **Prudential Retirement Insurance and Annuity Company ("PRIAC")**, is located in Shelton and Hartford, CT, USA and is one of the underwriters of the Fund.

18.   The Defendant, **Jennison Associates LLC ("Jennison")**, is located in New York, NY, USA; and a portfolio manager of the Fund and a contractual intermediary of the Trust.

19. The Defendant, **LSV Asset Management ("LSV")**, is located in Chicago, IL, USA; and a portfolio manager of the Fund and a contractual intermediary of the Trust.

20. The Defendant, **Marsico Capital Management LLC ("Marsico")**, is located in Denver, CO, USA; and a portfolio manager of the Fund and a contractual intermediary of the Trust.

21. The Defendant, **Quantitative Management Associates LLC ("QMA")**, is located in Newark, NJ, USA; and a portfolio manager of the Fund and a contractual intermediary of the Trust.

22. The Defendant, **T. Rowe Price Associates, Inc. ("T. Rowe Price")**, is located in Baltimore, MD, USA; and a portfolio manager of the Fund and a contractual intermediary of the Trust.

23. The Defendant, **William Blair & Company LLC ("William Blair")**, is located in Chicago, IL, USA; and a portfolio manager of the Fund and a contractual intermediary of the Trust.

24. The Defendant, **John Robert Strangfeld Jr. ("Strangfeld")**, is located in Newark, NJ, USA; and is the CEO, Chairman, and President of PFI and PICA

25. The Defendant, **Mark Brown Grier ("Grier")**, is located in Newark, NJ, USA; and is the vice Chairman of PFI and PICA.

26. The Defendant, **Richard J. Carbone ("Carbone")**, is located in Newark, NJ, USA, and is the (ex) CFO of PFI and PICA.

27. The Defendant, **July Ann Rice ("Rice")**, is located in Newark, NJ, USA; and is the (ex) chairman of PI and the CEO of PIMS and the person who launched one of the first separately managed account business for PFI.

28. The Defendant, **Christine Marcks ("Marcks")**, is located in Hartford, CT, USA, and is the President of PRIAC.

29. The Defendant, **Christopher Hagan ("Hagan")**, is with **PAI** located in Philadelphia, PA, USA.

30. The Defendant, **Michael Weissberger ("Weissberger")**, is with **PAI** located in Philadelphia, PA, USA.

31. The Defendant, **Citigroup, Inc. ("Citigroup")**, is located in New York, NY, USA, and is the owner of Citigroup Global Markets, Inc.

32. The Defendant, **Citigroup Global Markets, Inc. ("CGMI")**, is also known as Citi Personal Wealth Management ("**CPWM**") and is located in New York City, NY, USA, and is an investment adviser firm and a brokerage firm.

33. The Defendant, **John P. Havens ("Havens")**, is located in New York, NY, USA; and was the CFO of Citigroup and the CEO of CGMI.

34. The Defendant, **Xiao-mei (Linda) Wang ("Wang")**, is located in Naperville, Illinois, USA and is a registered individual representative of the Citigroup broker-dealer firm.

## IV. FACTS

### Misconducts et al of Citigroup, CPWM, and Wang

35. Plaintiffs are long-time customers of Citibank. They visited the Citibank branch office in Naperville, IL where **Wang** has an office space and told the cashier on March 29, 2010 that they wanted to invest their savings to make more money than interest paid by certificate of deposit ("CD") when their CD would mature on April 13, 2010. The cashier told Plaintiffs that the old brokerage office there was closed and **Wang** of CPWM could help. Plaintiffs walked to and told **Wang** that Plaintiffs' primary investment objective is growth on March 29, 2010.

36. **Wang** did not give Plaintiffs a current Prospectus at the time of recommendation on March 29, 2010.

37. **Wang** did not give Plaintiffs a separate, brief, and easy-to-read (written in "plain English") risk disclosure document that highlights the main features of the particular VA transaction at the time of recommendation on March 29, 2010.

38. **CPWM** didn't develop and document specific training policies or programs reasonably designed to ensure that associated persons who effect and registered principals who review transactions in deferred VAs comply with the requirements of National Association of Securities Dealers ("**NASD**") Conduct Rule 2821 and that they understand the material features of deferred VAs.

39. Neither **Citigroup** nor **CPWM** established and maintained specific written supervisory procedures reasonably designed to achieve compliance with the standards set forth in NASD or Financial Industry Regulatory Authority ("**FINRA**") Conduct Rules.

40. **Wang** did not have thorough knowledge of the specifications of the VA that she recommended at the time of recommendation on March 29, 2010.

41. **Wang** did not receive any specific product/benefit training prior to the time of recommendation on March 29, 2010.

42. **Wang** used Prudential's "Highest Daily Lifetime 6 Plus Income Benefit" brochure to misrepresent Prudential VA with Income Benefit on March 29, 2010.

43. **Wang** used three unapproved sales materials to misrepresent that "Prudential VA with Highest Daily Lifetime 6 Plus Income Benefit" would grow at least 6% at the time of recommendation on March 29, 2010. A copy of said three unapproved sales materials is attached as **EXHIBIT A**.

44. **Wang** misrepresented that "Benefit Fee was rider charge by Prudential for the minimum guaranteed 6% growth" at the time of recommendation on March 29, 2010; and again on December 6, 7, and 8, 2011. A copy of **Wang**'s e-mails dated from December 7, 2011 to January 5, 2012 is attached as **EXHIBIT B**.

45. **CPWM** misrepresented on March 13, 2012 that "commissions et al were fully disclosed to Plaintiffs also on the Confirmation of Trade." A copy of CPWM's letter dated March 13, 2012 is attached as **EXHIBIT C**.

46. **CPWM** misrepresented on March 13, 2012 (**EXHIBIT C**) that "on March 29, 2010, Wang went over **the auto transfer feature** that may be triggered by a volatile market."

47. On March 19, 2012, Plaintiffs asked **CPWM together** with **Wang** to show Plaintiffs how the 17 "Benefit Fund Transfers" documented in 2011 Transaction History fit into the "Transfer Mathematical Formula" of **the auto transfer feature**.

48. Neither **CPWM** nor **Wang** could tell Plaintiffs how **the auto transfer feature** works for the underlying 17 "Benefit Fund Transfers" as of today.

49. Plaintiffs gave **Wang** a check of $100,000 to purchase said VA product with income benefit on March 29, 2010 based on Wang's misrepresentations.

50. **Wang** gave Plaintiffs' check to a Citibank cashier in Wang's working place on March 29, 2010 and asked the casher to hold it until to April 13, 2010.

51. **Wang** opened a CPWM Broker/Dealer account for Plaintiffs on March 29, 2010 without forwarding to a registered principal for suitability review. A copy of the CPWM brokerage firm account application form; and Plaintiffs' authorizations dated April 16, 2010 and April 16, 2012 is attached as **EXHIBIT D**.

52. **Wang** recommended "AST Preservation Asset Allocation Portfolio", which shall be deemed to be one of underlying registered mutual funds of **the Trust**, to Plaintiffs without disclosing that said portfolio was actually an unregistered fund disguised as said underlying registered mutual fund and was already doped with scalable amount of mispriced "junk bonds", on March 29, 2010.

53. **Wang** filled out a Prudential VA application form except the beneficiary information for Plaintiffs and told Plaintiffs where to sign on March 29, 2010. The signed application form, which was enclosed in the CPWM letter dated March 13, 2012 (**EXHIBIT C**), indicated that **Wang** did not give Plaintiffs the Prospectus when **Wang** filled out the form for Plaintiffs on March 29, 2010. A copy of the Prudential VA application form is attached as **EXHIBIT E**.

54. The Prudential VA application form (**EXHIBIT E**) was given back to **Wang** when the $100,000 CD of Plaintiffs matured and after Citigroup wired $100,000 from Plaintiffs' account to CPWM Broker/Dealer's account directly on April 13, 2010.

55. **Citigroup** did not return the unused check of $100,000 back to Plaintiffs

56. **CPWM** misrepresented on March 13, 2012 that "**Wang** gave Michael Wu and Ms. Wu the Prospectus on March 29, 2010" pursuant to the letter dated March 20, 2012 from **Hagan**, which said that "our records indicate that you received a prospectus on April 15, 2010." A copy of the letter dated March 20, 2012 from **Hagan** is attached as **EXHIBIT F**.

57. Plaintiffs told **Wang** on March 29, 2010 that Michael Wu was leaving for China.

58. **CPWM** said on March 13, 2012 (**EXHIBIT C**) that "**Wang** informed CPWM that Michael Wu was not present on April 16, 2010 when the contract was issued."

59. **Wang** could not and did not give Michael Wu a Prospectus on April 15, 2010.

60. **CPWM** should buy and put the underlying registered "AST Preservation Asset Allocation Portfolio" of **the Trust** rather than the underlying unregistered one of **the Fund** in Plaintiffs' CPWM account on April 16, 2010.

61. **CPWM** is the one and only broker-dealer of Plaintiffs (**EXHIBITs D and E**).

62. **CPWM** never sends Plaintiffs a trade confirmation.

63. **CPWM** is merely a storefront that does not get involved in any transaction.

64. The VA account values of Plaintiffs shown in quarterly statements, which are generated by **CPWM**, differ from that shown in quarterly statements, which are generated by **PAI**, on the same valuation day (**EXHIBIT F**).

65. Plaintiffs' application form for **CPWM** broker-dealer account (**EXHIBIT D**) told **CPWM** not to reinvest Plaintiffs' dividends.

66. **CPWM** generated quarterly statements show that Plaintiffs never receive dividends since April 16, 2010.

67. Plaintiffs' application form for **CPWM** broker-dealer account (**EXHIBIT D**) said that "Dividend Reinvestments: Reinvest dividends into additional shares automatically."

68. **CPWM** generated quarterly statements show that Plaintiffs never receive additional shares since April 16, 2010.

## Prudential Variable Annuity (VA) Products Are Private Placements

69. **Prudential VAs** contracts are securities.

70. *Prudential VA Prospectus* says that "**each underlying mutual fund** is **registered** as an open-end management investment company under the Investment Company Act of 1940."

71. **Hagan** said on March 20, 2012 (**EXHIBIT F**) that "Prudential VA products **are not** mutual funds, but rather are **annuity products** that invest in mutual funds."

72. *PICA Brochure* says that many of **Prudential VA products** are supported by investments PICA holds in various types of **registered** and **unregistered** insurance company separate accounts.

73. **Grier** said on February 7, 2008 that **PFI** has **hedging instruments**. A copy of Grier's statement is attached as **EXHIBIT G**.

74. **Grier** said on February 10, 2010 (**EXHIBIT G**) that **PFI** has **hedging equities**.

75. *PIM Brochure* says that PIM's portfolio managers manage **unregistered** insurance company separate accounts of **unregistered funds (including hedge funds)**.

76. *Prudential VA Prospectus* indicates that many portfolios may have exposure to non-investment grade bonds, which are commonly known as "**junk bonds**".

77. **PFI hedging equities** (**EXHIBIT G**) consist of **unregistered hedge funds** and "**junk bonds**".

78. **Unregistered hedge funds** of **PFI** hedging equities are unaffiliated mutual funds, which are also known as variable insurance trusts ("**VITs**"), which are mentioned in *PI Brochure* and are not mentioned in *Prudential VA prospectus*.

79. **VITs** of **PFI** neither are registered with the United States Securities and Exchange Commission ("**SEC**") nor meet an exemption.

80. **Prudential VA products** are unregistered **VITs** of **PFI**.

81. **Prudential VA products** are underlying unregistered funds of **the Fund**, which are disguised in the Prudential VA application form (**EXHIBIT E**) as underlying registered mutual funds of **the Trust**.

82. *PI Brochure* says that PI et al allocate VA contract values to **VITs**.

83. **PFI** sold VA individuals underlying disguised (or pirate or unregistered) mutual funds of **the Fund**, not underlying registered mutual funds of **the Trust**, when **Pruco Life** issued VA contracts to underlying VA individuals.

84. Underlying **AST Investment Grade Bond Portfolio** of **the Trust** (**EXHIBIT E**), which is documented in *Prudential VA prospectus* is actually an unregistered fund of non-investment grade bonds, or the commonly known "**junk bonds**".

85. *Prudential VA Prospectus* said that all of the assets attributable to **the fixed-income segment** are invested in the unregistered **AST Investment Grade Bond Portfolio**.

86. The **AST Preservation Asset Allocation Portfolio** of **the Trust**, which was recommended by **Wang** on March 29, 2010 (**EXHIBIT E**), already contained significant amount of non-investment grade "**junk bonds**" prior to March 29, 2010 (**EXHIBIT G**).

## PFI et al Manipulate Security Prices

87. **PAI** never publishes **firm quotes** for **"AST Investment Grade Bond Portfolio"** and "**AST Bond Portfolios 2017~2024**" at website *http://www.annuities.prudential.com/investor* under the tab "Prices and Performance", "Prices", and then "Products". A copy of sample **PAI**'s publication is attached as **EXHIBIT H**.

88. **PAI** publishes multiple **quotes** with different unit prices for the same disguised mutual fund of **the Fund,** one for each of **Prudential Annuities products**, at website *http://www.annuities.prudential.com/investor* under the tabs "Prices and Performance", "Prices", and then "Products". A copy of sample **PAI**'s publication is attached as **EXHIBIT I**.

89. **PIM et al** smuggle scalable amount of **AST Investment Grade Bond Portfolio** into all of the assets attributable to **the fixed-income segment**.

90. **Marcks** said on June 4, 2009 that target date funds (i.e., **AST Bond Portfolios 2017~2024**) and similar investment options (i.e., **AST Investment Grade Bond Portfolio**) are institutionally (mis)priced. A copy of Marcks' letter dated June 4, 2009 is attached as **EXHIBIT J**.

91. **Grier** said on February 9, 2012 that "the capital requirements on the investment-only stable value products are pretty small."

92. **PAI** privately changed the mispriced unit price of a disguised mutual fund of **the Fund** for prohibited transactions, which were already executed on unregistered

exchanges. A copy of the letter dated July 27, 2012 from **PAI** is attached as **EXHIBIT K**.

## Misrepresentations of Strangfeld et al

93.  *Prudential VA Prospectus* misrepresents that the **AST Investment Grade Bond Portfolio of the Trust**, which is a portfolio of non-investment grade "junk bonds", is also registered as an open-end management investment company under the Investment Company Act of 1940.

94.  *Prudential VA Prospectus* misrepresents that "we are the legal owner of the shares of the underlying mutual funds in which the Sub-accounts invest. However, under current SEC rules, you have voting rights in relation to Account Value maintained in the Sub-accounts."

95.  *Prudential VA Prospectus* misrepresents that "paying out greater compensation to firms and individual registered representatives and branch managers for selling the Annuities (**EXHIBIT C**) will not result in any additional charge to you."

96.  **PAI (Davis)** misrepresented on December 8, 2011 that on each business day, the formula monitors fluctuations in the VA contract value, the projected Annual Income Amount, and other factors, relative to certain "reallocation triggers". A copy of the letter dated December 8, 2011 from **PAI** (Davis) and the formula is attached as **EXHIBIT L**.

97.  **PAI (Davis)** misrepresented on December 8, 2011 (**EXHIBIT L**) that "the proprietary formula systematically transfers amount between the Permitted Sub-accounts and the AST Investment Grade Bond Portfolio."

98.  **PAI (Davis)** misrepresented on December 8, 2011 (**EXHIBIT L**) that "the rebalancing program is intended to increase our investment flexibility."

99.  **PAI (Davis)** misrepresented on December 8, 2011 (**EXHIBIT L**) that "the rebalancing program will automatically rebalance on the benefits **quarterversary** basis according to most recent allocation under the program established on the contract."

100. **PAI (Davis)** misrepresented on December 8, 2011 (**EXHIBIT L**) that "when you signed the application you authorized us to make these transfers on your annuity contract".

101. **Hagan** misrepresented on February 23, 2012 that the intent and operation of the Spousal Highest Daily Lifetime 6 Plus ("SHD6 Plus") were clearly described in the sales material and prospectus you received and reviewed prior to purchase (**EXHIBITS D, E,** and **F**)." A copy of **Hagan's** Letter dated February 23, 2012 is attached as **EXHIBIT M**.

102. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "the mutual funds underlying the VA contract owner's contract (**A**) are mutual funds, like all other mutual funds (**B**)." [Plaintiffs' Note. (**A**) are underlying **unregistered** funds of **the Fund** doped with scalable amount of mispriced "junk bonds", which disguise as (**B**), which are underlying **registered** mutual funds of **the Trust**. They look alike but are unlike materially.]

103. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "the sales material, contract and prospectus contain no misrepresentations."

104. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that the transactions related to the pre-determined mathematical formula are not subject to arbitrage and the sub-accounts underlying your annuity contract are not mispriced."

105. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "DBRT relates to defined benefit retirement **plans** and not to individual annuity contracts such as yours."

106. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "the proprietary formula attempts to help lessen both your investment risk and Prudential's financial risk in a down market through the benefit fund transfers."

107. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "any investment loss in your contract is not considered gain by Prudential."

108. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "dividends and distributions of underlying mutual funds of VA contracts are reinvested and reflected in the accumulation unit value."

109. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "no variable annuity contract owner of any insurance company ever receives a direct payment of underlying mutual fund dividend or distributions."

110. **Carbone** said on February 10, 2011 that "Given PICA's excess statutory capital position in relation to our target, **PICA** paid dividends to **Prudential Financial** of $3 billion in 2010."

111. **Carbone** said on February 9, 2012 that "During the year, **Prudential Insurance** paid dividends totaling $1.6 billion to the holding company, **Prudential Financial, Inc.**, essentially moving excess capital to the parent company and thereby enhancing our financial flexibility."

112. **Hagan** misrepresented on March 20, 2012 (**EXHIBIT F**) that "**Wang** received specific product/benefit training from her Citigroup broker-dealer firm prior to your purchase of your annuity and living benefit (**EXHIBIT C**)."

113. **Weissberger** misrepresented on May 14, 2012 that "we note that **Prudential Annuities** is **not** a brokerage firm." A copy of Weissberger's Letter dated May 14, 2012 is attached as **EXHIBIT N**.

114. **Weissberger** misrepresented on May 14, 2012 (**EXHIBIT N**) that "as all annuity financial transactions are priced on **the day** in which they are received, meeting the requirements of FINRA and the SEC."

115. **Weissberger** misrepresented on May 14, 2012 (**EXHIBIT N**) that "as transaction confirmations are produced and mailed **the next business day**, meeting the requirements of FINRA and the SEC".

116. **Pruco Life** misrepresented in the sale material "Highest Daily Lifetime 6 Plus Income Benefit" that account values of VA individuals are transferred between "Your Chosen Investment Options" and "Bond Portfolio". A copy of **Pruco Life's** misrepresentations on asset transfers is attached as **EXHIBIT O**.

117. **Hagan** misrepresented on June 15, 2012 that "the asset transfers between the Bond Portfolio and your sub-accounts are entirely normal and based upon this (predetermined mathematical) formula." A copy of Hagan's letter dated June 15, 2012 is attached as **EXHIBIT P**.

118. **Marcks** misrepresented on June 4, 2009 (**EXHIBIT J**) that **PFI guarantees** are insurance guarantees, which enable retirement plan participants to protect their retirement income against market downturns while allowing continued measured exposure to equity investments.

119. **Grier** misrepresented on February 5, 2009 (**EXHIBIT G**) that "**the customer** agrees to our **daily rebalancing** from the **selected funds** to fixed income investments in support of **the guarantee** when there are equity market declines." A copy of the auto-rebalancing feature of **Grier** is attached as **EXHIBIT Q**.

120. **Grier** misrepresented on February 10, 2011 (**EXHIBIT G**) that auto-rebalancing feature reallocates **customer funds** to fixed income investments to support **our guarantees** in the event of market declines (**EXHIBIT Q**).

121. **PFI** et al completed **seventeen (17)** "Pension Risk Transfer" transactions via in-house "Benefit Fund Transfer" transactions in 2011 (**EXHIBIT Q**).

122. **Strangfeld** misrepresented in **PFI** 2011 Annual Report that "In 2011, Prudential completed **four** pension risk transfer transactions, including its first longevity reinsurance transaction and the U.S.'s first pension plan risk transfer transaction utilizing **a buy-in** of a specially designed **annuity product**." A copy of **PFI** 2011 Annual Report is attached as **EXHIBIT R**.

123. *PICA Brochure* misrepresents that "many of our variable insurance and annuity products are supported by investments we hold in various types of registered and **unregistered** insurance company separate accounts" without spelling out.

124. *PICA Brochure* misrepresents that "we have **three institutional investment advisory clients**, each a defined benefit retirement plan" without spelling out.

125. *PICA Brochure* misrepresents that "**holders of variable insurance contracts** supported by our **unregistered** insurance company separate accounts, generally employee benefit plans, are **holders of securities issued by Prudential**" without spelling out.

126. *PICA Brochure* misrepresents that "**holders of our variable insurance contracts** are **not our investment advisory clients**, and **the assets we hold**

**in our separate accounts** that support such insurance contracts are **not our client assets under management**" without spelling out.

127. **PICA Brochure** misrepresents that "we provide retirement record-keeping and administrative services and **stable value investment products** to a wide variety of defined benefit and defined contribution plans" without spelling out.

128. **PI Brochure** misrepresents that "**the affiliated insurance companies** enter into participation agreements with VITs in order to purchase shares of the VITs" without spelling out.

129. **PI Brochure** misrepresents that "**the contracts** permit allocation of contract values to VITs" without spelling out.

130. **PI Brochure** misrepresents that "VITs are offered through **group variable annuities** sold to (three) retirement plans and IRAs" without spelling out.

131. **PIM Brochure** misrepresents "**unregistered funds (including hedge funds)**" without spelling out.

132. **PIM Brochure** misrepresents "**commingled vehicles**" without spelling out.

133. **PIM Brochure** misrepresents "**the proprietary accounts of certain other affiliates of PIM**" without spelling out.

### Devices, Schemes, or Artifices

134. **PFI** et al use the term "**investment-only stable value products**", which were mentioned by **Grier** on February 9, 2012 (**EXHIBIT G**), to cover up mispriced "junk bonds" in **AST Investment Grade Bond Portfolio** et al.

135. **PFI** et al use mispriced "junk bonds" in "**Bond Portfolio**" to defraud account values of VA individuals (**EXHIBITs O and Q**).

136. **PFI** et al use the term **VITs** to cover up the **unregistered funds** (including **hedge funds**) of **Prudential VA products** (**EXHIBIT F**).

137. **PFI** et al disguise **unregistered VITs** of the Fund as underlying **registered mutual funds** of the Trust (**EXHIBITs E and F**).

138. **Unregistered PICA accounts** are used to keep **unregistered VITs of the Fund**, which are unregistered **hedge funds** and mispriced "junk bonds"

139. Underlying **unregistered hedge funds** of such **unregistered VITs** are daily transferred **in-house** between "**Your Chosen Investment Options**" sub-accounts of PFI and their 1-to-1 corresponding ones of VA individuals to maintain consistence of the manipulated **PRU** market cap via real **"Pension Plan Risk Transfer"** transactions of **the robust capital protection scheme (EXHIBIT R)**, which disguised as **"Benefit Fund Transfer"** transactions of **the daily auto-rebalance scheme (EXHIBIT Q)**, during **stage 1**.

140. Underlying mispriced **"junk bonds"** of such **unregistered VITs** are transferred **in-house** between "**Bond Portfolio**" sub-accounts of **PICA** and that of VA individuals to defraud account values of VA individuals on the opposite direction whenever **unregistered hedge funds** are transferred between them during **stage 1**.

141. **PFI** et al smuggle scalable amount of such non-capital "**junk bonds**" into many underlying unregistered mutual funds of **the Fund**, which disguise as underlying registered mutual funds of **the Trust**, to further defraud account values of VA individuals during **stage 1**.

142. Underlying registered PICA accounts of **the Trust** are used by **PFI** to expose the capital funds of **PFI** and VA individuals in underlying unregistered PICA accounts of **the Fund** to the financial risks, which are transferred to VA individuals by **PFI** via real daily **"Pension Plan Risk Transfer"** transactions at **stage 1** and then the synthesized quarterly ones at **stage 2 (EXHIBITs F, G, Q, and S)**. I.e., market gains of **the Trust** are retained by **PFI** and market losses of **the Trust** are transferred to VA individuals by using the robust capital protection scheme **(EXHIBITs G and R)**.

143. **Grier** said on February 10, 2011 **(EXHIBIT G)** that "At the trough of the market, <u>more than 3/4 of the account values</u> were in <u>auto-rebalance fixed income accounts</u>."

144. The disguised "**AST Preservation Asset Allocation Portfolio**" was doped with significant amount of mispriced "**junk bonds**" by **PFI** et al in 2010 **(EXHIBIT G)**.

145. **PFI** et al use **the hedged equity**, which **Grier** mentioned on February 10, 2011 (**EXHIBIT G**), to bridge the gap between the disguised mutual funds in "Your Chosen Investment Options" and the mispriced "junk bonds" in "Bond Portfolio".

146. The projected annual income amount (**EXHIBIT L**) is calculated based on the 13% to 14% of **PRU** ROE arbitrage, which is predetermined by **Strangfeld** et al.

147. **Grier** told Suneet Kamath (Sanford C. Bernstein & Co., LLC, Research Division) on February 9, 2012 that the capital requirements on **Annuities** are more capital-intensive than the **investment-only stable value products**.

148. **The auto-rebalance feature** of Grier (**EXHIBIT G**) uses capital funds of VA individuals as weights to daily auto-rebalance the projected market cap of **PRU** based on the need of the projected annual income amount (**EXHIBIT L**).

149. **The predetermined mathematical formula** (**EXHIBIT L-2**), which is documented in *Prudential VA Prospects*, does not disclose **the initial value** of the "P – Income Basis", which is used to drive the formula, and **the beneficiary** of the "P – Income Basis" where "P – Income Basis" is the projected annual income amount of PRU. **PFI** is **the beneficiary** of the "P – Income Basis".

150. The at least 20% **impediment** of the **Customer Portfolios Program** ("**CPP**"), which is documented in the *Prudential VA Prospectus*, is not prescribed in the public interest or for the protection of investors.

151. **The robust capital protection framework**, which **Strangfeld** mentioned in *2011 PFI Annual Report* (**EXHIBIT R**), is the 2-stage, arbitrage-based, DBRT embezzlement scheme, which uses **a)** the daily auto-rebalancing scheme (**EXHIBITs F and G**) to steal capital funds and market gains of VA individuals during stage 1, and **b)** the CPP scheme of stage 1 to cover up the "Pension Plan Risk Transfer" scheme, which uses synthesized transactions to cook the books, at stage 2 (**EXHIBIT F**), to protect the 13% to 14% of ROE arbitrage of **PRU**, which is predetermined by **Strangfeld et al.**

152. Tom Granaghan of Lord, Abbett & Co. LLC ("Lord Abbett"), an underlying Mutual Fund Company of **the Trust**, said on June 11, 2012 that "**the Trust** is

not available for direct investment by VA individuals". A copy of the e-mail dated June 11, 2012 from Tom Granaghan is attached as **EXHIBIT S**.

153. **PFI** et al allocate "**Investments of VA Individuals**" to Prudential VA products (**EXHIBIT F**), which are underlying unregistered funds (including hedge funds) of **the Fund** disguised as underlying registered mutual funds of **the Trust** (**EXHIBITs E and P**), via prohibited transactions on unregistered exchanges.

154. **Hedge funds** are made available only to certain sophisticated or accredited investors and cannot be offered or sold to the general public pursuant to **Dodd–Frank Wall Street Reform and Consumer Protection Act** [Public Law 111-203]. PFI et al sell unregistered funds (including hedge funds) to VA individuals who are the general public (**EXHIBITs E, F, and S**).

155. The **PFI** manipulated "**Benefit Fund Transfers**" use the daily auto-rebalancing scheme of **Grier** (**EXHIBITs G and Q**), which repeatedly uses the disguised mutual funds, the non-capital "**AST Investment Grade Bond Portfolio**", the projected annual income amount, the illegal "late trading and market timing" practices of 2003 Mutual Fund Scandal, and prohibited transactions on unregistered exchanges without forwarding such transactions to underlying contractual intermediaries for compliance reviews, to steal capital funds of VA individuals when the market downturns and then market gains of VA individuals when the market upturns (**EXHIBITs Q, and R**).

156. **PIM** charged the Trust, for example, $9,868,867, $32,648,835, and $46,133,870 of (mis)management fees and expenses in managing the **AST Investment Grade Bond Portfolio** of "junk bonds" in 2010, 2011, and 2012 respectively.

157. The permitted "**Reallocations of VA Individuals**" only allow VA individuals to trade the disguised mutual funds in "your chosen investment options" sub-accounts under VA individuals with that under **PFI** (**EXHIBIT R**) and do not allow VA individuals to get rid of the mispriced "junk bonds", which were smuggled into their "Bond Portfolios" by **PFI** et al during "Benefit Fund Transfers" (**EXHIBIT O**).

158. **Pruco Life** said in *Prudential VA Prospectus* that "We have **market timing** policies and procedures."

159. The market timing policies and procedures, which are documented in *the Prospectus*, restrict individual clients to have only one transaction in any particular sub-accounts within 30 calendar days.

160. PI directed 17 batches of "Benefit Fund Transfers" for **PFI** from August 5, 2011 to December 16, 2011 (**EXHIBIT Q**), for example, which are more frequently than allowed in the *Prudential VA Prospectus*.

161. In a novel interpretation of New York's Martin Act, Spitzer contended that fund firms committed "**market timing**" fraud when they allowed some clients to trade more frequently than allowed in their fund documents and Prospectus. A copy of **2003 Mutual Fund Scandal**-related documents is attached as **EXHIBIT T**.

162. In Statement of 3Q2012, **PAI** privately reversed two batches of already executed transactions of **in-house** "Benefit Fund Transfers" from **PFI selling disguised mutual funds to VA individuals** to **PFI buying them back from VA individuals**, which were executed on June 15, 2012 and June 18, 2012 respectively, in favor of **PFI** without the involvements of buyers/sellers, broker-dealers, compliance reviewers, registered exchanges, and underlying Mutual Fund Companies; and did not produce and mail the trade confirmations of such reversals to VA individuals, which violated **NYSE Rule 5210**. A copy of the statement of said reversals is attached as **EXHIBIT U**.

163. Quarterly "**Benefit Fee**" transactions (**EXHIBITs B, C, Q-2, Q-3, and R**) are prohibited transactions used to transfer disguised mutual funds and mispriced "junk bonds" from VA individuals to **PFI** et al during stage 1 of each benefit quarter.

164. Quarterly "**Program Rebalance**" transactions (**EXHIBITs L, Q, and R**) under the **CPP**, which are prohibited transactions executed on unregistered exchanges between VA individuals and **PFI** during stage 1 of each benefit quarter, are used to cover up the quarterly "**Pension Risk Transfer**" buy-ins (**EXHIBITs Q-2, Q-3, and R**), which are done at stage 2 on each benefit quarter

by using synthesized transactions, which are formed by combining all prohibited transactions done during stage 1 of each benefit quarter.

165. Quarterly "**Pension Risk Transfer**" transactions (**EXHIBIT R**), which are done between underlying unregistered omnibus accounts of **the Fund**, which are maintained by **PICA**, and underlying registered omnibus accounts of **the Trust**, which are maintained by underlying Mutual Fund Companies of **the Trust** and also underlying **broker-dealers** of VA individuals respectively, once at stage 2 on each benefit quarter, are used to cook the books.

166. All transaction confirmations, which were produced and mailed to VA individuals **the next business day** (**EXHIBIT N**), and all quarterly statements (e.g., **EXHIBITs Q-2, Q-3, and U**) were forged by **PAI**.

167. **PICA** (Angella Anderson) proposed an offer asking Plaintiffs to cancel the VA contract; and completely release and discharge **PFI** et al on January 20, 2012, which was extended five times after the offer expired (**EXHIBITs F, M, N, P, and W**). A copy of the PICA offer dated January 20, 2012 is attached as **EXHIBIT V**.

168. **Weissberger** misrepresented Prudential VA to **SEC** on April 5, 2012 with misrepresentations of **PAI** (**EXHIBIT L**) and **Hagan** (**EXHIBITs F and M**); and the offer of **PICA** (**EXHIBIT V**). A copy of the letter dated April 5, 2012 from **Weissberger** is attached as **EXHIBIT W**.

**The 2-stage, Arbitrage-based, DBRT Embezzlement Scheme**

169. **Strangfeld** said on February 6, 2014 that "It was in 2010 that we set out an ROE goal of 13% to 14% for 2013."

170. **Carbone** said on February 9, 2012 that "I want to make the point that the ROEs in these (VA) products are supporting that 13% to 14% return."

171. **Grier** said on February 9, 2012 that "Yes, favorable mix shift, if **Annuities slow down** and **investment-only stable value** speeds up, yes. The **wildcard** is the **defined benefit risk transfer ("DBRT")**."

172. **DBRT** of **Grier** is the financial risk management scheme of **PFI** et al.

173. The theory of **DBRT** of **Grier** is an Arbitrage Pricing Model ("**APM**") where the Arbitrageur, **PFI**, projected a 13% to 14% of ROE arbitrage for the **APM**. A copy of the paper, which said that the cornerstone of financial economics has become the principle of no-**risk** (i.e., non-**arbitrage**), is attached as **EXHIBIT X.**

174. The Defined Benefit **("DB")** in **Grier's DBRT APM** is the projected 13% to 14% of annual ROE arbitrage (**EXHIBIT L**), which is predetermined for **PRU** by **Strangfeld** et al.

175. The Risk Transfer **("RT")** in **Grier's DBRT APM** means to transfer **PFI** financial risks to VA individuals by using **Grier's** daily auto-rebalancing scheme (**EXHIBIT Q**), which is used during stage 1 of each benefit quarter to protect the projected **PRU** market cap of **the robust capital protection scheme (EXHIBIT R)**.

176. One of the benefits on the **APM** is taking the benefit of the mispriced securities as profit by arbitrageurs, **Strangfeld** et al. A copy of the paper, which links the benefits of **APM** to that of mispriced securities, is attached as **EXHIBIT Y**.

177. *The Prospectus of the Fund* said that "**PI** can change the allocations without prior notice and without board or shareholder approval."

178. **PI** et al use VITs and the 2-stage arbitrage-based DBRT embezzlement scheme to steal capital funds, market gains, and dividends of VA individuals; and cook the books based on said authorization from the Board of Trustees of **the Fund**.

179. **PFI (Darrell Oliver)** said in ***Prudential News 0222360-00001-00*** dated April 9, 2012 that "**PI** is the mutual fund family of **PFI** (NYSE **PRU**)." A copy of said ***Prudential News*** is attached as **EXHIBIT Z**.

180. **PFI** said that "Mutual funds are distributed by **PIMS**" (**EXHIBIT Z**).

181. **PI** et al commingle hedge funds in **PFI's** annuities account with that in permitted sub-accounts of VA individuals in **unregistered** Prudential proprietary (or omnibus) accounts during **stage 1**. No prohibited transaction between **PFI** and VA individuals (**EXHIBITs Q-2, Q-3, and U**) was forwarded to contractual intermediaries for compliance review according to Eagle Fund Services, another underlying Mutual Fund Company of **the Trust**. A copy of the e-mail dated June 5, 2012 from Eagle Fund Services is attached as **EXHIBIT AA**.

182. Underlying "Pension Risk Transfer" buy-ins of **PFI** (**EXHIBIT R**) use synthesized transactions to invest the commingled vehicles of underlying unregistered hedge funds **of the Fund** in commingled vehicles of underlying registered mutual funds of **the Trust** (**EXHIBITs F, L, R, S, and AA**) at **stage 2** on each benefit quarter.

183. *PIM Brochure* said that "**PIM** may cause securities transactions to be executed for a client's account concurrently with authorizations to purchase or sell the same securities for other accounts managed by **PIM**, including <u>proprietary accounts of affiliates</u>."

184. *PI Brochure* said that "we are affiliated with several U.S.-registered broker-dealers including, but not limited to **Pruco Securities** and **PIMS**. Such broker-dealer affiliates may act in certain capacities. In this regard, one or more broker-dealer affiliates may effect transactions <u>in the capacity of principal or agent on both sides of the transaction</u>".

185. All trade orders of "**Investment**", "**Reallocation**", "**Benefit Funds Transfer**", "**Program Rebalance**", and "**Benefit Fee**" transactions (**EXHIBITs E, F, Q-2, Q-3, R, S, and AA**), which are executed during **stage 1** of each benefit quarter, are prohibited transactions done between VA individuals and **PFI**.

186. **VA Group** poses as both buyer and seller of all trade orders of "**Benefit Funds Transfer**", "**Program Rebalance**", and "**Benefit Fee**" transactions (**EXHIBITs Q-2, Q-3, R, and U**).

187. **PI** affiliated broker-dealers are NOT authorized broker-dealers of VA individuals (**EXHIBITs D and E**).

188. All trade orders of prohibited in-house transactions done between **PFI** and VA individuals are transmitted and received through the same <u>unauthorized</u> **PI** affiliated broker-dealers (**EXHIBIT R**).

189. *PI Brochure* said that "**PIMS, a registered <u>broker-dealer</u>** (File No. 8-36540), **acts as <u>clearing broker</u>** for <u>mutual fund transactions</u> associated with Pruco's wrap fee programs for which we provide Platform services."

190. **PIMS** is <u>**NOT**</u> a registered national securities exchange.

191. All **prohibited transactions** done between VA individuals and **PFI** are executed on **unregistered exchanges (EXHIBIT R)**.

192. *PI Brochure* said that "Certain **compliance functions** are administered across **subsidiary companies of PFI** for those portfolio assets that are directly managed by affiliated sub-advisers."

193. All **prohibited transactions** done between VA individuals and **PFI** are not forwarded to underlying contractual intermediaries of **the Trust** for compliance reviews (**EXHIBITs R and AA**).

194. **PI** and **ASTIS** use the capital funds of **the Trust** to pay each of underlying contractual intermediaries millions of dollars annually without forwarding any "Benefit Fund Transfer" transaction to them for their conducting compliance review as prescribed by SEC Rule 22c-2 (**EXHIBIT AA**). A copy of new subadvisory (i.e., contractual intermediaries) arrangements is attached as **EXHIBIT AB.**

195. **PICA** uses the books of underlying **unregistered insurance company separate accounts** of **the Fund** to record all prohibited transactions done between VA individuals and **PFI** during **stage 1** of each benefit quarter.

196. **PFI** et al use the chances of quarterly "**Pension Plan Risk Transfers**" (**EXHIBITs L and R**) to cook the books by copying records from the books of underlying **unregistered insurance company separate accounts** of **the Fund**, which are maintained by **PICA**, to that of underlying **registered insurance company separate accounts** of **the Trust**, which are maintained by underlying Mutual Fund Companies of **the Trust** and underlying **broker-dealers** of VA individuals (**EXHIBITs D and E**) respectively, at stage 2 on each benefit quarter.

197. **PI** benchmarks the capital need of PRU based on the 13% to 14% of ROE arbitrage (**EXHIBIT Q-1**), which is predetermined by **Strangfeld** et al for **PRU**.

198. **PI** said in *PI brochure* that "PI provides oversight of the VITs. PI's oversight services include (i) monitoring fund performance; style and **market cap consistency**; and et al", which cannot be done until after **the Trust** prices their NAVs (**EXHIBITS Q-1**).

199. PI uses **market cap inconsistency** of **PRU** to facilitate **PRU market timer** (**EXHIBITS Q-1**).

200. *PI brochure* said that PI provides **proprietary reports including trading management and skill** to Sponsors of Managed Account Wrap Platforms, Insurance Company Separate Accounts of Affiliates, and Affiliated Investment Adviser.

201. PI never provides such **proprietary reports** to VA individuals.

202. PFI et al repeatedly use **PI proprietary reports** to conduct forged in-house "Benefit Fund Transfer" transactions between **PFI** and VA individuals in favor of **PFI** during **stage 1** of each benefit quarter (**EXHIBIT Q**).

203. When the market downturns and trigs the PRU market timer, **PFI** et al steal the PRU needed capital funds from VA individuals (**EXHIBIT Q**), which worth more shares of disguised mutual funds when the market downturns, to protect PFI account values and support PFI's insurance guarantees (**EXHIBITs G and R**).

204. When the market upturns and trigs the PRU market timer, **PFI** et al return the spare capital funds of PRU, which PFI et al stole from VA individuals earlier, back to VA individuals (**EXHIBIT Q**), which worth less shares when the market upturns, to steal market gains of VA individuals (**EXHIBITs G and R**).

205. **PFI** et al never send or give the trade confirmation of underlying transaction to VA individuals **at or before** underlying transaction is completed (**EXHIBIT N**).

206. **PFI** et al never provide VA individuals **the sealed timestamp** of underlying transaction of VA individuals in underlying trade confirmation. A copy of sample trade confirmation, which was fabricated by **PAI**, is attached as **EXHIBIT AC**.

207. VA individuals never act as buyers or sellers in any "Benefit Fee", "Benefit Fund Transfer", "Pension Plan Risk Transfer", and "Program Rebalance" transactions, which are manipulated by **VA group** et al exclusively.

208. **PFI** et al never provide VA individuals **the name(s) of broker-dealer(s)** who submitted and/or received trade orders of VA individuals (**EXHIBIT AC**).

209. **PFI** et al never provide VA individuals **the name of the buyer** in trade confirmation (**EXHIBIT AC**) when VA individuals sell disguised mutual funds and/or "junk bonds" to the buyer via underlying PI affiliated broker-dealer(s).

210. **PFI** et al never provide VA individuals **the name of the seller** in trade confirmation (**EXHIBIT AC**) when VA individuals buy disguised mutual funds and/or "junk bonds" from the seller via underlying PI affiliated broker-dealer(s).

211. **PFI** et al never provide VA individuals **the trade confirmations of underlying PFI's quarterly "Pension Risk Transfer" buy-in transactions**, which are done at stage 2 on each benefit quarter.

212. Plaintiffs asked **Hagan** and **Weissberger** to disclose particular information pursuant to the requirements under 17 CFR § 240.10b-10 Confirmation of transactions on February 13, 2014. A copy of Plaintiffs e-mails dated February 13, 2014 is attached as **EXHIBIT AD**.

213. **PICA** said in the *Supplement dated December 2, 2013 to the current Prospectus, Prospectus and Statement of Additional Information (SAI) of the Fund* that the equity portion of the Portfolio is generally managed as an index fund, designed to perform similarly to the holdings of the Standard & Poor's 500 Composite Stock Price Index ("S&P 500").

214. **Grier** said on February 10, 2011 (**EXHIBIT G**) that "Our auto-rebalancing algorithm has functioned well, producing net transfers of about **$7 billion** from auto-rebalanced fixed income investments to funds that clients have selected since the market trough in early 2009."

215. **Grier** said on February 9, 2012 (**EXHIBIT G**) that "Our highest daily protected value feature, coupled with auto-rebalancing tailored to each customer's account, clearly distinguishes our product and has a proven track record of **more than 5 years** with clients and their advisors."

216. **Andrew Frye** of **Bloomberg** said on March 19, 2012 that "Prudential CEO Can Be Rewarded for Missing Target". **Strangfeld** et al use the DBRT wildcard of **Grier** to steal capital funds and market gains of VA individual to auto-rebalance the projected PRU market cap and the capital funds available in contracts of VA

individuals far exceed underlying PRU market cap; and, therefore, **Strangfeld** would never miss target. A copy of the news dated March 19, 2012 is attached as **EXHIBIT AE**.

217. **Wall Street** said that S&P 500 gained <u>46.9705%</u> (or 590.72) from 1,257.64 on December 31, 2010 to 1,848.36 on December 31, 2013 but **PAI** said that Plaintiffs' account value gained only <u>0.96%</u> (or $1,061) from $110,096 on December 31, 2010 to $111,157 on December 31, 2013. A copy of statements showing Plaintiffs' account values on 12/31 from 2010 to 2013 is attached as **EXHIBIT AF.**

218. **PAI** said that the unit values of AST Cohen & Steers Realty, AST Lord Abbett Core Fixed Income Portfolio, AST Marsico Capital Growth, and AST Neuberger Berman Mid-Cap Growth, which were the Plaintiffs' portfolio chosen on July 20, 2011, went up <u>**5.4811%**</u>, <u>**2.6191%**</u>, <u>**35.0011%**</u>, <u>**32.4899%**</u>, and <u>**28.4498%**</u> respectively from July 20, 2011 to December 31, 2013.

219. B**loomberg (EXHITBIT AE)** said on March 19, 2012 that "**Strangfeld** said that **PRU** ROE was 11% to 11.5% in 2011; and Prudential set an ROE target of 12 percent, on average, for the three years through 2014, targeted 2012 ROE of 10.9% to 11.9%, and was focusing on boosting ROE to 13% to 14% in 2013."

220. **PFI** said that <u>**PRU**</u> made <u>**10.47%**</u> of ROE and **PAI** said that <u>Plaintiffs'</u> account value, after being inflated with over 42% of mispriced "junk bonds", lost <u>**11.10%**</u> while **Wall Street** said that <u>S&P 500</u> **made even**, after S&P 500 distributed 2.09% of dividends, in 2011.

221. **PAI** said that <u>Plaintiffs' VA contract value</u> went down $737.77 (or <u>**-0.6605%**</u>) from $111,691.77 on July 20, 2011 when Plaintiffs did their third reallocation to $110,954 on December 31, 2013 while **Wall Street** said that <u>S&P 500</u> went up 522.52 (or <u>**39.4105%**</u>) from 1,325.84 to 1,848.36 during the same period.

222. **Zachary Tracer** of **Bloomberg** said on February 6, 2014 that "<u>**PRU**</u>'s adjusted return on equity ("ROE") in 2013 was <u>**15.2%**</u>, beating **Strangfeld**'s target of 13% to 14%" and "The stock has gained 41% in the past 12 months". A copy of Tracer's statement is attached as **EXHIBIT AG**.

223. **Wall Street** said that <u>S&P 500</u> gained 422.17 (or **29.6012%**) from 1,426.19 to 1,848.36 in 2013, which was near twice of what **PRU** gained in 2013.

224. **PAI** said that <u>Plaintiffs'</u> contract value increased only **7.1235%** (or $7,378.22) from $103,575.78 on December 31, 2012 to $110,954 on December 31, 2013, which was less than half of what **PRU** gained in 2013.

225. More than **22%** (< 29.6012% - 7.1235%) of market gains of VA individuals were stolen by **PFI** et al if the gain of S&P 500 is used as the base, or up to **33.87%** (< 41% - 7.1235%) of that were stolen by **PFI** et al if the gain of **PRU** (**EXHIBIT AG**) is used as the base, in 2013.

226. **Strangfeld** used the stolen 22% (or 34%) of market gains of VA individuals to reward **PFI** executive officers, Investment Managers of **the Fund**, Portfolio Managers of **the Fund**, **PFI** employees, **PRU** shareholders, and contractual intermediaries of **the Trust** (**EXHIBITs AE and AG**) who were disabled to comply with SEC Rule 22c-2 by **PFI** et al (**EXHIBITs S and AA**).

227. **Strangfeld** et al allowed sub-account of unregistered "Bond Portfolio" separate account of PFI and mispriced "junk bonds" of private fixed income securities of PICA to be smuggled into all accounts of VA individuals, which violates *NYSE Rule 5210* and the **FINRA** complementary regulatory scheme for the supervision of member firms, which is consisted of *NASD Conduct Rules 3010 and 3012 and FINRA Rule 3130*.

228. **Strangfeld** et al allowed underlying prohibited transactions between **PFI** and VA individuals to be recorded in-house in the books of the unregistered insurance company separate accounts of **the Fund** without being submitted for recording to underlying Mutual Fund Companies of **the Trust** and executed by affiliated unregistered exchange without being forwarded for execution to the unaffiliated clearing broker during stage 1 of each benefit quarter, which violates *NYSE Rule 5210* and the FINRA complementary regulatory scheme for the supervision of member firms.

229. **Strangfeld** et al allowed underlying "pension risk transfer" transactions, which were synthesized by **PFI** et al and were done between **the Fund** and **the Trust**,

to enter into order-routing and execution systems at stage 2 on each benefit quarter, which violates **NYSE Rule 5210** and the FINRA complementary regulatory scheme for the supervision of member firms.

230. **FINRA** (Eugenia Sampat) misrepresented on May 14, 2013 that the private reversals of in-house transactions done by **PAI** exclusively (**EXHIBIT U**) were error corrections. A copy of the e-mail dated May 14, 2013 and the FINRA letter dated June 13, 2013 is attached as **EXHIBIT AH**.

231. **Fund Industry Intelligence** uses "lifetime achievement award" to reward **RICE** who used her top talent in creating Devices, Schemes, or Artifices, which are used to defraud VA individuals (**EXHIBIT Z**).

232. **Investment Adviser Association ("IAA")** was lobbying for Proprietary Trading, which are prohibited transactions between IAA members and VA individuals, in favor of IAA members with misrepresentations. A copy of the IAA letter dated **February 13, 2012** is attached as **EXHIBIT AI**.

233. **Proprietary Trading** was prohibited effectively on April 1, 2014. **PFI** et al got rid of such mispriced "junk bonds" only in "AST Investment Grade Bond Portfolio" in 1Q 2014 (**EXHIBIT AF**). A copy of the Act is attached as **EXHIBIT AJ**.

234. **Strangfeld** et al use capital funds and market gains of VA individuals to protect PFI account values and support PFI's insurance guarantees (**EXHIBIT G**); and mainly to reward Strangfeld et al. A copy of 2013 compensations of Strangfeld, Grier, and Carbone is attached as **EXHIBIT AK**.

235. The estimated loss of Plaintiffs is near $50,000, which can be justified only by asking PFI et al to revoke all in-house "Benefit Fee", "Benefit Fund Transfer", and "Program Rebalance" transactions; completely eliminate unregistered hedge funds and mispriced "junk bonds" from contracts of VA individuals; and give the credit of all dividends and/or distributions, which were put in PFI pocket by PICA; and disgorge the mismanagement charges, which were charged by or paid to underlying executive officers, investment managers, portfolio managers, and sub-advisers et al, since 2010, back to Plaintiffs. A copy of the estimate and

the counter proposal, which Plaintiffs ask PFI et al to revoke all such in-house transactions, is attached as **EXHIBIT AL**.

## V. COUNTS

### COUNT 1 - Violations of Sections 5(a), 5(b), and 5(c) of the Securities Act

236. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

237. Havens, Wang, CGMI, Citigroup, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, PRIAC, Pruco Life, ASTIS, PI, PIM, PIMS, PAI, Jennison, Pruco Securities, and QMA, singly or in concert, directly or indirectly, sold **private placements** to non-accredited investors (or other purchases) without informing them that they received "restricted" securities, neither meeting either the requirement of Sections 3(b) or 4(a)(2) nor following the ***Rules 504, 505, and 506*** set out under Regulation D of the Securities Act of 1933.

238. By reason of the foregoing, Defendants mentioned in paragraph 237, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Sections 5(a), 5(b), and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(b), and 77e(c)].

### COUNT 2 - Violations of Section 12(a) of the Securities Act

239. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

240. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, PRIAC, Pruco Life, ASTIS, PI, PIMS, PIM, PAI, Jennison, Pruco Securities, and QMA, singly or in concert, directly or indirectly, made an untrue statement of material fact or omitted to state a material fact required to make the statements therein no misleading in the **registration statement** of underlying mutual funds in the Prospectus, reports, news, brochures, and contracts of Prudential VAs, which are securities.

241. By reason of the foregoing, Defendants mentioned in paragraph 240, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 12(a) of the Securities Act [15 U.S.C. § 77l(a)].

**COUNT 3 - Violations of Sections 12(a)(1) and 12(a)(2) of the Securities Act**

242. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

243. All Defendants enlisted in underlying complaint, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, engage in any transaction, practice, or course of selling of offering a security, which violates Sections 5 of the Securities Act and uses **misrepresentations**.

244. By reason of the foregoing, Defendants mentioned in paragraph 243, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Sections 12(a)(1) and 12(a)(2) of the Securities Act [15 U.S.C. § 77l(a)(1) and 77l((a)(2)].

**COUNT 4 - Violations of Section 14 of the Securities Act**

245. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

246. CGMI put a binding statement in CGMI (i.e., CPWM) Broker-dealer Account Application Form. Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title or of the rules and regulations of the Commission shall be void.

247. By reason of the foregoing, CGMI, directly or indirectly, has violated and, unless enjoined, will again violate Section 14 of the Securities Act [15 U.S.C. § 77n].

**COUNT 5 - Violations of Section 15(a) of the Securities Act**

248. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

249. All Defendants enlisted in underlying complaint, singly or in concert, directly or indirectly, violate the rule of **liability of controlling persons**.

250. By reason of the foregoing, Defendants mentioned in paragraph 249, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 15(a) of the Securities Act [15 U.S.C. § 77o(a)].

## COUNT 6 – Violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act

251. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

252. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Securities, Pruco Life, PRIAC, ASTIS, PI, PIM, PIMS, PAI, and PAD directly or indirectly, singly or in concert, in the offer and sales of Prudential VAs, which are securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have (1) employed **devices, schemes, or artifices to defraud**; (2) made **untrue statements of material fact**, or **omitted to state material facts** necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in transactions, practices, or courses of business which operate or would operate as a **fraud or deceit** upon the purchase of securities.

253. By reason of the foregoing, Defendants mentioned in paragraph 252, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Sections 17(a)(1), 17(a)(2), and 17(a)(3) of Securities Act [15 U.S.C. § 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

## COUNT 7 – Violations of Section 5 of the Securities Exchange Act

254. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

255. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, PIRAC, ASTIS, PI, PIM, PIMS, PAI, PAD, Jennison, LSV, Marsico, QMA, T. Rowe Price, William Blair, Global Portfolio, Prudential Bache, and Pruco Securities, singly or in concert, directly or indirectly, engage in transactions, practices, or courses of executing "Benefit Fund Transfer" **transactions on Unregistered Exchanges** and the volume of underlying transactions is too big to be traded on Unregistered Exchanges.

256. By reason of the foregoing, Defendants mentioned in paragraph 255, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 5 of the Securities Exchange Act [15 U.S.C. § 78e].

## COUNT 8 - Violations of Sections 9(a), 9(b), and 9(j) of the Securities Exchange Act

257. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

258. Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, ASTIS, PAI, PAD, Global Portfolio, Prudential Bache, PI, PIMS, PRIAC, PIM, Jennison, LSV, Marsico, QMA, T. Rowe Price, William Blair, and PIRAC, singly or in concert, directly or indirectly, engage in acts, practices, or courses of **manipulation of security prices**.

259. By reason of the foregoing, Defendants mentioned in paragraph 258, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Sections 9(a), 9(b), and 9(j) of the Securities Exchange Act [15 U.S.C. § 78i(a), 78i(b) and 78i(j)].

## COUNT 9 – Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder

260. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

261. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Securities, Pruco Life, PRIAC, ASTIS, PI, PIM, PIMS, PAI, and PAD, directly or indirectly, singly or in concert, use unregistered funds (including hedge funds), the projected ROE arbitrage predetermined by Strangfeld et al, the unregistered proprietary accounts of PFI et al, the proprietary misappropriation formula documented in the Prospectus, the proprietary **nonpublic reports** based on "late trading and market timing" practices from PI, unauthorized PI affiliated broker-dealers, PI affiliated compliance reviewers, and unregistered exchanges to make in-house proprietary **insider trading** between VA individuals and PFI in favor of PFI.

262. By reason of the foregoing, Defendants mentioned in paragraph 261, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## COUNT 10 – Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-10(a) thereunder

263. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

264. Havens, Wang, Citigroup, CGMI, Hagan, Weissberger, PAI, PAD, ASTIS, Global Portfolio, Prudential Bache, Pruco Securities, PI, PIM, and PIMS, singly or in concert, directly or indirectly, did not give or send all VA individuals trade confirmation **at or before** completion of such transaction.

265. By reason of the foregoing, Defendants mentioned in paragraph 264, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate SEC Rule 10b-10(a) [17 C.F.R. § 240.10b-10(a)] under Section 10b of the Securities Exchange Act [15 U.S.C. § 78j(b)].

## COUNT 11 – Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-10(a)(1) thereunder

266. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

267. Havens, Wang, Citigroup, CGMI, Hagan, Weissberger, PAI, PAD, ASTIS, Global Portfolio, Prudential Bache, Pruco Securities, PI, PIM, and PIMS, singly or in concert, directly or indirectly, did not disclose **the time** of the transactions in trade confirmation.

268. By reason of the foregoing, Defendants mentioned in paragraph 267, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate SEC Rule 10b-10(a)(1) [17 C.F.R. § 240.10b-10(a)(1)] under Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)] .

## COUNT 12 – Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-10(a)(2) thereunder

269. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

270. Havens, Wang, Citigroup, CGMI, Hagan, Weissberger, PAI, PAD, ASTIS, Global Portfolio, Prudential Bache, Pruco Securities, PI, PIM, and PIMS, singly or in concert, directly or indirectly, did not disclose in transaction confirmations whether **the broker or dealer** is acting as agent for Plaintiffs, as agent for some other person, as agent for both Plaintiffs and some other person, or as principal for its own account; and if the broker or dealer is acting as principal, whether it is **a market maker** in the security (other than by reason of acting as a block positioner).

271. By reason of the foregoing, Defendants mentioned in paragraph 270, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate SEC Rule 10b-10(a)(2) [17 C.F.R. § 240.10b-10(a)(2)] under Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)].

## COUNT 13 – Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-10(a)(2)(i)(A) thereunder

272. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

273. Havens, Wang, Citigroup, CGMI, Hagan, Weissberger, PAI, PAD, ASTIS, Global Portfolio, Prudential Bache, Pruco Securities, PI, PIM, and PIMS, singly or in concert, directly or indirectly, never furnish in transaction confirmations **the name of the person** from whom the security was purchased, or to whom it was sold, for Plaintiffs or the fact that the information will be furnished upon written request of Plaintiffs.

274. By reason of the foregoing, Defendants mentioned in paragraph 273, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate SEC Rule 10b-10(a)(2)(i)(A) [17 C.F.R. § 240.10b-10(a)(2)(i)(A)] under Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)].

### COUNT 14 – Violations of Section 11 of the Securities Exchange Act

275. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

276. Hagan, Weissberger, PICA, Pruco Life, PAI, Pruco Securities, PI, PIM, and PIMS, singly or in concert, directly or indirectly, use **the at least 20% impediment** of the CPP to conduct in-house "Program Rebalance" transactions, which are done during stage 1 of each benefit quarter and are used to cover up the synthesized "Pension Plan Risk Transfer" transactions, which are done at stage 2 on each benefit quarter.

277. By reason of the foregoing, Defendants mentioned in paragraph 276, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate SEC Section 11 of the Securities Exchange Act [15 U.S.C. § 78k].

### COUNT 15 – Violations of Section 11A of the Securities Exchange Act

278. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

279. Hagan, Weissberger, PICA, Pruco Life, PAI, Pruco Securities, PI, PIM, and PIMS, singly or in concert, directly or indirectly, use **the at least 20% impediment** of the CPP to force VA individuals to allocate at least 20% of unregistered hedge funds, which are disguised as underlying registered mutual funds of **the Trust** and sold to them, in their "Your Chosen Investment Options" sub-accounts to purchase designated fixed-income bond portfolios, which contain scalable amounts of mispriced "junk bonds" to further account values of VA individuals, whenever VA individuals submit **"Reallocation"** transactions.

280. By reason of the foregoing, Defendants mentioned in paragraph 279, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate SEC Section 11A of the Securities Exchange Act [15 U.S.C. § 78k-1].

## COUNT 16 –Violations of Section 13(a) of the Securities Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder

281. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

282. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Hagan, Weissberger, PFI, PICA, Pruco Securities, Pruco Life, PAI, ASTIS, PI, PIM, and PIMS, singly or in concert, directly or indirectly, submitted underlying two batches of synthesized "pension risk transfer" transactions for recording to underlying Mutual Fund Companies of the Trust and forwarded them for execution to the unaffiliated clearing broker rather than underlying 17 batches of prohibited in-house "Benefit Fund Transfer" transactions, which were done in 2H 2011, for example, between VA individuals and PFI; and used mispriced "junk bonds" to defraud account values of VA individuals. Therefore, underlying Defendants **failed to file with SEC factually accurate annual and quarterly reports, and accounts** which, in reasonable detail, accurately and fairly reflected its transactions and the dispositions of its assets; and failed to add further material information, if any, as may be necessary to make the required

statements, in the light of the circumstances under which they are made, not misleading.

283. By reason of the foregoing, Defendants mentioned in paragraphs 282, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

## COUNT 17 –Violations of Section 13(b)(2)(A) of the Securities Exchange Act

284. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

285. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Hagan, Weissberger, PFI, PICA, Pruco Life, ASTIS, PAI, PAD, Global Portfolio, Prudential Bache Securities LLC, Pruco Securities LLC, PI, PIM, PIMS, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, singly or in concert, directly or indirectly, submitted underlying two batches of synthesized "pension risk transfer" transactions for recording to underlying Mutual Fund Companies of the Trust and forwarded them for execution to the unaffiliated clearing broker rather than underlying 17 batches of prohibited in-house "Benefit Fund Transfer" transactions, which were done in 2H 2011, for example, between VA individuals and PFI; and used mispriced "junk bonds" to defraud account values of VA individuals. Therefore, underlying Defendants **failed to make and keep books, records and accounts** which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

286. By reason of the foregoing, Defendants mentioned in paragraphs 285, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## COUNT 18 –Violations of Section 13(b)(5) of the Securities Exchange Act and Rules 13b2-1 and 13b2-2 thereunder

287. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

288. Havens, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, ASTIS, PI, PIM, PIMS, PAI, PAD, and Pruco Securities, singly or in concert, directly or indirectly, **knowingly circumvented or knowingly failed to implement a system of internal accounting controls**, or **knowingly falsified the books, records, and accounts** of their respective companies because the books, records, and accounts are falsified by the robust capital protection scheme.

289. By reason of the foregoing, Defendants mentioned in paragraphs 288, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Rules 13b2-1 and 13b2-2 [17 C.F.R. § 240.13b2-1, 240.13b2-2].

## COUNT 19 - Violations of Section 29(a) of the Securities Exchange Act

290. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

291. CGMI put a binding statement in CGMI (i.e., CPWM) Broker-dealer Account Application Form. Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void

292. By reason of the foregoing, CGMI, directly or indirectly, has violated and, unless enjoined, will again violate Sections 29(a) of the Securities Exchange Act [15 U.S.C. § 78cc(a)].

## COUNT 20 – Violations of Sections 12(d)(1)(A) and 12(d)(1)(B) of the Investment Company Act

293. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

294. All Defendants, singly or in concert, directly or indirectly, use **the robust capital protection scheme** et al, which are not prescribed as necessary or appropriate **in the public interest or for the protection of investors**, to protect the projected annual income amount of PRU, to transfer PFI financial risks to VA individuals, and to cook the books.

295. By reason of the foregoing, Defendants mentioned in paragraph 294, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Sections 12(d)(1)(A) and 12(d)(1)(B) of the Investment Company Act [15 U.S.C. § 80a-12(d)(1)(A) and 12(d)(1)(B)].

## COUNT 21 – Violations of Section 19(a) of the Investment Company Act

296. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

297. PICA, Pruco Life, PAI, Strangfeld, Grier, Carbone, Hagan, and Weissberger, singly or in concert, directly or indirectly, forwarded all **dividends and/or distributions in the nature of dividends**, which underlying Mutual Fund Companies of the Trust paid to all clients, including VA individuals, who are co-owners of underling registered commingled vehicles, to PFI without being accompanied by written statements which adequately disclose **the source or sources of such payments**.

298. By reason of the foregoing, Defendant mentioned in paragraph 297 has violated and, unless enjoined, will again violate Section 19(a) of the Investment Company Act [15 U.S.C. § 80a-19(a)].

## COUNT 22 – Violations of Section 20 of the Investment Company Act

299. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

300. Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, PAI, PI, PIM, and PIMS, singly or in concert, directly or indirectly, claimed in Prudential VA Prospectus that "We are the legal owner of the shares

of the underlying mutual funds in which the Sub-accounts invest. However, under current SEC rules, you have voting rights in relation to Account Value maintained in the Sub-accounts." VA individuals were given underlying unregistered hedged equities of **the Fund**, which did not issue **voting-trust certificates**. Underlying Defendants intercepted the **voting-trust certificates,** which were issued by underlying Mutual Fund Companies of **the Trust**, and privately voted without forwarding such certificates to underlying VA individuals.

301. By reason of the foregoing, Defendant mentioned in paragraph 300 has violated and, unless enjoined, will again violate Section 20 of the Investment Company Act [15 U.S.C. § 80a-20].

## COUNT 23 – Violations of Section 22(c) under the Investment Company Act and Rule 22c-1 Thereunder

302. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

303. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, PRIAC, PAI, PAD, ASTIS, PI, PIM, PIMS, Jennison, LSV, Marsico, QMA, T. Rowe Price, William Blair, PIMS, Global Portfolio, Prudential Bache, and Pruco Securities, singly or in concert, directly or indirectly, did not take affirmative steps to protect themselves and their shareholders against **late trading** by obtaining assurances that those policies and procedures of SEC Rule 22c-1 under the Investment Company Act are effectively administered; and willingly and egregiously engaged in the course of the "**late trading**" practices during daily in-house prohibited "Benefit Fund Transfer" transactions.

304. By reason of the foregoing, Defendants mentioned in paragraph 303, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 22(c) of the Investment Company Act [15 U.S.C. § 80a-22(c)] and Investment Company Rule 22c-1 [17 C.F.R. § 270.22c-1].

## COUNT 24 – Violations of Section 22(c) of the Investment Company Act and Rule 22c-2 Thereunder Act

305. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

306. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, PRIAC, Pruco Life, ASTIS, PI, PIM, PIMS, Pruco Securities, PAI, PAD, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, singly or in concert, directly or indirectly, willfully aided and abetted and caused violations of Rule 22c-2 by not forwarding all "Benefit Fund Transfer" transactions to underlying contractual **compliance reviewers** of the Trust for the purpose of detecting potential **market timing** activities.

307. By reason of the foregoing, Defendant mentioned in paragraph 306 has violated and, unless enjoined, will again violate Section 22(c) under the Investment Company Act [15 U.S.C. § 80a-22(c)] and Company Act Rule 22c-2 thereunder Act [17 C.F.R. § 270.21c-2].


## COUNT 25 – Violations of Section 34(a) of the Investment Company Act

308. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

309. Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, PIRAC, Pruco Securities, PAI, PAD, ASTIS, PI, PIM, PIMS, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, singly or in concert, directly or indirectly, engage in the course of **altering account and book** via such PAI fabricated trade confirmations, such synthesized "Pension Plan Risk Transfer" transactions, such price change notice, and such two batches of transaction reversals.

310. By reason of the foregoing, Defendants mentioned in paragraph 309, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 34(a) of the Investment Company Act [15 U.S.C. § 80a-34(a)].

**COUNT 26 – Violations of Section 34(b) of the Investment Company Act**

311. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

312. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, PIRAC, Pruco Securities, PAI, PAD, ASTIS, PI, PIM, PIMS, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, directly or indirectly, singly or in concert, in the offer and sales of Prudential VAs, which are securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have (a) employed **devices, schemes, or artifices to defraud**; (b) made **untrue statements of material fact**, or **omitted to state material facts** necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operate or would operate as a **fraud or deceit** upon the purchase of securities.

313. By reason of the foregoing, Defendants mentioned in paragraph 312, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-34(b)].

**COUNT 27 – Violations of Section 37 of the Investment Company Act**

314. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

315. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Securities, Pruco Life, PRIAC, PAI, PAD, ASTIS, PI, PIM, PIMS, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, singly or in concert, directly or indirectly, engage in the course of **stealing, unlawful and willful abstracting, unlawful and willful converting to the use of PFI, or embezzling** of the moneys (i.e., dividends and/or distributions), funds, securities, or assets of VA individuals via such fraudulent

in-house daily DBRT "benefit fund transfer" transactions and such synthesized "pension plan risk transfer" transactions on each benefit quarter.

316. By reason of the foregoing, Defendants mentioned in paragraph 315, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 37 of the Investment Company Act [15 U.S.C. § 80a-37].

## COUNT 28 – Violations of Section 38(a) under the Investment Company Act and Rule 38a-1 Thereunder

317. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

318. Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Securities, Pruco Life, PRIAC, PAI, PAD, ASTIS, PI, PIM, PIMS, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, singly or in concert, directly or indirectly, did not have **in place procedures** that segregate investor orders received <u>before</u> the fund prices its shares (which will receive that day's price) from those that were received <u>after</u> the fund prices its shares (which will receive the following day's price); did not have **contractual provisions** <u>with transfer agents and other intermediaries</u> that obligate those parties to segregate orders received by <u>time</u> of receipt in order to prevent "late trading" based on a previously determined price; and did not take **affirmative steps** to protect themselves and their shareholders against <u>late trading</u> by obtaining assurances that those policies and procedures of SEC Rule 38a-1 under the Investment Company Act are effectively administered.

319. By reason of the foregoing, Defendants mentioned in paragraph 318, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 38(a) of the Investment Company Act [15 U.S.C. § 80a-38(a)] and Rule 38a-1 (17 C.F.R. § 270.38a-1) thereunder.

## COUNT 29 – Violations of Section 47 of the Investment Company Act

320. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

321. CGMI put a binding statement in CGMI (i.e., CPWM) Broker-dealer Account Application Form. Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or with any rule, regulation, or order thereunder shall be void.

322. By reason of the foregoing, CGMI, singly or in concert, directly or indirectly, has violated and, unless enjoined, will again violate Section 47 of the Investment Company Act [15 U.S.C. § 80a-47].

### COUNT 30 – Violations of Section 206(1) of the Investment Advisers Act

323. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

324. Havens, Wang, Citigroup, CGMI, Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, Pruco Life, Pruco Securities, PRIAC, PAI, PAD, PI, PIM, PIMS, and ASTIS, by use of the mails or any means or instrumentality of interstate commerce, singly or in concert, directly or indirectly, **employ devices, schemes, or artifices** in Prudential VAs to defraud all clients or prospective clients.

325. By reason of the foregoing, Defendants mentioned in paragraph 324, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 206(1) of the Investment Advisers Act [15 U.S.C. § 80b-6(1)].

### COUNT 31 – Violations of Section 206(2) of the Investment Advisers Act

326. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

327. All Defendants enlisted in underlying complaint, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, engage in any transaction, practice, or course of business which **operates as a fraud or deceit** upon all clients or prospective clients of Prudential VAs.

328. By reason of the foregoing, Defendants mentioned in paragraph 327, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 206(2) of the Investment Advisers Act [15 U.S.C. § 80b-6(2)].

## **COUNT 32 – Violations of Section 206(3) of the Investment Advisers Act**

329. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

330. PICA, PAI, PAD, ASTIS, Global Portfolio, Prudential Bache, PI, PIM, PIMS, Pruco Securities, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, singly or in concert, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, acting as principal for his own account, knowingly to sell securities to or purchase securities from VA individuals, or acting as broker for a person other than VA individuals, knowingly to effect sales or purchases of securities for the accounts of underlying VA individuals, without disclosing to underlying VA individuals in writing before the completion of such transactions the capacity in which they are acting and obtaining the consents of VA individuals to such transactions.

331. By reason of the foregoing, Defendants mentioned in paragraph 330, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 206(3) of the Investment Advisers Act [15 U.S.C. § 80b-6(3)].

## **COUNT 33 – Violations of Section 206(4) of the Investment Advisers Act and Custody Rule 206(4)-2 thereunder**

332. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

333. PICA, Pruco Life, PRIAC, ASTIS, PI, PIM, PIMS, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William, PAI, PAD, Global Portfolio, Prudential Bache, Pruco Securities, singly or in concert, directly or indirectly, DO NOT maintain client assets with "qualified custodians" either in **a separate account for each client**

under that client's name or in **an account** under the adviser name as agent for the adviser's clients **that only contains client assets**.

334. By reason of the foregoing, Defendants mentioned in paragraph 333, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 206(4) of the Investment Advisers Act [15 U.S.C. § 80b-6(4)] and Custody Rule 206(4)-2 [17 C.F.R. § 275.206(4)-2] thereunder.

## COUNT 34 – Violations of Section 206(4) of the Investment Advisers Act and Rules 206(4)-6(a) and 206(4)-6(c) thereunder

335. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

336. PICA, Pruco Life, and PIRAC, the underwriters of the Fund, fraudulently exercised voting authority over securities of VA individuals without mailing written **proxy voting policies and procedures** to such VA individuals.

337. By reason of the foregoing, Defendants mentioned in paragraph 336, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 206(4) of the Investment Advisers Act [15 U.S.C. § 80b-6(4)] and Rules 206(4)-6(a) and 206(4)-6(c) [17 C.F.R. § 275.206(4)-6(a) and 275.206(4)-6(c)] thereunder.

## COUNT 35 – Violations of Section 206(4) of the Investment Advisers Act and Rule 206(4)-8 thereunder

338. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

339. Wang, CGMI, PICA, PI, PIM, PIMS, ASTIS, PAI, Pruco Life, Pruco Securities, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, singly or in concert, directly or indirectly, **make untrue statements of a material fact** or **omit to state a material fact** necessary in order to make the statements made to investors or prospective investors of Prudential VAs, in the light of the circumstances under which they were made, not misleading.

340. By reason of the foregoing, Defendants mentioned in paragraph 339, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 206(4) of the Investment Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

## COUNT 36 – Violations of Section 207 of the Investment Advisers Act

341. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

342. Strangfeld, Grier, Carbone, Rice, Marcks, Hagan, Weissberger, PFI, PICA, PAI, Pruco Life, PRIAC, PI, PIM, PIMS, ASTIS, and Pruco Securities, singly or in concert, directly or indirectly, **willfully to make untrue statement of a material fact in the registration application or the report** filed with the U.S. Securities and Exchange Commission under Section 203 or 204 of the Investment Advisers Act, or willfully to omit to state in such application or report the material fact which is required to be stated therein.

343. By reason of the foregoing, Defendants mentioned in paragraph 342, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 207 of the Investment Advisers Act [15 U.S.C. § 80b-7].

## COUNT 37 – Violations of Section 215(a) of the Investment Advisers Act

344. Plaintiffs re-allege and incorporate paragraphs 1 through 235 by reference as if fully set forth herein.

345. CGMI put a binding statement in CGMI (i.e., CPWM) Broker-dealer Account Application Form. Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or with any rule, regulation, or order thereunder shall be void.

346. By reason of the foregoing, CGMI, singly or in concert, directly or indirectly, has violated and, unless enjoined, will again violate Section 215(a) of the Investment Advisers Act [15 U.S.C. § 80b-15(a)]

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants and award damages as follows:

A. **Declaratory Relief**:

Declare, determine, and find that Defendants have committed the violations of the federal securities laws alleged in this Complaint.

B. **Permanent Injunctive Relief**:

Issue a Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

C. **Disgorgement:**

Issue an Order directing

(1) PFI to disgorge all ill-gotten revenues including prejudgment interest resulting from the acts or courses of conduct alleged in this Complaint by revoking all fraudulent "Benefit Fund Transfer", "Benefit Fee", and "Rebalance Program" transactions.
(2) PFI to disgorge all ill-gotten dividends and/or distributions.
(3) Strangfeld, Grier, Carbone, Rice, and Marcks to disgorge all ill-gotten compensations.
(4) PICA, ASTIS, PI, PIM, PIMS, PRIAC, Pruco Life, Pruco Securities, PAI, PAD, Jennison, LSV, Marsico, QMA, T. Rowe Price, William Blair to disgorge all ill-gotten management charges.
(5) PI, PIM, PIMS, Pruco Securities, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair to disgorge all ill-gotten acquired portfolio fees & expenses.
(6) Underlying sub-advisers of the Trust, who failed to detect market timing activities, to disgorge ill-gotten compliance reviewer fees.
(7) Havens, Wang, Citigroup, and CGMI to disgorge all ill-gotten greater compensations from selling such Prudential VAs.
(8) PFI et al to return the above-mentioned ill-gotten disgorgements back to VI individuals.

(9) PFI to revoke all unauthorized "Benefit Fee", "Benefit Fund Transfer", and "Program Rebalance" transactions.

(10) PFI to completely remove unregistered funds (including hedge funds) and mispriced "junk bonds" from Plaintiffs' account.

## D. Penalties

Issue an Order directing all Defendants to pay civil money penalties and prejudgment interest pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-42(e)].

## E. Accounting

Issue an Order requiring PICA to:

(1) make a sworn accounting to this Court and the Plaintiffs of all funds, whether in the form of bonus, compensation, commissions, income (including payments for assets, shares or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature) received by Strangfeld, Grier, Carbone, Rice, Marcks, PFI, PICA, Pruco Life, PARIC, PAI, PAD, ASTIS, PI, PIM, PIMS, Pruco Securities, Jennison, LSV, Marsico, QMA, T. Rowe Price, William Blair, Havens, Wang, Citigroup, and/or CGMI, relating in any way to the Prudential VAs business of PFI;

(2) make a sworn accounting to this Court and the Plaintiffs of all assets, funds, or other properties held by CGMI, PFI, and/or PICA, jointly or individually, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property; and

(3) provide to the Court and the Plaintiffs a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts and deposits of any kind) in which CGMI, PFI, and/or PICA (whether solely or jointly), directly or indirectly (including through a corporation, partnership or nominee), either have an interest or over which they have the power or right to exercise control.

### F. Records Preservation

Issue an Order requiring that Defendants Citigroup, CGMI, PFI, PICA, PAI, PAD, ASTIS, PI, PIM, PIMS, Pruco Securities LLC, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, be and they hereby are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to Defendants Citigroup, CGMI, PFI, PICA, PAI, PAD, ASTIS, PI, PIM, PIMS, Pruco Securities LLC, Jennison, LSV, Marsico, QMA, T. Rowe Price, and William Blair wherever located and in whatever form, electronic or otherwise, until further Order of this Court.

### G. Further Relief

Grant such other and further relief as may be necessary and appropriate.

### H. Retention of Jurisdiction

Further, the Plaintiffs respectfully request that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Plaintiffs for additional relief within the jurisdiction of this Court.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury

Dated this 15th day of July, 2014

Michael H. Wu and Christine T. Wu

# EXHIBIT A. The Three Unapproved Sales Materials Given by Wang on March 29, 2010

**Current Allocation**

| Investments | Amount |
|---|---|
| AST AllianceBernstein Core Value | 754.22 |
| AST Goldman Sachs Concentrated Growth | 727.68 |
| AST Goldman Sachs Mid-Cap Growth | 1499.00 |
| AST International Growth | 745.62 |
| AST JP Morgan Intl Equity | 1477.12 |
| AST MFS Global Equity | 1482.83 |
| AST Neuberger Berman / LSV Mid-Cap Value Portfolio | 765.15 |
| AST PIMCO Total Return Bond | 2718.22 |
| AST Parametric Emerging Markets Equity | 2244.51 |
| AST T. Rowe Price Large-Cap Growth | 749.27 |
| AST T.Rowe Price Natural Resources | 1450.55 |

**Important Note:** Fixed Allocations are not included in rebalance transactions.

**Rebalance To**

To search for an investment, type the fund name; as you type, the first match will be highlighted.

https://annuityclientservice.prudential.com/wps/myportal/!ut/p/kcxml/04_SJ9SPykssy0xP...   03/29/2010

Unapproved Sales Materials

# EXHIBIT A. The Three Unapproved Sales Materials Given by Wang on March 29, 2010



Annuity Service Online

*7 $ 7lin. f.t*

*7/8/09.*

*in/iliel $50 k.*

*w/ 6% credit bonus*

*=7 $ 17/*

Page 2 of 3

## Allocation Mix

20%  16%
   ● Large-Cap    16%
   ● Int'l Equity  22%
   ● Mid/Small Cap 16%
   ● Special Equity 10%
10%   ● Bond        20%
16%   22%

Allocations may be rounded to equal 100%.

| Variable Sub-accounts | # of Variable Units | Value Per Unit | Sub-account Value |
|---|---|---|---|
| AST Goldman Sachs Mid-Cap Growth | 935.03694 | 10.86792 | 10,161.91 |
| AST JP Morgan Intl Equity | 1,120.32440 | 8.75805 | 9,811.86 |
| AST PIMCO Total Return Bond | 957.95087 | 12.39246 | 11,871.37 |
| AST Parametric Emerging Markets Equity | 1,057.30872 | 9.49247 | 10,036.47 |
| AST T. Rowe Price Large-Cap Growth | 1,001.92426 | 10.11854 | 10,138.01 |
| AST T.Rowe Price Natural Resources | 993.85280 | 9.70798 | 9,648.30 |
| **Total Value of Contract** | | | **$61,667.92** |

# EXHIBIT A. The Three Unapproved Sales Materials Given by Wang on March 29, 2010

Annuity Service Online



**Allocation Mix**

- ● Large Cap    30%
- ░ Int'l Equity    40%
- ▒ Mid/Small Cap    10%
- ● Bond    20%

Allocations may be rounded to equal 100%.

*(handwritten: In the sk)*

*(handwritten: 11/18/09)*

*(handwritten: 6% bonus)*

| Variable Sub-accounts | # of Variable Units | Value Per Unit | Sub-account Value |
|---|---|---|---|
| AST Goldman Sachs Mid-Cap Growth | 493.74169 | 10.86792 | 5,365.95 |
| AST JP Morgan Intl Equity | 928.78724 | 8.75805 | 8,134.37 |
| AST MFS Global Equity | 792.40742 | 10.24220 | 8,116.00 |
| AST PIMCO Total Return Bond | 874.06844 | 12.39245 | 10,831.86 |
| AST Parametric Emerging Markets Equity | 573.12969 | 9.49247 | 5,440.42 |
| AST T. Rowe Price Large-Cap Growth | 1,599.46980 | 10.11854 | 16,184.30 |
| **Total Value of Contract** | | | **$54,072.90** |

Unapproved Sales Materials

Wu v. PFI et al

## EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Thu, 5 Jan 2012 13:41:55 -0500
Subject: RE: e-Documents Availability
Thread-Topic: e-Documents Availability
Thread-Index: AczLsXXdPYkRgQV8T6a0wSViTl81fgAJ67aA
Message-ID: <1C767F10D77EF346BBFB0783F252131405CE3CDADD@exnjmb91.nam.nsroot.net>

Michael,
I forwarded your concern to the management of our company, CPWM already and it's under review.
Please understand I can not talk to you further about this particular matter.

Thanks


Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax: 630-357-0712
linda.wang@citi.com

EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Tue, 3 Jan 2012 15:02:28 -0500
Subject: your email dated 1/2/12

Michael,
Yes, the sample portfolio is subject to auto transfer to or from the investment bond fund mentioned in your email.
Thanks

Linda Wang

EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Fri, 9 Dec 2011 11:57:53 -0500
Subject: RE: Prudential
Thread-Topic: Prudential
Thread-Index: Acy1+8LS0gqwtOq/Qz63+24DqXd9BAAlUh7g
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD8A689E@exnjmb91.nam.nsroot.net

Michael,

I need to clarify when I mentioned security, all I meant is if your email contains your prudential contract info such as contract number or transaction detail, I have to write (secure) in subject to reply your email, but your email did not take that way of reply, as it's shown on my email as "pending deliver". That's why I have to start a new email instead of reply yours directly.   Sorry for any confusion.

I emailed you Prudential's "How we manage your highest daily guarantee: Highest Daily Lifetime Income", which explains in detail what determines the transfer to the bond portfolio. Transfer to bond fund is not unauthorized transfer, because after you made reallocation from preservation to your choice of funds, your acct is subject to the auto transfer.

I will call Prudential again and urge them to reply your letter to them asap.
Thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax:  630-357-0712
linda.wang@citi.com

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Thu, 8 Dec 2011 10:29:52 -0500
Subject: RE: Prudential
Thread-Topic: Prudential
Thread-Index: Acy0+bs8OfLxpctCSy+dYHeAyT7UtQAw98lw
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD8058EF@exnjmb91.nam.nsroot.net

I explained it in my previous email and email you a detailed attachment about this. I will have to call you if you still have question about this. What's the number I can reach you? I can either call you between 9am and 10am or between 5pm and 5:45pm our time tomorrow.
Although market value fluctuate, your contract benefit base grows at minimum 6%.
Thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax: 630-357-0712
linda.wang@citi.com

## EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'mhw2000usa@gmail.com'" <mhw2000usa@gmail.com>
Date: Wed, 7 Dec 2011 11:02:50 -0500
Subject: benefit transfer
Thread-Topic: benefit transfer
Thread-Index: Acy0+atW0bf7UAazSxS9v04DzX0/Qg==
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD75EC40@exnjmb91.nam.nsroot.net

Michael,
 I have to start a new email because the previous one has your contract number and info, and when I replied in secured way as required by our company, it could not deliver. Please do not write your contact number etc when reply.
I did not overlook the question of benefit transfer, I just try to figure out who did the reallocation that led to the auto movement to/from investment grade bond fund. Please recall there was no such movement before 5/1/11. Initially I thought Pruco reallocated from preservation to customized model. Now I'm clear.
Wait to get your phone number.
Thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax: 630-357-0712
linda.wang@citi.com

From: "Wang, Linda " <linda.wang@citi.com>

To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Wed, 7 Dec 2011 10:52:23 -0500
Subject: RE: Prudential
Thread-Topic: Prudential
Thread-Index: Acy0cGPegUY53lsmRqG0HwuwHJGPbQAhjYxg
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD75EBF0@exnjmb91.nam.nsroot.net

Michael,

What's your phone number?

Please take a look at the attachment in my previous email regarding to benefit transfer in detail. When you reallocate to the funds of your choice, the program will auto transfer to or from investment grade bond fund depending on market situation, no charge . Auto rebalance has no charge either. As I said, the charge of "benefit fee"  is for the guaranteed 6% growth of your benefit base, which I explained to you as rider charge.

I'll call you when got your number.
Thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax:  630-357-0712
linda.wang@citi.com

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Tue, 6 Dec 2011 18:10:31 -0500
Subject: FW: Prudential
Thread-Topic: Prudential
Thread-Index: Acy0ZACb7Om1gTF0TiuBXt89hjY/NAABqIuA
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD69EBD8@exnjmb91.nam.nsroot.net

You initial email came out half Chinese and half English, a little confusing. Did you ever did any reallocation from the initial 100% preservation?

The attached explains what triggers the movement between investment grade bond fund and funds chosen automatically.

Benefit fee is rider charge by Prudential that we went over for the minimum guaranteed 6% growth of your benefit base.

Benefit transfer is the auto reallocation. The first contract year it's 100% invested in preservation, and I did not see benefit transfer. Did you request reallocation online which led to reallocation on 5/2/11? Please clarify.

Our branch is closing now so I have to leave.
thanks


Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax: 630-357-0712
linda.wang@citi.com

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Tue, 6 Dec 2011 16:51:22 -0500
Subject: RE: Contract Number E1028928
Thread-Topic: Contract Number E1028928
Thread-Index: AcywT3GWNytQCcJ+SNOTt5ShMmod4wD6hO1A
Message-ID:1C767F10D77EF346BBFB0783F252131405CD69EA61@exnjmb91.nam.nsroot.net

Michael
I checked with Prudential and the rep told me you reallocated the investment on 4/30/11 at 9:20am online. Is that right?

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax: 630-357-0712
linda.wang@citi.com

EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Thu, 5 Jan 2012 13:41:55 -0500
Subject: RE: e-Documents Availability
Thread-Topic: e-Documents Availability
Thread-Index: AczLsXXdPYkRgQV8T6a0wSViTI81fgAJ67aA
Message-ID: <1C767F10D77EF346BBFB0783F252131405CE3CDADD@exnjmb91.nam.nsroot.net>

Michael,
I forwarded your concern to the management of our company, CPWM already and it's under review.
Please understand I can not talk to you further about this particular matter.

Thanks


Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax:  630-357-0712
linda.wang@citi.com

EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Tue, 3 Jan 2012 15:02:28 -0500
Subject: your email dated 1/2/12

Michael,
Yes, the sample portfolio is subject to auto transfer to or from the investment bond fund
mentioned in your email.
Thanks

Linda Wang

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Fri, 9 Dec 2011 11:57:53 -0500
Subject: RE: Prudential
Thread-Topic: Prudential
Thread-Index: Acy1+8LS0gqwtOq/Qz63+24DqXd9BAAIUh7g
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD8A689E@exnjmb91.nam.nsroot.net

Michael,

I need to clarify when I mentioned  security, all I meant is if your email contains your prudential contract info such as contract number or transaction detail, I have to write (secure) in subject to reply your email, but your email did not take that way of reply, as it's shown on my email as "pending deliver".  That's why I have to start a new email instead of reply yours directly.   Sorry for any confusion.

I emailed you Prudential's "How we manage your highest daily guarantee: Highest Daily Lifetime Income", which explains in detail what determines the transfer to the bond portfolio. Transfer to bond fund  is not  unauthorized transfer, because after  you made reallocation from preservation to your choice of funds, your acct is subject to the auto transfer.

I will call Prudential again and urge them to reply your letter to them asap.
Thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax:  630-357-0712
linda.wang@citi.com

EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Thu, 8 Dec 2011 10:29:52 -0500
Subject: RE: Prudential
Thread-Topic: Prudential
Thread-Index: Acy0+bs8OfLxpctCSy+dYHeAyT7UtQAw98lw
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD8058EF@exnjmb91.nam.nsroot.net

I explained it in my previous email and email you a detailed attachment about this. I will have to call you if you still have question about this. What's the number I can reach you? I can either call you between 9am and 10am or between 5pm and 5:45pm our time tomorrow.
Although market value fluctuate,  your contract benefit base grows at minimum 6%.
Thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax:  630-357-0712
linda.wang@citi.com

EXHIBIT B. Wang's E-mails Dated from December 6, 2011 to January 5, 2012

From: "Wang, Linda " <linda.wang@citi.com>
To: "'mhw2000usa@gmail.com'" <mhw2000usa@gmail.com>
Date: Wed, 7 Dec 2011 11:02:50 -0500
Subject: benefit transfer
Thread-Topic: benefit transfer
Thread-Index: Acy0+atW0bf7UAazSxS9v04DzX0/Qg==
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD75EC40@exnjmb91.nam.nsroot.net

Michael,
I have to start a new email because the previous one has your contract number and info, and when I replied in secured way as required by our company, it could not deliver. Please do not write your contact number etc when reply.
I did not overlook the question of benefit transfer, I just try to figure out who did the reallocation that led to the auto movement to/from investment grade bond fund. Please recall there was no such movement before 5/1/11. Initially I thought Pruco reallocated from preservation to customized model. Now I'm clear.
Wait to get your phone number.
Thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax:  630-357-0712
linda.wang@citi.com

From: "Wang, Linda " <linda.wang@citi.com>

To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Wed, 7 Dec 2011 10:52:23 -0500
Subject: RE: Prudential
Thread-Topic: Prudential
Thread-Index: Acy0cGPegUY53IsmRqG0HwuwHJGPbQAhjYxg
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD75EBF0@exnjmb91.nam.nsroot.net

Michael,

What's your phone number?

Please take a look at the attachment in my previous email regarding to benefit transfer in detail. When you reallocate to the funds of your choice, the program will auto transfer to or from investment grade bond fund depending on market situation, no charge . Auto rebalance has no charge either. As I said, the charge of "benefit fee"  is for the guaranteed 6% growth of your benefit base, which I explained to you as rider charge.

I'll call you when got your number.
Thanks


Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax:  630-357-0712
linda.wang@citi.com

From: "Wang, Linda " <linda.wang@citi.com>
To: '"Michael Wu"' <mhw2000usa@gmail.com>
Date: Tue, 6 Dec 2011 18:10:31 -0500
Subject: FW: Prudential
Thread-Topic: Prudential
Thread-Index: Acy0ZACb7Om1gTF0TiuBXt89hjY/NAABqIuA
Message-ID: 1C767F10D77EF346BBFB0783F252131405CD69EBD8@exnjmb91.nam.nsroot.net

You initial email came out half Chinese and half English, a little confusing. Did you ever did any reallocation from the initial 100% preservation?

The attached explains what triggers the movement between investment grade bond fund and funds chosen automatically.

Benefit fee is rider charge by Prudential that we went over for the minimum guaranteed 6% growth of your benefit base.

Benefit transfer is the auto reallocation. The first contract year it's 100% invested in preservation, and I did not see benefit transfer. Did you request reallocation online which led to reallocation on 5/2/11? Please clarify.

Our branch is closing now so I have to leave.
thanks

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax: 630-357-0712
linda.wang@citi.com

From: "Wang, Linda " <linda.wang@citi.com>
To: "'Michael Wu'" <mhw2000usa@gmail.com>
Date: Tue, 6 Dec 2011 16:51:22 -0500
Subject: RE: Contract Number E1028928
Thread-Topic: Contract Number E1028928
Thread-Index: AcywT3GWNytQCcJ+SNOTt5ShMmod4wD6hO1A
Message-ID:1C767F10D77EF346BBFB0783F252131405CD69EA61@exnjmb91.nam.nsroot.net

Michael
I checked with Prudential and the rep told me you reallocated the investment on 4/30/11 at 9:20am online. Is that right?

Linda Wang
Financial Advisor
Citi Personal Wealth Management
The Cralle Financial Group
1195 East Ogden Avenue
Naperville, IL 60563

Phone: 630-357-3431
Phone:800-846-5200
Fax: 630-357-0712
linda.wang@citi.com

Citi Personal Wealth Management



*John P. Weindler, Esq.*
*Two Court Square*
*Long Island City, NY 11120*
*T – 347-648-1101*
*F – 347-648-1198*

**VIA OVERNIGHT MAIL**

March 13, 2012

Mr. Michael H. Wu
138 Stableford Drive
Glen Ellyn, IL 60137-3216

RE:    Citi Personal Wealth Management Account Number XXX-XXX991
       Prudential Annuity Contract # E1028928

Dear Mr. Wu:

This letter is in response to your various email communications over the last few months to Citi Personal Wealth Management ("CPWM") concerning the Prudential Annuity Contract, referenced above.

In order to prepare this response, we have reviewed certain relevant account documentation and information on file with CPWM, and have also communicated with the branch office servicing your account, and your Financial Advisor, Xiaomei (Linda) Wang.

By way of background, our records indicate that you and Christine T. Wu opened a joint brokerage account with CPWM in or about April 2010. At that time, both you and Christine Wu were retired as engineers from Lucent. Moreover, your Liquid Net Worth was in the $600,000 to $1,200,000 range, and you had at least 25 years of investment experience in equities and fixed income investment vehicles. Your stated Risk Tolerance was Moderate, and your Primary Investment Objective was Growth, with Tax Deferral and Current Income as Secondary Objectives. This information was confirmed to you by letter dated April 23, 2010, a copy of which we enclose for your convenience.

INVESTMENT AND INSURANCE PRODUCTS: NOT FDIC INSURED • NOT A DEPOSIT OR OTHER OBLIGATION OF, AND NOT GUARANTEED BY, CITIGROUP OR ANY OF ITS AFFILIATES • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED

Citi Personal Wealth Management is a business of Citigroup Inc., which offers securities through Citigroup Global Markets Inc. ("CGMI"), member SIPC. Insurance is offered through Citigroup Life Agency LLC ("CLA"). In California, CLA does business as Citigroup Life Insurance Agency, LLC (license number 0G56746). CGMI, CLA, and Citibank, N.A. are affiliated companies under the common control of Citigroup Inc. Citibank and Citi with Arc design are registered service marks of Citigroup Inc. and its affiliates and are used and registered throughout the world.

Mr. Michael H. Wu
March 13, 2012

As part of the account opening process, you executed a CPWM Disclosure Statement on March 29, 2010. That Statement states the following:

**Investments, insurance and annuity products and services (Non-Deposit Products) are:**
- **Not FDIC insured;**
- **Not insured by the Federal Government or any other Federal Government Agency, by Citibank, or by an affiliate of Citibank;**
- **Not deposits or other obligations of, or guaranteed by, Citibank or an affiliate of Citibank; and**
- **Subject to investment risk, including possible loss of the principal amount invested.**

In addition, towards the middle of the page, there are additional disclosures concerning costs, fees, premiums and charges. We have enclosed a copy of this Disclosure Statement for your convenience.

Also, as part of the account opening process, you and Ms. Wu executed a CPWM Account Application, Client Agreement and Substitute Form W-9 on March 29, 2010. Please note, there are additional Disclosures (very similar to the ones referenced above) on page 3 thereof, just above your signature. You also acknowledged that you received a copy of the Client Agreement, which contains a pre-dispute arbitration clause. We have enclosed a copy of the Client Agreement for your convenience.

On or about April 13, 2010, you executed a Prudential Premier Retirement Variable Annuity Application Form. You and Ms. Wu signed the Form on page 7. Among other things, you acknowledged that you had received a current prospectus for this annuity. We have enclosed a copy of the Application Form for your convenience.

As stated above, we have communicated with your Financial Advisor, Xiaomei Wang. She informs us that she met with both you and Ms. Wu in late March 2010. She explained the Prudential Annuity to you in detail, including, but not limited to, the living benefit rider, the rider fees, and the auto rebalance feature. She recalls reviewing Prudential sales materials with you, including the current Prospectus. She handed all of the materials, including the Prospectus, to you at the end of the meeting. You indicated that you wanted to read and digest all of this literature. You decided to make the purchase/investment of $100,000 approximately two (2) weeks later.

On Tuesday, March 6, 2012, you sent me an email with 6 specific questions. I will answer your questions in the order they were presented.

EXHIBIT C. CGMI's, i.e., CPWM's, Letter Dated March 13, 2012

Mr. Michael H. Wu
March 13 , 2012

1. Xiaomei (Linda) Wang is registered with FINRA. Her CRD Number is 2982152. She took and passed the Series 63 Exam (Uniform Securities Agent State Law Exam) in February 1998. She took and passed the Series 7 Exam (General Securities Representative Exam) in March 1999.
2. There were no mark-ups or mark-downs associated with your investment. Ms. Wang discussed with you all fees and charges associated with your Prudential Annuity investment. Moreover, fees, charges, commissions and other forms of remuneration were fully disclosed to you in March and April 2010, not only in the Prospectus, but also on the Confirmation of Trade, a copy of which we enclose for your convenience.
3. Ms. Wang informs us Michael Wu was not present on April 16, 2010 when the contract was issued. She recalls that the original contract was mailed to the address of record.
4. As stated above, Ms. Wang gave you and Ms. Wu the Prospectus and sales kit on March 29, 2010.
5. Ms. Wang states she met with you and Ms. Wu on March 29, 2010. She disclosed that the Annuity investment is not FDIC insured, not guaranteed by Citibank or any other bank. She went over the information in the sales kit, the auto transfer feature that may be triggered by a volatile market, the terms, fees and bonus credit. She also reviewed with you the surrender charge schedule and the choice of funds for the subaccounts. She presented you with the Application Form, and instructed you on how to complete the Form and where to sign. She believes you may have said you were leaving for China, and that Ms. Wu would drop off the completed paperwork. She also believes that Ms. Wu submitted the completed paperwork on or about April 13 or 14, 2010, and the purchase order was submitted shortly thereafter.
6. Ms. Wang indicates that she spent quite some time familiarizing herself with the Prudential Prospectus and sales material.

Based on the above, we believe that the Prudential Annuity was suitable for your objectives. Moreover, we are confident that all the material aspects of this particular investment were fully disclosed to you.

In reviewing the many emails you have sent both to Prudential and to CPWM over the course of the last few months, it appears to us that your primary concern is the methodology of the auto-rebalance feature. We believe that Prudential has addressed this issue in their recent correspondence to you.

Mr. Michael H. Wu
March 13, 2012

We trust this letter serves to answer the questions you have raised. May we remind you that you have an open invitation to provide us with your telephone number and a convenient time to schedule a conference call in order to address any additional questions or concerns you may have. Should you wish to contact me directly, I can be reached at (347) 648-1101.

Sincerely,

John P. Weindler

# EXHIBIT D-1. CPWM Broker/Dealer Account Application Form (Partial)

## Citi Personal Wealth Management

**Account Application, Client Agreement and Substitute Form W-9 Request for Taxpayer Identification Number**

Account Number:
Branch
CSG: 14499    T 3 PA    AMT
Citibank Financial Center Number
003

### Personal Information

| Account Owner | Account Owner |
|---|---|
| Name MICHAEL   H   WU | Name CHRISTINE   T   WU |
| SS# or Tax ID 346664652   Date of Birth 01  02  1947 | SS# or Tax ID 235589296   Date of Birth 08  01  1950 |
| Citizenship: ☒ U.S.  ☐ U.S. Permanent Resident Alien   Country of Citizenship if | Citizenship: ☒ U.S.  ☐ U.S. Permanent Resident Alien   Country of Citizenship if |
| Daytime Phone   Evening Phone  7733011012 | Daytime Phone   Evening Phone  7733011012 |
| Fax | Fax |
| Email mhw2000usa@yahoo.com | Email  none |
| Account Owner's Mother's Maiden Name:   CHEN | Account Owner's Mother's Maiden Name:   LIANG |
| Security Question: Account Owner's City of Birth:   ZHANGHUA | Security Question: Account Owner's City of Birth:   HONGKONG |
| Mailing Address for this account | Permanent Legal Address for this account (if different than Mailing Address) |
| Street Address 138  STABLEFORD DR | Street Address |
| City GLEN ELLYN   State IL   ZIP 60137 | City   State   ZIP |
| This account is for (check appropriate box): ☒ Individual/Joint ☐ Sole Proprietor | ☐ Corporation ☐ Partnership ☐ Other (Specify): ___ |

### Additional Account Owner(s)

| | |
|---|---|
| Name | Name |
| SS# or Tax ID   Date of Birth | SS# or Tax ID   Date of Birth |
| Citizenship: ☐ U.S.  ☐ U.S. Permanent Resident Alien   Country of Citizenship if | Citizenship: ☐ U.S.  ☐ U.S. Permanent Resident Alien   Country of Citizenship if |

U.S. Federal law requires us to obtain, verify and record information that identifies each person or entity that opens an account. What this means for you is that when you open an account, we will ask for your name, a street address, date of birth, and an identification number, such as a Social Security No. or other identification number, that Federal law requires us to obtain. We may also ask to see a driver's license, corporate formation document (for corporate entities), or other identifying documents that will allow us to identify you or the corporate entity seeking to open an account. We appreciate your cooperation.

---

**INVESTMENT AND INSURANCE PRODUCTS:**
**NOT FDIC INSURED • NO BANK GUARANTEE • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NOT A BANK DEPOSIT • MAY LOSE VALUE**

---

*Citi Personal Wealth Management is a business of Citigroup Inc., which offers securities through Citigroup Global Markets Inc. ("CGM"), member SIPC. Insurance is offered through Citigroup Life Agency LLC ("CLA"). CGM, CLA and Citibank, N.A. are affiliated companies under the common control of Citigroup Inc. Citi and Citi with Arc design are registered service marks of Citigroup Inc. or its affiliates.*

3026-NAS-CPWM (10/2009) Page 1 of 7



# EXHIBIT D-1. CPWM Broker/Dealer Account Application Form (Partial)

| Account Number Branch | Account | T | C | FA |
|---|---|---|---|---|
| SBG | 14499 | 1 | 3 | AHT |

## Alternate Mail Instructions

Complete this section if you desire another individual to receive mail on your behalf. The individual you designate MUST qualify as a "special custodian," which is defined as someone who: is not authorized to withdraw funds or securities from your account, AND; is not authorized to place orders or move assets for you, AND is not affiliated with a broker/dealer or registered investment advisor.

Please direct all communications, including trade confirmations and monthly statements, for my account indicated above, to the special custodian designated below. This instruction will remain in effect until written notice to the contrary is received by you at the branch office servicing my account. (See Paragraph 13 Page 5)

Name _____

Street Address _____ City _____ State _____ ZIP _____

## Trade Settlement/Sweep Option

Check either A, B, C, D or E. All trades require 100% cash balance in your settlement account at the time you place your order. When you select a trade settlement/sweep option, payment for your brokerage transactions will be drawn from that option and proceeds from your sales transactions will be credited to that option.

The Bank Deposit Program will be established for you if a trade settlement/sweep option is not part of your brokerage account for any reason unless you specifically choose to have no such option. You may change this option at any time.

☒ A. **Citibank Checking or Money Market Account.** Cash balances swept daily into the Citibank account you select. Your brokerage account will automatically be linked to your Citibank Banking Card so you may access your brokerage account electronically through Citibank Online. Note: The title of your settlement account must be identical to that of your brokerage account. Money Market accounts are subject to Regulation D of the Federal Reserve Board which restricts the number of withdrawals to six per statement cycle.

A summary of your brokerage information will be shown on your Citibank statement unless you check this box: ☒

Type of Account: ☐ Money Market ☐ Checking

| Account Number 000905677300 | ☐ CHECK HERE IF THIS IS CITIGOLD CHECKING ACCOUNT |
|---|---|

☐ B. **Bank Deposit Program ("BDP").** Cash balances swept daily into a federally insured savings deposit account(s) which participate in BDP. (Subject to BDP eligibility rules. Please consult with your Financial Advisor).

☐ Please link my brokerage account to my Citibank Banking Card, which will allow me electronic access to my Citi Personal Wealth Management brokerage account through Citibank Online. In addition, a summary of brokerage information will appear on my Citibank statement.

A summary of your brokerage information will be shown on your Citibank statement unless you check this box: ☐

| Account Number |
|---|

☐ C. **Tax Free Money Market Fund.** Cash balances swept daily into Tax Free Money Market Funds which are not FDIC insured and are covered by SIPC up to $100,000. Availability of this sweep feature subject to restriction. (Subject to BDP eligibility rules. Please consult with your Financial Advisor).

☐ Please link my brokerage account to my Citibank Banking Card, which will allow me electronic access to my Citi Personal Wealth Management brokerage account through Citibank Online. In addition, a summary of brokerage information will appear on my Citibank statement.

A summary of your brokerage information will be shown on your Citibank statement unless you check this box: ☐

| Account Number |
|---|

☐ D. **Taxable Money Market Fund.** Cash balances swept daily into Taxable Money Market Funds which are not FDIC insured and are covered by SIPC. (Taxable funds are available for Clients in investment advisory accounts and who are not eligible for BDP. See BDP disclosure document for eligibility requirements.)

☐ Please link my brokerage account to my Citibank Banking Card, which will allow me electronic access to my Citi Personal Wealth Management brokerage account through Citibank Online. In addition, a summary of brokerage information will appear on my Citibank statement.

A summary of your brokerage information will be shown on your Citibank statement unless you check this box: ☐

| Account Number |
|---|

☐ E. **No Sweep.** Cash balances are not swept daily into an interest bearing product.

☐ Please link my brokerage account to my Citibank Banking Card, which will allow me electronic access to my Citi Personal Wealth Management brokerage account through Citibank Online. In addition, a summary of brokerage information will appear on my Citibank statement.

A summary of your brokerage information will be shown on your Citibank statement unless you check this box: ☐

| Account Number |
|---|

3026-NAS-CPWM (10/2009) Page 2 of 7

## EXHIBIT D-1. CPWM Broker/Dealer Account Application Form (Partial)

| Account Number | | | | |
|---|---|---|---|---|
| Branch | Account | T | C | TA |
| 58G | 14499 | 1 | 3 | AHT |

### Borrowing Privileges

Portfolio CreditLine® (margin) allows you to borrow against the value of eligible securities in your account for almost any investment, personal or business purpose. Eligible accounts will have Portfolio CreditLine borrowing privileges unless you decline below. See accompanying literature for an explanation of Portfolio CreditLine borrowing.

☐ I/We do not want Portfolio CreditLine borrowing privileges in my/our account.

### Dividend Reinvestment

☐ Reinvest dividends into additional shares automatically (fees may apply). Speak to your Financial Advisor to select which dividends to reinvest.

### Name Disclosure

The issuers of securities we hold for you in street name may request your name, address and securities position. This information will not be released to United States issuers if you check this box. ☐

Bank issued certificates of deposit purchased through Citi Personal Wealth Management and the Bank Deposit Program are insured by the FDIC (see disclosure documents for details). All other investment or insurance products sold through Citi Personal Wealth Management:
   • are not insured by the FDIC or any federal government agency;
   • are not a deposit or other obligation of a depository institution and are not guaranteed by a depository institution;
   • are subject to investment risks, including the possible loss of the principal amount invested.

In consideration of Citigroup Global Markets Inc. ("you") accepting an account for me/us, I/we ("I") acknowledge that I have read, understand and agree to the terms of the attached Client Agreement in sections 1 through 13. If this is a multiple party account, I further acknowledge that I have read, understand and agree to the terms of the attached Client Agreement contained in sections 14 through 16.

If this account is established with Portfolio CreditLine (margin) privileges, I further acknowledge that I have read, understand, and agree to the terms of the attached Client Agreement contained in sections 17 through 19 and that my/our securities may be loaned to you or loaned out to others.

> **Tax Certification: Under penalties of perjury I certify that:**
> 1.) the number I have provided above is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and
> 2.) I am not subject to backup withholding because: a.) I am exempt from backup withholding, or b.) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or c.) the IRS has notified me that I am no longer subject to backup withholding;
> 3.) I am a U.S. person (including a U.S. resident alien)
> Certification Instructions: You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

Citi Personal Wealth Management requires your consent to the applicable provisions of this Agreement in order to open and maintain your account. All account owners must sign.

I acknowledge that I have received a copy of the client agreement which contains a pre-dispute arbitration clause on page 6 of 7, section 6 and the Unlawful Internet Gambling Enforcement Act Affirmation clause on page 6 of 7, section 7.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| | | Date |
|---|---|---|
| Account Owner Signature | (X) | 3/29/2010 |
| Account Owner Signature | (X) | 3/29/2010 |
| Additional Account Owner Signature | | Date |
| Additional Account Owner Signature | | Date |

3026-NAS-CPWM (10/2009) Page 3 of 7

## EXHIBIT D-2. Plaintiffs' Authorization Information as of April 16, 2010

7569999 01561 E1028928_AUTHOWNCHG_001_592

 **Prudential**

Annuities Services
P.O. Box 11467
Philadelphia, PA 19176

April 16, 2010

>01561 7569999 001 092001
MICHAEL H WU
CHRISTINE T WU
158 STABLEFORD DR
GLEN ELLYN IL 60137-3216

**Contract Owner:**
MICHAEL H WU
CHRISTINE T WU
**Annuitant:**
MICHAEL H WU
**Contract Number:** E1028928

Dear MICHAEL H WU:

This letter is being sent so that you may verify the authorization information we currently have on file for your contract. Please review the information below. It lists the authorization(s) granted to the named individual(s) related to this contract. These authorizations may include obtaining access to account information, performing account maintenance, transferring money between sub-accounts in your annuity and modifying allocation instructions. If the fields are blank, that indicates no other individual currently has authorization status on your contract.

| | | | |
|---|---|---|---|
| Name<br>Authorizations | BRENT R SHEETS<br>Account Inquiry<br>Account Maintenance<br>Transfers/Rebalance | Role | Investment Professional |
| Name<br>Authorizations | CHRISTOPHER E CRALLE<br>Account Inquiry<br>Account Maintenance<br>Transfers/Rebalance | Role | Investment Professional |
| Name<br>Authorizations | JEFFREY D WROBEL<br>Account Inquiry<br>Account Maintenance<br>Transfers/Rebalance | Role | Investment Professional |
| Name<br>Authorizations | XIAOMEI WANG<br>Account Inquiry<br>Account Maintenance<br>Transfers/Rebalance | Role | Investment Professional |
| Name<br>Authorizations | NELSON E NEWTON<br>Account Inquiry<br>Account Maintenance<br>Transfers/Rebalance | Role | Investment Professional |
| Name<br>Authorizations | WALTER WU JR<br>Account Inquiry<br>Account Maintenance<br>Transfers/Rebalance | Role | Investment Professional |

Annuities are issued by The Prudential Insurance Company of America and Pruco Life Insurance Company (in New York by Pruco Life Insurance Company of New Jersey), all located in Newark, NJ, or by Prudential Annuities Life Assurance Corporation, Shelton, CT. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial, Inc. Companies and each is solely responsible for its own financial condition and contractual obligations.

Agent# B7GGT2/ Office# Z70XW

A-AUTHOWNCHG-001
PAGE 1 of 2

01561 7569999 001562 001794 00001/00001

## EXHIBIT D-2. Plaintiffs' Authorization Information as of April 16, 2010

7569999 01561

| | | | |
|---|---|---|---|
| Name | MICHAEL H WU | Role | Owner |
| Authorizations | Account Inquiry | | |
| | Account Maintenance | | |
| | Transfers/Rebalance | | |
| | Partial Surrender | | |
| | | | |
| Name | CHRISTINE C WU | Role | Joint Owner |
| Authorizations | Account Inquiry | | |
| | Account Maintenance | | |
| | Transfers/Rebalance | | |

This information has been made effective as of April 16, 2010. If the information is incorrect, please contact us immediately.

Your satisfaction is important to us. If you have questions, please contact your financial professional or our Annuities Service Center at (888) 778-2888. Representatives are available to assist you Monday through Thursday between 8 a.m. and 7 p.m., and Friday between 8 a.m. and 6 p.m. Eastern time. You may also obtain additional information on our Web site, www.prudentialannuities.com. Please send all correspondence to Annuities Service Center, P.O. Box 7960, Philadelphia, PA 19176. Thank you for choosing Prudential Annuities for your financial needs.

Sincerely,

*Gary Hogard*

Gary Hogard
Vice President, Annuities Services

# EXHIBIT D-3. Plaintiffs' Authorization Information as of April 16, 2012

8232169  01841  E 1028928_AUTHOWNCHG_001_649

 **Prudential**

Annuities Services
P O Box 11467
Philadelphia, PA 19176

April 16, 2012

>01841 8232169 001 092001
MICHAEL H WU
CHRISTINE T WU
135 SCARBLEFORD DR
GLEN ELLYN IL 60137-5216

**Contract Owner:**
MICHAEL H WU
CHRISTINE T WU
**Annuitant:**
MICHAEL H WU
**Contract Number:** E 1028928

Dear MICHAEL H WU

This letter is being sent so that you may verify the authorization information we currently have on file for your contract. Please review the information below. It lists the authorization(s) granted to the named individual(s) related to this contract. These authorizations may include obtaining access to account information, performing account maintenance, transferring money between sub-accounts in your annuity and modifying allocation instructions. If the fields are blank, that indicates no other individual currently has authorization status on your contract.

| | | | |
|---|---|---|---|
| Name<br>Authorizations | BRENT R SHEETS<br>Account Inquiry<br>Account Maintenance | Role | Investment Professional |
| Name<br>Authorizations | CHRISTOPHER J CRABLE<br>Account Inquiry<br>Account Maintenance | Role | Investment Professional |
| Name<br>Authorizations | JEFFREY D WROBEL<br>Account Inquiry<br>Account Maintenance | Role | Investment Professional |
| Name<br>Authorizations | XIAOMEI WANG<br>Account Inquiry<br>Account Maintenance | Role | Investment Professional |
| Name<br>Authorizations | NELSON E NEWTON<br>Account Inquiry<br>Account Maintenance | Role | Investment Professional |
| Name<br>Authorizations | WALTER WULF<br>Account Inquiry<br>Account Maintenance | Role | Investment Professional |
| Name<br>Authorizations | MICHAEL H WU<br>Account Inquiry<br>Account Maintenance<br>Transfers-Rebalance<br>Partial Surrender | Role | Owner |

Annuities are issued by The Prudential Insurance Company of America and Pruco Life Insurance Company (in New York by Pruco Life Insurance Company of New Jersey), all located in Newark, NJ, or by Prudential Annuities Life Assurance Corporation, Shelton, CT. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial, Inc. Companies and each is solely responsible for its own financial condition and contractual obligations.

A-AUTHOWNCHG-001

Agent# BFGGT2/ Office# ZPOXW

## EXHIBIT D-3. Plaintiffs' Authorization Information as of April 16, 2012

8232169 01841

Name              CHRISTINE T WU                    Role    Joint Owner
Authorizations    Account Inquiry
                  Account Maintenance
                  Transfers-Rebalance

This information has been made effective as of April 16, 2012. If the information is incorrect, please contact us immediately.

Your satisfaction is important to us. If you have questions, please contact your financial professional or our Annuities Service Center at (888) 778-2888. Representatives are available to assist you Monday through Thursday between 8 a.m. and 7 p.m., and Friday between 8 a.m. and 6 p.m. Eastern time. You may also obtain additional information on our Web site, www.prudentialannuities.com. Please send all correspondence to Annuities Service Center, P.O. Box 7960, Philadelphia, PA 19176. Thank you for choosing Prudential Annuities for your financial needs.

Sincerely,

Gary Hogard

Gary Hogard
Vice President, Annuities Services

**EXHIBIT E. Prudential Premier Retirement VA Application Form (Partial)**

---

## Prudential

### Prudential
# Premier® Retirement
Variable Annuity Application Form
*Annuities are issued by Pruco Life Insurance Company*

Annuities Service Center
Financial Professionals:
1-800-513-0805
www.prudentialannuities.com

Regular Mail Delivery:
Annuities Service Center
P.O. Box 7960
Philadelphia, PA 19176

Overnight Service, Certified or
Registered Mail Delivery:
Prudential Annuities Service Center
2101 Welsh Road
Dresher, PA 19025

---

**PRODUCT SELECTION♦**  ✓ X Series  ☐ B Series  ☐ L Series  ☐ C Series

---

### SECTION 1 ■ OWNERSHIP INFORMATION

**A. TYPE OF OWNERSHIP**

☑ Individual  ☐ Custodian  ☐ UTMA/UGMA  ☐ Trust*  ☐ Corporation*  ☐ Other*
*If the Owner is a Trust, Corporation or other entity you must complete and submit the Certificate of Entity form with this application.

**B. OWNER**

Name (First, Middle, Last, or Trust / Entity): Michael H Wu
Birth Date (Mo / Day / Yr): 01 / 02 / 1947    SSN / TIN: 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    ☑ Male  ☐ Female

Street Address: 158 Stableford Dr    City: Glen Elly.    State: IL    ZIP: 60137

☑ U.S. Citizen  ☐ Resident Alien/Citizen of: _____
☐ Non-Resident Alien/Citizen of: _____    (Submit IRS Form W-8 (BEN, ECI, EXP or IMY)

**C. CO-OWNER - Not available for entity-owned Annuities or Qualified Annuities**

☑ Check here to designate the Co-Owners as each other's Primary Beneficiary.
Name (First, Middle, Last): Christine T Wu
Birth Date (Mo / Day / Yr): 08 / 01 / 1950    SSN / TIN: 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    ☐ Male  ☑ Female

Street Address: Same    City: _____    State: _____    ZIP: _____

☑ U.S. Citizen  ☐ Resident Alien/Citizen of: _____
☐ Non-Resident Alien/Citizen of: _____    (Submit IRS Form W-8 (BEN, ECI, EXP or IMY)
Relationship to Owner: _____

**D. ANNUITANT - Complete this Section if the Annuitant is not the Owner.**

Name (First, Middle, Last): _____
Birth Date (Mo / Day / Yr): _____    SSN / TIN: _____

Street Address: _____    City: _____    State: _____    ZIP: _____    ☐ Male  ☐ Female

☐ U.S. Citizen  ☐ Resident Alien/Citizen of: _____
☐ Non-Resident Alien/Citizen of: _____    (Submit IRS Form W-8 (BEN, ECI, EXP or IMY)

**FOR BROKER/DEALER USE ONLY**    Networking No. 58G 14499    Annuity No. (If established) _____

P-VAA(2/10)

## EXHIBIT E. Prudential Premier Retirement VA Application Form (Partial)

 **Prudential**

### SECTION 2 ■ BENEFICIARY INFORMATION

- For Custodial IRA contracts, the Custodian must be listed as the Beneficiary.
- For Qualified contracts (Profit Sharing Plan, 401(k), etc.) other than an IRA or SEP-IRA, the Plan must be listed as the Beneficiary.

Indicate classifications of each Beneficiary. Percentage of benefit for all Primary Beneficiaries must total 100%. Percentage of benefit for all Contingent Beneficiaries must total 100%. If the Co-Owners have been chosen as each other's Primary Beneficiary, then only Contingent Beneficiaries may be designated below.

| Name (First, Middle, Last) | | Birth Date (Mo / Day / Yr) | |
|---|---|---|---|
| | | / / | |
| ☐ Primary ☐ Contingent | Relationship | SSN/TIN | Percentage % |

| Name (First, Middle, Last) | | Birth Date (Mo / Day / Yr) | |
|---|---|---|---|
| Susan W. Miller | | 11 / 16 / 1974 | |
| ☐ Primary ☑ Contingent | Relationship Daughter | SSN/TIN 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 | Percentage 50 % |

| Name (First, Middle, Last) | | Birth Date (Mo / Day / Yr) | |
|---|---|---|---|
| Patrick P. Wu | | 06 / 07 / 1976 | |
| ☐ Primary ☑ Contingent | Relationship Son | SSN/TIN 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 | Percentage 50 % |

### SECTION 3 ■ ANNUITY INFORMATION

#### A. EXISTING ANNUITY OR LIFE INSURANCE COVERAGE

**1. Do you have any existing Annuity or Life Insurance Contracts?** ☐ Yes ☑ No
*If yes, a State Replacement Form is required for NAIC model regulation states.*

**2. Will the Annuity being applied for replace (in whole or in part) one or more existing Annuity or Life Insurance Contracts?** ☐ Yes ☑ No *If yes, complete the following and submit a State Replacement Form, if required.*

| Company Name | Policy or Annuity Number | Year Issued |
|---|---|---|
| | | |

Use Section 7 of this Application to specify additional coverage.

#### B. TYPE OF CONTRACT BEING REQUESTED

☑ Non-Qualified    ☐ SEP-IRA*    ☐ Roth 401(k)*    ☐ 457(b)*(gov't. entity)    ☐ 401*(Plan Year) _____
☐ IRA    ☐ Roth IRA    ☐ 403(b)*    ☐ 457(b)*(501(c) tax-exempt)    ☐ Other _____

*The following information is required if the contract being requested is an employer plan.*

| Employer Plan No. (if available) | Employer Plan Phone No. |
|---|---|
| | |

| Employer Plan Name | Employer Plan Contact Name |
|---|---|
| | |

| Street Address | City | State | ZIP |
|---|---|---|---|
| | | | |

**EXHIBIT E. Prudential Premier Retirement VA Application Form (Partial)**

**Prudential**

**SECTION 3 ■ ANNUITY INFORMATION (continued)**

**C. PURCHASE PAYMENTS**

**Make all checks payable to Pruco Life Insurance Company.** *Purchase Payment amounts may be restricted by Pruco Life; please see your prospectus for details.*

| QUALIFIED CONTRACT PAYMENT TYPE | NON-QUALIFIED CONTRACT PAYMENT TYPE |
|---|---|
| *Indicate type of initial estimated payment(s).* | *Indicate type of initial estimated payment(s).* |
| ☐ Transfer . . . . . . . . . . . $ | ☐ 1035 Exchange . . . . . . . . . $ |
| ☐ Rollover . . . . . . . . . . $ | ☑ Amount Enclosed . . . . . . . . $ 100,000.00 |
| ☐ Direct Rollover . . . . . . $ | ☐ CD Transfer or Mutual Fund Redemption . . . $ |
| ☐ IRA / Roth IRA Contribution . . . . . . . . $ for tax year | |
| *If no year is indicated, contribution defaults to current tax year.* | |

**D. OPTIONAL BENEFITS**

**Riders may not be available in all states or may vary. If elected, additional charges, age and investment restrictions may apply. Please see the prospectus for full details.**

| Living Benefits (ONLY ONE may be chosen.) | | Death Benefits (ONLY ONE may be chosen.) |
|---|---|---|
| **Income Benefits** | **Accumulation Benefits** | ☐ Combination 5% Roll-up and Highest Anniversary Value |
| ☐ Highest Daily Lifetime℠ 6 Plus | ☐ Highest Daily℠ Guaranteed Return Option℠ II (HD GRO℠ II) | ☐ Highest Anniversary Value (HAV) |
| ☑ Spousal Highest Daily Lifetime℠ 6 Plus | ☐ Guaranteed Return Option℠ Plus II (GRO Plus II) | *Death Benefits can only be elected at issue of a new contract and cannot be terminated once elected.* |
| ☐ Highest Daily Lifetime℠ 6 Plus with Lifetime Income Accelerator ¹ | | |
| ¹ *Cannot be elected with any Optional Death Benefit.* | | |

**SECTION 4 ■ INVESTMENT SELECTION**  *NOTE: ALL ELECTIONS MUST BE IN WHOLE PERCENTAGES, NOT DOLLARS.*

**A. 6 OR 12 MONTH DOLLAR COST AVERAGING (DCA) PROGRAM - Please see the prospectus for details on this program.**

If not enrolling in 6 or 12 Month DCA, proceed to Section 4B.

If enrolling in 6 or 12 Month DCA, check the applicable box and proceed to Section 4B to select the Portfolios to which your DCA transfers will be allocated. You may not participate in both the 6 and 12 Month DCA at the same time.

**6 or 12 Month DCA may not be available in all states.**

☐ 6 Month DCA |_____| % of purchase payments **OR** ☐ 12 Month DCA |_____| % of purchase payments

*If you have elected a 6 or 12 month DCA program, you may NOT elect any of the MVA Options in Section 4B.*

*If you choose to allocate less than 100% of your purchase payment to the 6 or 12 month dca program, the remaining percentage of your purchase payment will be allocated to the investments you select in Section 4B.*

**EXHIBIT E. Prudential Premier Retirement VA Application Form (Partial)**


**Prudential**

### SECTION 4 ■ INVESTMENT SELECTION *NOTE: ALL ELECTIONS MUST BE IN WHOLE PERCENTAGES, NOT DOLLARS.*
(continued)

**B. INVESTMENT ALLOCATIONS**

If you are electing an optional living and/or death benefit in Section 3D, you must choose from ONE of the following three options:
1. **Prudential Portfolio Combinations:** You may pick ONE of the Prudential Portfolio Combinations in Box 1; OR
2. **Asset Allocation Portfolios:** Indicate the percent of your investment for each Asset Allocation Portfolio. Allocations made among these portfolios must total 100% (BOX 2); OR
3. **Custom Portfolios Program:** You must allocate at least 20% among the individual portfolios listed in BOX 3 and the remaining percentage among the individual portfolios listed in BOX 2 and BOX 4 in any percent combinations. The Custom Portfolios Program will automatically be rebalanced quarterly to the allocations selected.

If you are NOT electing an optional living and/or death benefit, you may pick one of the Prudential Portfolio Combinations in Box 1; OR allocate among any of the portfolios and MVA Options listed in BOXES 2, 3, 4 or 5 in any percentage combination totaling 100%.

**AUTOMATIC REBALANCING** - *Available for options 1 or 2 above or if you are NOT electing an optional living and/or death benefit*

☐ Check here if you would like the below percentages to rebalance. Indicate the day of the month and frequency.

Day of the Month (1st - 28th) _____ Rebalancing Frequency: ☐ Monthly  ☐ Quarterly  ☐ Semi-Annually  ☐ Annually

**BOX 1 | Prudential Portfolio Combinations**

| ☐ Combination 1 | ☐ Combination 2 | ☐ Combination 3 |
|---|---|---|
| 50% AST Capital Growth Asset Allocation | 20% Franklin Templeton VIP Founding Funds Allocation Fund | 20% AST Horizon Growth Asset Allocation |
| 30% Franklin Templeton VIP Founding Funds Allocation Fund | 20% AST Fidelity Investments® Pyramis® Asset Allocation | 30% AST Academic Strategies Asset Allocation |
| 20% AST First Trust Capital Appreciation Target | 20% AST CLS Growth Asset Allocation | 50% AST Schroders Multi-Asset World Strategies |
| | 20% AST First Trust Capital Appreciation Target | |
| | 20% AST Advanced Strategies | |
| ☐ Combination 4 | ☐ Combination 5 | ☐ Combination 6 |
| 35% AST Balanced Asset Allocation | 40% AST T. Rowe Price Asset Allocation | 20% AST Horizon Moderate Asset Allocation |
| 35% AST T. Rowe Price Asset Allocation | 15% AST CLS Moderate Asset Allocation | 50% AST Academic Strategies Asset Allocation |
| 30% AST First Trust Balanced Target | 15% AST First Trust Balanced Target | 20% AST Schroders Multi-Asset World Strategies |
| | 30% AST Advanced Strategies | 10% AST J.P. Morgan Strategic Opportunities |
| ☐ Combination 7 | ☐ Combination 8 | ☐ Combination 9 |
| 20% AST T. Rowe Price Asset Allocation | 60% AST Preservation Asset Allocation | 25% AST Preservation Asset Allocation |
| 80% AST Preservation Asset Allocation | 40% AST J.P. Morgan Strategic Opportunities | 75% AST J.P. Morgan Strategic Opportunities |

Over time, the percentage that each Asset Allocation Portfolio you are invested in represents to your Account Value may vary from the original allocation percentage within the Prudential Portfolio Combination you selected. We will not automatically rebalance your variable Account Value to stay consistent with that original allocation, unless you specifically direct us to do so in the Automatic Rebalancing section above. In providing these Portfolio Combinations, we are not providing investment advice. You and your Financial Professional are responsible for determining which Portfolio Combinations or Sub-account(s) are best for you.

**BOX 2 | Asset Allocation Portfolios %**

| Traditional | Tactical | Alternative |
|---|---|---|
| └───┘ AST Balanced Asset Allocation | └───┘ AST CLS Growth Asset Allocation | └───┘ AST Academic Strategies Asset Allocation |
| └───┘ AST Capital Growth Asset Allocation | └───┘ AST CLS Moderate Asset Allocation | └───┘ AST Advanced Strategies |
| └───┘ AST Fidelity Investments® Pyramis® Asset Allocation | └───┘ AST Horizon Growth Asset Allocation | └───┘ AST J.P. Morgan Strategic Opportunities |
| └100┘ AST Preservation Asset Allocation | └───┘ AST Horizon Moderate Asset Allocation | └───┘ AST Schroders Multi-Asset World Strategies |
| └───┘ AST T. Rowe Price Asset Allocation | **Quantitative** | |
| └───┘ Franklin Templeton VIP Founding Funds Allocation Fund | └───┘ AST First Trust Balanced Target | |
| | └───┘ AST First Trust Capital Appreciation Target | **BOX 2 Total** └100┘ % |

**BOX 3 | Bond Portfolios %**

| | | |
|---|---|---|
| └───┘ AST PIMCO Total Return Bond | └───┘ AST Western Asset Core Plus Bond | **BOX 3 Total** └───┘ % |

*(Continued)*

## EXHIBIT E. Prudential Premier Retirement VA Application Form (Partial)

### Prudential

**SECTION 4 ■ INVESTMENT SELECTION** *NOTE: ALL ELECTIONS MUST BE IN WHOLE PERCENTAGES, NOT DOLLARS* (continued)

**BOX 4 | Additional Portfolios %**

**Large-Cap Growth**
- AST Goldman Sachs Concentrated Growth
- AST Jennison Large-Cap Growth
- AST Marsico Capital Growth
- AST MFS Growth
- AST T. Rowe Price Large-Cap Growth

**Large-Cap Blend**
- AST QMA US Equity Alpha

**Large-Cap Value**
- AST AllianceBernstein Core Value
- AST AllianceBernstein Growth & Income
- AST American Century Income & Growth
- AST DeAM Large-Cap Value
- AST Jennison Large-Cap Value
- AST Large-Cap Value

**Mid-Cap Growth**
- AST Goldman Sachs Mid-Cap Growth
- AST Neuberger Berman Mid-Cap Growth

**Mid-Cap Value**
- AST Mid-Cap Value
- AST Neuberger Berman / LSV Mid-Cap Value

**Fixed Income**
- AST High Yield
- AST Lord Abbett Bond-Debenture
- AST Money Market
- AST PIMCO Limited Maturity Bond
- AST T. Rowe Price Global Bond

**Small-Cap Growth**
- AST Federated Aggressive Growth
- AST Neuberger Berman Small-Cap Growth
- AST Small-Cap Growth

**Small-Cap Value**
- AST Goldman Sachs Small-Cap Value
- AST Small-Cap Value

**International Equity**
- AST International Growth
- AST International Value
- AST JP Morgan International Equity
- AST MFS Global Equity
- AST Parametric Emerging Markets Equity

**Specialty Portfolio**
- AST Cohen & Steers Realty
- AST Global Real Estate
- AST T. Rowe Price Natural Resources

**BOX 4 Total** |_____| %

**BOX 5 | MVA Options %**

| | | |
|---|---|---|
| |_____| 3-Year Guarantee Period | |_____| 7-Year Guarantee Period | |
| |_____| 5-Year Guarantee Period | |_____| 10-Year Guarantee Period | **BOX 5 Total** |_____| % |

**CUMULATIVE (TOTAL 100%)** |_____| %

**SECTION 5 ■ E-DOCUMENTS**

☐ By checking, providing my e-mail address below and signing Section 9, I consent to accept documents electronically for my variable annuity. E-mail notifications will be provided indicating that documents are available and will include instructions on how to quickly and easily access them on-line.

I understand that I will receive documents including but not limited to: statements, confirmations and prospectuses electronically, if available, until I notify Prudential that I am revoking my consent at which time I will begin receiving paper documents by mail. I also understand there are no fees charged by Prudential for the e-Documents service or for paper documents. See your Internet Service Provider for any other access fees that may apply.

E-mail Address |_____|

**SECTION 6 ■ FINANCIAL PROFESSIONAL AUTHORIZATION**

If not checked we will assume that your answers are "YES" (except in Utah, where we will assume your answer is "NO") to Perform Contract Maintenance and Provide Investment/Allocation Instructions. For definitions, see Definitions and Disclosures.

**DO YOU AUTHORIZE** your Financial Professional to perform any of the designated activities below? ☑ Yes ☐ No Please indicate what designated activities you authorize your Financial Professional to have:

☐ **Perform Contract Maintenance**    ☐ **Provide Investment/Allocation Instructions**

**SECTION 7 ■ ADDITIONAL INFORMATION**

If needed for:  • Special Instructions  • Beneficiaries  • Contingent Annuitant (for custodial business only)
               • Annuity Replacement  • Entity Authorized Individuals

**EXHIBIT E. Prudential Premier Retirement VA Application Form (Partial)**



**SECTION 8 ■ NOTICES & DISCLAIMERS**

**FOR ANY ANNUITY ISSUED UNDER A GROUP CONTRACT:** The Owner of the group contract is the Pruco Life Insurance Variable Annuity Trust, an out-of-state, discretionary trust under the regulation of Indiana law.

**ARIZONA:** Upon written request an insurer is required to provide, within a reasonable time, factual information regarding the benefits and provisions of the annuity contract to the contract owner.

If for any reason you are not satisfied with this contract, you may return it to us within 10 days (or 30 days for applicants 65 or older) of the date you receive it. All you have to do is take it or mail it to one of our offices or to the representative who sold it to you, and it will be canceled from the beginning. If this is not a variable contract, any monies paid will be returned promptly. If this is a variable contract, any monies paid will be returned promptly after being adjusted according to state law.

**CALIFORNIA:** If any Participant(s)/Owner(s) (or Annuitant for entity-owned contracts) is age 60 or older, you are required to complete the "Important Information for Annuities Issued or Delivered in California" form.

**COLORADO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages.

Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**FLORIDA:** Any person who knowingly and with intent to injure, defraud or deceive any insurer, files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**KENTUCKY:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**MAINE:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NEW JERSEY:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NORTH CAROLINA: North Carolina residents must respond to this question:**
1. Did you receive a prospectus for this annuity?
   ☐ Yes ☐ No
2. Do you believe the annuity meets your financial objectives and anticipated future financial needs?
   ☐ Yes ☐ No

**OHIO:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**OKLAHOMA: WARNING —** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**OREGON and VERMONT: —** Any person who knowingly presents a materially false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

**PENNSYLVANIA:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**TENNESSEE, VIRGINIA, and WASHINGTON:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

**ALL OTHER STATES:** Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**EXHIBIT E. Prudential Premier Retirement VA Application Form (Partial)**



### SECTION 9 ■ OWNER ACKNOWLEDGEMENTS AND SIGNATURE(S)

☐ By checking this box and signing below, I consent to receiving the prospectus for this variable annuity on the compact disc (the "CD Prospectus") contained within the sales kit for this annuity. I acknowledge that I (i) have access to a personal computer or similar device (ii) have the ability to read the CD Prospectus using that technology and (iii) am willing to incur whatever costs are associated with using and maintaining that technology. With regard to prospectus supplements and other amended/updated prospectuses created in the future, I understand that such documents may be delivered to me in paper form.

- I understand that if I have purchased another Non-Qualified Annuity from Pruco Life or an affiliated company this calendar year that they will be considered as one annuity for tax purposes. If I take a distribution from any of these contracts, the taxable amount of the distribution will be reported to me and the IRS based on the earnings in all such contracts purchased during this calendar year; and

- This variable annuity is suitable for my investment time horizon, goals and objectives and financial situation and needs; and

- I understand that annuity payments, benefits or surrender values, when based on the investment experience of the separate contract investment options, are variable and not guaranteed as to a dollar amount;

- I represent to the best of my knowledge and belief that the statements made in this application are true and complete.

- I acknowledge that I have received a current prospectus for this annuity.

- Amounts allocated to an MVA Option may be subject to a Market Value Adjustment if withdrawn or transferred at any time other than during the 30 day period prior to the MVA Option's Maturity Date. See prospectus for details.

  *Note: For Trusts, Corporations or other Entity-owned Applications: This application must be accompanied by a completed Certificate of Entity Ownership Form.*

**REQUIRED ◆**  State where signed  |___/L_____|

(If application is signed in a State other than the Owner's State of Residence, a Contract Situs Form may be required.)

**OWNER'S TAX CERTIFICATION (SUBSTITUTE W-9)**

Under penalty of perjury, I certify that the taxpayer identification number (TIN) I have listed on this form is my correct TIN. I further certify that the citizenship/residency status I have listed on this form is my correct citizenship/residency status.

☐ I have been notified by the Internal Revenue Service that I am subject to backup withholding due to underreporting of interest or dividends.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

| **SIGN HERE ◆** | Owner | Date |
| --- | --- | --- |
| | (X) | 04 / 13 / 2010 |
| | | Month / Day / Year |

**TITLE (If Any) ◆**  |_____|

If signing on behalf of an entity, you must indicate your official title / position with the entity; if signing as a Trustee for a Trust, please provide the Trustee designation.

| **SIGN HERE ◆** | Co-Owner | Date |
| --- | --- | --- |
| | (X) | 04 / 13 / 2010 |
| | | Month / Day / Year |

| **SIGN HERE ◆** | Annuitant | Date |
| --- | --- | --- |
| | (if different from Owner) | Month / Day / Year |

## EXHIBIT F. Hagan's Letter Dated March 20, 2012

 Prudential

Prudential Annuities
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

March 20, 2012

MICHAEL H WU
40 E 9TH STREET (#1805)
CHICAGO IL 60605

**Contract Owner:** Michael H. Wu &
Christine T. Wu
**Contract Number:** E1028928

Dear Mr. Wu:

I am writing in response to your outstanding questions. The responses are as follows:

**Q1. "Why Prudential Insiders did so many unauthorized transactions"?**

In our letter dated February 23, 2012, we provided details regarding the pre-determined mathematical formula benefit fund transfers that are part of the Spousal HD6 Plus living benefit you purchased. In addition to the transactions related to Spousal HD6 Plus, we also outlined information regarding the Custom Portfolios Program you elected for your investment options. This program has a required automatic quarterly rebalance.

For additional reference, the pre-determined mathematical formula is disclosed in your contract and prospectus, and also in the client brochure that we understand your Citigroup financial professional, Linda Wang, used when she met with you prior to your decision to purchase the benefit. Information on the Custom Portfolios Program rebalance was disclosed when you elected the program through Service Online and is also available in the prospectus.

**Q2. "Why Prudential misrepresents that there is 6% minimum growth guarantee from very Beginning"?**

The purchase of your product was through your Citigroup financial professional, Linda Wang. Prudential clearly explains the benefit features in the sales material, contract and prospectus. These documents contain no misrepresentations regarding the annuity contract or the Spousal HD6 Plus optional living benefit feature you elected as part of the annuity contract. Please note that the Spousal HD6 Plus benefit you purchased has a Protected Withdrawal Value ("PWV") separate from your account value as outlined in our letter dated February 23, 2012, in the prospectus and in the brochure that we understand your Citigroup financial professional used when she met with you. It's possible that the 6% guarantee you mention in your question is in reference to one of the methods for calculating the PWV. More information is available in our prior letter and in the prospectus as referenced.

**Q3. "Why Prudential swindles much more than $6,000 and still locks more than $45,000 of our money in said Prudential Insiders' cover-up sub-account"?**

With respect to the questions you have regarding the allocation of money to the AST Investment Grade Bond Portfolio ("Bond Portfolio"), please refer to our letter dated February 23, 2012, in which we explain in detail how funds move between your chosen subaccount allocations and the Bond Portfolio. Any investment loss in your contract is not considered gain by Prudential. Additionally, we refer you to our responses to Q16 and Q22 below regarding the risk mitigation aspect of the asset-transfer formula and the nature of the underlying investment options, respectively.

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

## EXHIBIT F. Hagan's Letter Dated March 20, 2012

**Q4. "If arbitrageurs could misprice securities, which of the above-mentioned six securities can be mispriced "?**

The transactions related to the pre-determined mathematical formula are not subject to arbitrage and the subaccounts underlying your annuity contract are not mispriced.

**Q5. "Securities are regulated by official agencies and traded in the open market. How come arbitrageurs can misprice them"?**

The subaccounts as described in our letter dated February 23, 2012 are not mispriced.

**Q6. "Why Prudential assign only a representative from your Customer Relations team is reviewing our records, who might have no financial background and authority"? (Ref: E-mail dated 01-05-2012 from VAWebRequests@prudential.com.)**

The contact person referenced in the email from our Customer Relations team who coordinated the research to address your concerns is Series 6 licensed with FINRA. Your concerns were reviewed by the appropriate individuals prior to our written response being sent to you. They have the background, authority and resources available in order to respond to questions about your annuity.

**Q7. "Wen Prudential will revoke all unauthorized transactions done for all Prudential customers, which are unsuitable trades for Prudential customers"?**

Please refer to our letter dated February 23, 2012, in which we explain your benefit transactions. These transactions will not be "revoked" as they are processed per the terms of the benefit you elected. As described in the prospectus you received and the brochure provided by your Citigroup financial professional, Linda Wang, these transactions are driven by an automated, pre-determined mathematical formula which is part of the Spousal HD6 Plus benefit you elected. The Spousal HD6 Plus benefit can be cancelled at any time, although all guarantees under the benefit will terminate. If you would like to cancel the benefit, please contact our Annuity Service Center at 888-778-2888.

**Q8. "Wen Prudential will remove Prudential Insiders' "Trojan Horse" (i.e., "AST Investment Grade Bond Portfolio") from all Prudential contracts"?**

The Bond Portfolio is a required component of the Spousal HD6 Plus living benefit design, and as such will not be removed. As mentioned in our response to Q7 above, the Spousal HD6 Plus benefit can be cancelled at any time, which would stop all transfers under the pre-determined mathematical formula. However, if you cancel your Spousal HD6 Plus benefit, you also would lose all guarantees and other features associated with that benefit.

**Q9. "Wen Prudential will eliminate Prudential "Arbitrage Pricing Model" from Prudential Variable Annuities software package"?**

Prudential does not utilize an Arbitrage Pricing Model.

**Q10. "When Prudential will eradicate Prudential "Duo Pricing Systems" (and Citigroup will eradicate the 3rd one)?**

Prudential does not utilize a Duo Pricing System. We direct you to Citigroup for that portion of your question that relates to Citigroup.

## EXHIBIT F. Hagan's Letter Dated March 20, 2012

**Q11. When Prudential will credit back all customers' accounts, which is cheated out of all Prudential contracts by Prudential's "Duo Pricing Systems"?**

As stated above, Prudential does not utilize a Duo Pricing System.

**Q12. "When Prudential will disarm her "Pyramid Scheme" organization, which includes Prudential's partnership with Citigroup, Inc., and maybe others"?**

Prudential does not participate in pyramid schemes of any kind.

**Q13. "Who does the Risk Transfer and Risk is Transferred to whom"?**

To the extent your question relates to the Defined Benefit Risk Transfer ("DBRT") that you raise in Q22 and Q25 below, please note that DBRT relates to defined benefit retirement plans and not to individual annuity contracts such as yours. The risk mitigation aspect of your benefit is completely separate and distinct from DBRT.

In terms of the risk mitigation feature of your benefit, the proprietary formula in the Spousal HD6 Plus attempts to help lessen both your investment risk and Prudential's financial risk in a down market through the benefit fund transfers as outlined in our letter dated February 23, 2012. The Spousal HD6 Plus formula helps to reduce your investment risk by moving assets out of the variable subaccounts and into the Bond Portfolio depending on the various components of the formula. This also helps to reduce Prudential's financial risk by attempting to lessen the gap between the Contract Fund Value and the benefit Protected Withdrawal Value, allowing us to offer you the guarantees associated with this benefit.

**Q14. "When the Risk Transfer will be done and how frequently"?**

The benefit fund transfers occur when dictated by the pre-determined mathematical formula described in our letter dated February 23, 2012 and prospectus.

As noted above, to the extent your question relates to DBRT, please note that DBRT relates to defined benefit retirement plans and not to individual annuity contracts such as yours. The risk mitigation aspect of your benefit is completely separate and distinct from DBRT.

**Q15. "How the Risk Transfer is done and how many % of Risk will be Transferred"?**

The benefit fund transfers occur when dictated by the pre-determined mathematical formula described in our letter dated February 23, 2012 and prospectus.

As noted above, to the extent your question relates to DBRT, please note that DBRT relates to defined benefit retirement plans and not to individual annuity contracts such as yours. The risk mitigation aspect of your benefit is completely separate and distinct from DBRT.

**Q16. "What does Risk Transfer really mean"?**

The objective of the pre-determined mathematical formula used with the Spousal HD6 Plus benefit is to help us manage your benefit guarantee through all market cycles. The formula is designed to help lessen your investment risk and the risks to Prudential related to the guarantees under the Spousal HD6 Plus benefit by moving assets as dictated by the Spousal HD6 Plus benefit's pre-determined mathematical formula into the Bond Portfolio. We described the operation of this formula in our letter dated February 23, 2012. This also attempts to lessen the gap between the Account Value and the benefit Protected Withdrawal Value, allowing us to offer you the guarantees associated with this benefit by reducing Prudential's exposure for the guarantees.

## EXHIBIT F. Hagan's Letter Dated March 20, 2012

As noted above, to the extent your question relates to DBRT, please note that DBRT relates to defined benefit retirement plans and not to individual annuity contracts such as yours. The risk mitigation aspect of your benefit is completely separate and distinct from DBRT.

Q17. "Why Risk Transfer is needed"?

As stated in Q16 above, the objective of the pre-determined mathematical formula used with the Spousal HD6 Plus benefit is to help us manage your benefit guarantee through all market cycles. The formula is designed to help lessen your investment risk and the risks to Prudential related to the guarantees under the Spousal HD6 Plus benefit by moving assets as dictated by the Spousal HD6 Plus benefit's pre-determined mathematical formula into the Bond Portfolio. We described the operation of this formula in our letter dated February 23, 2012. This also attempts to lessen the gap between the Account Value and the benefit Protected Withdrawal Value, allowing us to offer you the guarantees associated with this benefit by reducing Prudential's exposure for the guarantees.

As noted above, to the extent your question relates to DBRT, please note that DBRT relates to defined benefit retirement plans and not to individual annuity contracts such as yours. The risk mitigation aspect of your benefit is completely separate and distinct from DBRT.

Q18. "Can you tell Prudential annuity customers why they lost double while Prudential made non-negative profit"?

There are many factors and business lines that go into the formulation of Prudential Financial, Inc.'s financial results. However, we will respond to matters related to your individual annuity contract. Based upon our review of your contract, your initial investment was $100,000 and your contract value as of March 8, 2012 was $103,181.52 with a protected withdrawal value of $120,011.77.

Q19. "Does Mr. Carbone project Prudential "End of 2011 Price" in 4Q2010 by using his APT knowledge"?

The information you request is separate and distinct from the issues you have raised regarding your Spousal HD6 Plus benefit. Prudential has not provided projections of its share price. However, please direct any questions about Prudential Financial, Inc. other than your benefit-related issues to our Investor Relations group by email at investor.relations@prudential.com.

Q20. "What the old value of "Y%" (in DBRT, Ref. Attachment 8) was, which Mr. Carbone predefined in 4Q 2010 Earnings Call"?

The information you request is separate and distinct from the issues you have raised regarding your Spousal HD6 Plus benefit. Prudential has not provided projections of its share price. However, please direct any questions about Prudential Financial, Inc. other than your benefit-related issues to our Investor Relations group by email at investor.relations@prudential.com.

Q21. "Ms. Angella Anderson mentioned "on or before February 20, 2012" on "Page 2, Attachment 12. Does "February 20, 2012" have special meaning? Will "Customer/Market Guarantee 6+%" be distributed after February 20, 2012"?

Ms. Angella Anderson provided the February 20, 2012 date as a reasonable deadline by which you would need to accept our offer to resolve your dispute should you be interested in accepting the offer. We are willing to extend this deadline until April 1 given the additional time that it has taken for us to respond to your additional questions. However, this extension should not be viewed as an indication that we will provide further extensions in the future of the deadline to accept our offer. Please also note that there is no relation between Prudential's offer and the guarantees associated with your annuity contract.

## EXHIBIT F. Hagan's Letter Dated March 20, 2012

**Q22. "Prudential Variable Annuity (VA) Products are Mutual Funds packaged with "SHD6 Plus", DBRT, and whatever. Dividends of Mutual Funds are normally distributed in December annually, which belong to VA customers, not Prudential Insiders. Where are VA customers' dividends for calendar years 2010 and 2011"?**

As noted above, DBRT relates to defined benefit retirement plans and not to individual annuity contracts such as yours.

Prudential variable annuity products are not mutual funds, but rather are annuity products that invest in mutual funds. The purchase payments of variable annuity contract owners are allocated to subaccounts selected by the owner. These subaccounts, in turn, invest in mutual funds that are not publicly available. The mutual funds underlying the variable annuity contract owner's contract are mutual funds that, like all other mutual funds, periodically pay dividends and distributions that are then reinvested and reflected in the accumulation unit values. No variable annuity contract owner of any insurance company ever receives a direct payment of an underlying mutual fund dividend or distribution. Dividends are, however, always reflected in the contract owner's account values.

**Q23. "How Prudential helped individual and institutional customers grow and protect wealth for the past 135 years"? (Attachment 5a. Samples of Contract Value Difference; Ref. http://www.prudential.com/view/page/public/15280?seg=2&name=ourcompany)**

At Prudential, we are proud of our long history of serving our clients' needs in many ways. With respect to our annuity products, these needs could be anything from tax deferral to helping clients reach retirement income goals. For your specific individual needs, we refer you back to discussions you had with your Citigroup financial professional, Linda Wang, prior to making the decision to purchase your Prudential annuity with Spousal HD6 Plus.

**Q24. "Can we have a copy of the (e-)mailing list of all Prudential VA contracts? They might want to see both sides of the same token, so Prudential can get rid of similar complaints in the future".**

We will not provide you with personal information for any of our clients. At Prudential, we take client privacy very seriously and providing you with such information would be a breach of our clients' privacy.

**Q25. "Prudential Insiders' Transactions done in 2012 is 503% (on average) of their 2011's (Ref. http://finance.yahoo.com/q/it?s=PRU+Insider+Transactions). Should 403% of said 503% be attributed to Prudential "Groundbreaking Defined Benefit Risk Transfer (DBRT)" talent"?**

There is no relation between the Insider Transactions listed on the website you referred to and the transaction that occurred on your contract. Also, as explained above, DBRT relates to defined benefit retirement plans and not in any way to individual annuity contracts such as yours.

Finally, to address your other comments regarding our letter dated February 23, 2012, our records indicate that you received a prospectus on April 15, 2010. All aspects pertaining to the transactions related to the pre-determined mathematical formula within the Spousal HD6 Plus benefit is disclosed in the prospectus and we refer you to pages 55 through 57, specifically. Also, please note that all fees are fully disclosed in the prospectus and we refer you specifically to pages 3 through 10 in the prospectus you received on April 15, 2010. Additionally, it is our understanding that Linda Wang received specific product/benefit training from her Citigroup broker-dealer firm prior to your purchase of your annuity and living benefit.

# EXHIBIT F. Hagan's Letter Dated March 20, 2012

We now have responded to all your questions. We trust that you have adequate information to make a decision regarding our offer to resolve your dispute regarding your Spousal HD6 Plus benefit. Please respond by April 1, 2012, if you would like to accept our offer. Otherwise, our offer will expire on that date. Although we are leaving our offer open through April 1, we now consider this matter to be closed.

Sincerely,

Christopher Hagan
Vice President, Annuity Operations

## EXHIBIT G. Grier's Statements from Q4 2007 to Q4 2011

**What Mark Brown Grier said during PFI Q4 2007 Earnings Call held on February 7, 2008:**





**ETRACS DJ-UBS
Commodity Index
2-4-6 Blended
Futures ETN**

(Ticker: BLND)

A blend of
commodities



**ETRACS DJ-UBS
Commodity Index
2-4-6 Blended
Futures ETN**

(Ticker: BLND)

A blend of

Our annuity business reported adjusted operating income of $167 million in the fourth quarter, compared to $154 million a year ago. The $13 million increase came mainly from higher asset-based fees driven by market appreciation together with strong net sales of variable annuities, which amounted to $2.1 billion for the year.

Our hedging program continued to perform well through the volatile equity market conditions of the fourth quarter. The adjusted operating income that we report includes breakage between changes and the values of our living benefits guarantees and values of our hedging instruments. This breakage in our reported results has been no more than single digit millions in any quarter since the program began in 2005, and was insignificant in the current quarter.

Our gross variable annuity sales for the quarter were $3 billion, up 15% from a year ago. In a market that is increasingly focused on retirement income security, our innovative living benefit features have been well received by customers and their financial advisors. The value of this guarantee becomes dramatically clear when equity markets are turbulent. And we are the only company that offers income guarantees based on highest daily value, made possible by our product innovation and risk management skills.

Our overall take rate for living benefit was more than 80% and account values with our Highest Daily or HD Lifetime Five feature that we introduced just over a year ago, reached $3.7 billion at year-end.

Last week, we announced the enhancement of our annuity features with the addition of Highest Daily Lifetime Seven, a living benefit feature that offers a protected value for lifetime withdrawals, based on 7% annual comp growth of the highest daily account value until the earlier or first withdrawal for ten years. Like our earlier Lifetime Five benefits, risk management is an integral part of product design. For example, we think of the equity market risk on our HD features as essentially self hedging, since the guarantee is supported by daily rebalancing the funds between the customers' selected variable investments and fixed income investments.

Our sales are continuing to benefit from expanded distribution, including the new distribution that came to us with the acquisition of Allstate Variable Annuity business in 2006. Each of our distribution channels; insurance agents, warehouses and independent financial planners registered solid double-digit increases in sales for the quarter, compared to a year ago.

## EXHIBIT G. Grier's Statements from Q4 2007 to Q4 2011

### What Mark Brown Grier said during PFI Q4 2008 Earnings Call held on February 5, 2009:



http://seekingalpha.com/article/118898-prudential-financial-inc-4th-quarter-2008-earnings-call-transcript

al Financial Inc 4t... ×

編輯(E)  檢視(V)  我的最愛(A)  工具(T)  說明(H)

SPC Technical Analysi... ☻! ^GSPC TA (20, 30, 150) ☻! ^GSPC_STO,W%R,MACD, ☻! ^GSPC - W%R  取得更多附加元件 ▾

Home    Portfolio    Market Currents    Investing Ideas    Dividends & Income    ETFs    Macro View    ALERTS

Current quarter results also include charges of $409 million to strengthen our reserves for guaranteed minimum death and income benefits. This increase in reserves is based on the same projection of where account values will be over time that we use for DAC starting with the year-end balances as Rich described.

In setting these reserves, we estimate the extent to which our guarantees will be in the money over time and apply a dynamic lapse assumption that considers the tendency of contract holders to keep their annuities in force when the guarantees are in the money, since we expect more of the guarantees to turn into claims than if these customers lapsed at average rates.

In addition, the adjusted operated income we report also includes breakage between changes in the values of our living benefits guarantees and our hedging instruments. With the continued turbulent financial markets in the fourth quarter, we experienced negative breakage of $130 million after related amortization of DAC. To keep this breakage in perspective, I would note that we are hedging exposure on about $21 billion of account values as of year-end.

Lastly, we wrote off the entire $97 million balance of goodwill from our acquisition of Allstate's variable annuity business. The remainder of the decline in adjusted operating income for the annuity business from a year ago came from lower fees in the current quarter due to the market-driven declines in account values with spread income from funds rebalanced to the general account a partial offset.

Our gross variable annuity sales for the quarter were $2.1 billion compared to $3 billion a year ago. We feel that our gross sales have held up quite well in relation to the overall market. We are also continuing to enjoy positive net sales which were roughly $500 million for the fourth quarter and $2.2 billion for the year.

With our transition to products with the highest daily or HD features, a growing proportion of our account values with living benefits, 54% at year-end compared to 37% a year earlier, are essentially self-hedging as to equity market risk since the customer agrees to our daily rebalancing from the selected funds to fixed income investments in support of the guarantee when there are equity market declines.

## EXHIBIT G. Grier's Statements from Q4 2007 to Q4 2011

**What Mark Brown Grier said during PFI Q4 2009 Earnings Call held on February 11, 2010:**



Our gross variable annuity sales for the quarter amounted to $4.8 billion compared to $2.1 billion a year ago. Our highest daily or HD living benefit guarantees have provided us with a substantial competitive advantage in the variable annuity market. These products include an auto rebalancing feature that shifts customer funds to fixed income investments to protect account values and support our guarantees in market downturns.

We have completed our transition to our new HD 6 Plus living benefit product feature which was introduced in August. About $1 billion of the current quarter's sales, substantially all in the first month of the quarter, represented spillover sales of the earlier HD 6 product -- of the earlier product, HD 7 Plus. Significantly, monthly sales continued at a similar level in November and December suggesting that our new product is still attractive in the marketplace.

Our take-up rate for HD features, the percentage of eligible premiums where the customer has elected the benefit, was over 90% for the fourth quarter. The popularity of these features has driven the growth of our auto rebalancing book of business, reducing our risk profile and limiting our exposure to changes in hedging costs.

As of year-end about two-thirds of our account values with living benefits are subject to auto rebalancing compared to just over half of the account values a year earlier. The auto rebalancing algorithm is functioning as intended, returning customer funds to participate in market appreciation as account values become adequate to support our guarantees.

## EXHIBIT G. Grier's Statements from Q4 2007 to Q4 2011

**What Mark Brown Grier said during PFI 4Q 2010 Earnings Call held on February 10, 2011:**



All of the variable annuity living benefit features we offer today come packaged with an auto-rebalancing feature, where customer funds are reallocated to fixed income investments to support our guarantees in the event of market declines. Given the popularity of these features over the past several years, driven by our highest daily benefits, more than three quarters of our account values with living benefits at year end are subject to auto-rebalancing, reducing our risk profile and limiting our exposure to potentially volatile cost of hedging equity risk. Our auto-rebalancing algorithm has functioned well, producing net transfers of about $7 billion from auto-rebalanced fixed income investments to funds that clients have selected since the market trough in early 2009. As of year end, less than 12% of account values subject to auto-rebalancing remain in the designated fixed income accounts. Put another way, 88% of the account values for auto-rebalancing products are now in client-selected funds, providing participation in equity and fixed income markets. At the trough of the market, more than 3/4 of the account values were in auto-rebalance fixed income accounts.

Our gross rate of Annuity sales for the quarter amounted to $6.1 billion compared to $4.8 billion a year ago. Our highest daily products have fueled growth in each of our distribution channels and supported development of significant new relationships, especially in the bank channel, where quarterly sales passed the $1 billion mark for the first time and are up more than 70% over the year ago quarter.

## EXHIBIT G. Grier's Statements from Q4 2007 to Q4 2011

**What Mark Brown Grier said during PFI 4Q 2011 Earnings Call held on February 9, 2012:**



Our gross variable annuity sales for the quarter amounted to $4.4 billion, in line with the second and third quarters. This compares to $6.1 billion a year ago when new business was bolstered by sales in advance of the repricing of our annuity products in early 2011.

Our relative position within the top few variable annuity writers from one quarter to another reflects the constant dynamic of changes in the marketplace, including actions by competitors to revamp their products, which led in some instances to sale surges due to product introductions or in anticipation of future retrenchments or repricings. Our highest daily protected value feature, coupled with auto-rebalancing tailored to each customer's account, clearly distinguishes our product and has a proven track record of more than 5 years with clients and their advisors. We strongly believe that our consistent approach to product design and our demonstrated commitment to the advisor sold variable annuity business provide us with a solid competitive advantage in the market that is very much driven by third-party gatekeepers and distributors. And that the various ways of product design changes and market entries, exits and reentries by various providers serve to distinguish us and strengthen our position with our distribution partners.

## EXHIBIT H. Prudential Annuities Never Publishes Firm Quotes for Portfolios of Mispriced "Junk Bonds" (Sample)

# Prudential Premier® Retirement Variable Annuity X Series[SM]

| Prices as of 06/26/2014 | | | Show Scrollbars |
|---|---|---|---|
| **Sub-account [Group Alphabetically]** | **Price** | **+/-Price** | **% Change** |
| **Asset Allocation/Balanced** | | | |
| AST Academic Strategies Asset Allocation Portfolio[*,1] | 12.90697 | ↓0.00066 | -0.0051% |

. . .

| **International Equity** | | | |
|---|---|---|---|
| AST AQR Emerging Markets Equity Portfolio[*,2] | 10.35758 | ↑0.04824 | 0.4679% |
| AST International Growth Portfolio[2] | 13.09972 | ↑0.04599 | 0.3523% |
| AST International Value Portfolio[2] | 12.57095 | ↓0.00737 | -0.0586% |
| AST J.P. Morgan International Equity Portfolio[2] | 12.92811 | ↓0.02042 | -0.1577% |
| AST MFS Global Equity Portfolio[2] | 16.17538 | ↓0.03162 | -0.1951% |
| AST Parametric Emerging Markets Equity Portfolio[2] | 11.00829 | ↓0.00056 | -0.0051% |
| AST QMA Emerging Markets Equity Portfolio[*,2] | 9.98693 | ↑0.04826 | 0.4856% |
| **Fixed Income** | | | |
| AST Bond Portfolio 2017[5] | N/A | N/A | N/A |
| AST Bond Portfolio 2018[5] | N/A | N/A | N/A |
| AST Bond Portfolio 2019[5] | N/A | N/A | N/A |
| AST Bond Portfolio 2020[5] | N/A | N/A | N/A |
| AST Bond Portfolio 2021[5] | N/A | N/A | N/A |
| AST Bond Portfolio 2022[5] | N/A | N/A | N/A |
| AST Bond Portfolio 2023[*,5] | N/A | N/A | N/A |
| AST Bond Portfolio 2024[5] | N/A | N/A | N/A |
| AST Bond Portfolio 2025[*,5] | N/A | N/A | N/A |
| AST High Yield Portfolio[14] | 13.36126 | ↓0.00068 | -0.0051% |
| AST Investment Grade Bond Portfolio[5] | N/A | N/A | N/A |
| AST Lord Abbett Core Fixed Income Portfolio[*,20,21] | 12.11284 | ↑0.01998 | 0.1652% |
| AST Money Market Portfolio[22] | 9.23441 | ↓0.00047 | -0.0051% |
| AST Neuberger Berman Core Bond Portfolio[*] | 10.17402 | ↑0.009 | 0.0885% |
| AST PIMCO Limited Maturity Bond Portfolio | 9.97735 | ↓0.00051 | -0.0051% |
| AST PIMCO Total Return Bond Portfolio | 11.11041 | ↑0.01693 | 0.1526% |
| AST Prudential Core Bond Portfolio[*] | 10.50332 | ↑0.00899 | 0.0857% |
| AST Templeton Global Bond Portfolio[2,29] | 10.48219 | ↓0.00054 | -0.0052% |
| AST Western Asset Core Plus Bond Portfolio | 11.59129 | ↑0.00981 | 0.0847% |
| AST Western Asset Emerging Markets Debt Portfolio[*] | 10.09387 | ↑0.00914 | 0.0906% |
| **Specialty** | | | |
| AST Cohen & Steers Realty Portfolio[6] | 16.38539 | ↓0.05639 | -0.3430% |
| AST Global Real Estate Portfolio[6] | 15.15317 | ↑0.02688 | 0.1777% |
| AST Quantitative Modeling Portfolio | 12.28923 | ↓0.01006 | -0.0818% |
| AST T. Rowe Price Natural Resources Portfolio[6] | 12.44186 | ↓0.00545 | -0.0438% |

# EXHIBIT I. Prudential Annuities Publishes Multiple Quotes for the Same Disguised Mutual Fund of the Fund

There are over 100 Prudential Annuity Products, which can be viewed from Prudential Annuities website http://www.annuities.prudential.com/investor under tabs "Prices & Performance" and "Prices"; and then menu "Products" as shown below.



The prices of those products are manipulated by Prudential Financial, Inc. et al. More specifically, Prudential Annuities publishes different net asset values ("NAVs") for the same mutual fund portfolio but put under different Prudential Annuities Products on the same valuation date.

For example, there are four Premier Retirement Products: 1) Premier Retirement B, 2) Premier Retirement C, 3) Premier Retirement L, and 4) Premier Retirement X for non-NY and non-NJ investors, which were introduced by Prudential Financial, Inc. on March 12, 2010. Prudential Annuities publishes different prices for the same mutual fund under these four Premier Retirement Products on the same valuation date. The net asset values ("NAVs") of underlying mutual funds of said four products, which were published for 06/26/2014, were shown on the following four pages.

For example, the different Price (i.e., NAV), Price Change, and % Change of the mutual fund "AST Jennison Large-Cap Growth Portfolio" for 06/26/2014, which are excerpted from the following four pages, are shown below with prefix (B), (C), (L), and (X) respectively:

| Sub-account [Group Alphabetically] | Price | +/-Price | % Change |
|---|---|---|---|
| (B) AST Jennison Large-Cap Growth Portfolio^ | 16.99198 | ↑0.02506 | 0.1477% |
| (C) AST Jennison Large-Cap Growth Portfolio^ | 16.66216 | ↑0.02437 | 0.1465% |
| (L) AST Jennison Large-Cap Growth Portfolio^ | 16.69849 | ↑0.02444 | 0.1466% |
| (X) AST Jennison Large-Cap Growth Portfolio^ | 16.58957 | ↑0.02421 | 0.1461% |

# EXHIBIT I. Prudential Annuities Publishes Multiple Quotes for the Same Disguised Mutual Fund of the Fund

## Prudential Premier® Retirement Variable Annuity B Series[SM]

### Prices as of 06/26/2014

Show Scrollbars

| Sub-account  [Group Alphabetically] | Price | +/-Price | % Change |
|---|---|---|---|
| **Asset Allocation/Balanced** | | | |
| AST Academic Strategies Asset Allocation Portfolio[*,1] | 13.22003 | ↓0.00047 | -0.0036% |
| AST Advanced Strategies Portfolio | 14.66388 | ↓0.00053 | -0.0036% |
| AST Balanced Asset Allocation Portfolio[*,3,4] | 14.11739 | ↓0.00051 | -0.0036% |
| AST BlackRock Global Strategies Portfolio | 11.5537 | ↓0.01006 | -0.0870% |
| AST BlackRock iShares ETF Portfolio | 10.8825 | ↓0.00039 | -0.0036% |
| AST Capital Growth Asset Allocation Portfolio[4] | 14.82294 | ↓0.01064 | -0.0717% |
| AST Defensive Asset Allocation Portfolio[*] | 10.06514 | ↑0.00949 | 0.0944% |
| AST FI Pyramis® Asset Allocation Portfolio[*,4,9] | 14.35922 | ↓0.00051 | -0.0036% |
| AST FI Pyramis® Quantitative Portfolio[*,4,8] | 13.54729 | ↑0.01079 | 0.0797% |
| AST Franklin Templeton Founding Funds Allocation Portfolio[10] | 14.0567 | ↓0.01023 | -0.0727% |
| AST Franklin Templeton Founding Funds Plus Portfolio | 11.40462 | ↓0.01026 | -0.0899% |
| AST Goldman Sachs Multi-Asset Portfolio[*,12] | 12.92343 | ↑0.01017 | 0.0788% |
| AST J.P. Morgan Global Thematic Portfolio[*,4,15] | 14.30497 | ↓0.00051 | -0.0036% |
| AST J.P. Morgan Strategic Opportunities Portfolio[*,4,16] | 12.97506 | ↑0.00757 | 0.0584% |
| AST New Discovery Asset Allocation Portfolio[*,4,23] | 12.55152 | ↑0.0094 | 0.0749% |
| AST Preservation Asset Allocation Portfolio[4] | 12.92988 | ↓0.00046 | -0.0036% |
| AST Prudential Growth Allocation Portfolio[*,24] | 14.61788 | ↓0.00052 | -0.0036% |
| AST RCM World Trends Portfolio[*,25] | 13.24041 | ↑0.01051 | 0.0794% |
| AST Schroders Global Tactical Portfolio[*,4,26] | 14.63267 | ↓0.00052 | -0.0036% |
| AST Schroders Multi-Asset World Strategies Portfolio[*,4,27] | 13.31365 | ↓0.00048 | -0.0036% |
| AST T. Rowe Price Asset Allocation Portfolio[4] | 14.60189 | ↓0.00052 | -0.0036% |
| AST T. Rowe Price Growth Opportunities Portfolio[*,4] | 10.51745 | ↓0.00038 | -0.0036% |
| AST Wellington Management Hedged Equity Portfolio[*,4,30] | 11.86274 | ↓0.00999 | -0.0841% |
| **Large-Cap Growth** | | | |
| AST Jennison Large-Cap Growth Portfolio | 16.99198 | ↑0.02506 | 0.1477% |
| AST Loomis Sayles Large-Cap Growth Portfolio[*,18,19] | 17.08753 | ↑0.00504 | 0.0295% |
| AST MFS Growth Portfolio | 17.0402 | ↓0.01149 | -0.0674% |
| AST T. Rowe Price Large-Cap Growth Portfolio | 18.3729 | ↑0.00798 | 0.0435% |
| **Large-Cap Blend** | | | |
| AST AQR Large-Cap Portfolio[*] | 12.3796 | ↓0.01029 | -0.0831% |
| AST ClearBridge Dividend Growth Portfolio[*] | 12.4598 | ↓0.01027 | -0.0824% |
| AST QMA Large-Cap Portfolio[*] | 12.61593 | ↓0.02015 | -0.1595% |
| AST QMA US Equity Alpha Portfolio | 18.68414 | ↓0.02904 | -0.1552% |
| **Large-Cap Value** | | | |
| AST Goldman Sachs Large-Cap Value Portfolio[*,11] | 16.98695 | ↓0.02715 | -0.1596% |
| AST Herndon Large-Cap Value Portfolio[*,13] | 16.18834 | ↓0.02485 | -0.1533% |
| AST Jennison Large-Cap Value Portfolio | 15.40552 | ↓0.00055 | -0.0036% |
| AST Large-Cap Value Portfolio[17] | 17.42681 | ↓0.02476 | -0.1419% |

# EXHIBIT I. Prudential Annuities Publishes Multiple Quotes for the Same Disguised Mutual Fund of the Fund

## Prudential Premier® Retirement Variable Annuity C Series℠

### Prices as of 06/26/2014

Show Scrollbars

| Sub-account [Group Alphabetically] | Price | +/-Price | % Change |
|---|---|---|---|
| **Asset Allocation/Balanced** | | | |
| AST Academic Strategies Asset Allocation Portfolio*,1 | 12.96305 | ↓0.00063 | -0.0049% |
| AST Advanced Strategies Portfolio | 14.37912 | ↓0.0007 | -0.0049% |
| AST Balanced Asset Allocation Portfolio*,3,4 | 13.84318 | ↓0.00067 | -0.0048% |
| AST BlackRock Global Strategies Portfolio | 11.38836 | ↓0.01006 | -0.0883% |
| AST BlackRock iShares ETF Portfolio | 10.82475 | ↓0.00052 | -0.0048% |
| AST Capital Growth Asset Allocation Portfolio4 | 14.53515 | ↓0.01062 | -0.0730% |
| AST Defensive Asset Allocation Portfolio* | 10.01157 | ↑0.00931 | 0.0931% |
| AST FI Pyramis® Asset Allocation Portfolio*,4,9 | 14.08068 | ↓0.00068 | -0.0048% |
| AST FI Pyramis® Quantitative Portfolio*,4,8 | 13.28434 | ↑0.01041 | 0.0784% |
| AST Franklin Templeton Founding Funds Allocation Portfolio10 | 13.9185 | ↓0.0103 | -0.0739% |
| AST Franklin Templeton Founding Funds Plus Portfolio | 11.3439 | ↓0.01035 | -0.0912% |
| AST Goldman Sachs Multi-Asset Portfolio*,12 | 12.67249 | ↑0.00982 | 0.0776% |
| AST J.P. Morgan Global Thematic Portfolio*,4,15 | 14.02736 | ↓0.00068 | -0.0048% |
| AST J.P. Morgan Strategic Opportunities Portfolio*,4,16 | 12.72308 | ↑0.00726 | 0.0571% |
| AST New Discovery Asset Allocation Portfolio*,4,23 | 12.42829 | ↑0.00915 | 0.0737% |
| AST Preservation Asset Allocation Portfolio4 | 12.67869 | ↓0.00061 | -0.0048% |
| AST Prudential Growth Allocation Portfolio*,24 | 14.33398 | ↓0.00069 | -0.0048% |
| AST RCM World Trends Portfolio*,25 | 12.98346 | ↑0.01015 | 0.0782% |
| AST Schroders Global Tactical Portfolio*,4,26 | 14.34855 | ↓0.00069 | -0.0048% |
| AST Schroders Multi-Asset World Strategies Portfolio*,4,27 | 13.05533 | ↓0.00063 | -0.0048% |
| AST T. Rowe Price Asset Allocation Portfolio4 | 14.31833 | ↓0.00069 | -0.0048% |
| AST T. Rowe Price Growth Opportunities Portfolio*,4 | 10.49922 | ↓0.00051 | -0.0049% |
| AST Wellington Management Hedged Equity Portfolio*,4,30 | 11.69285 | ↓0.01 | -0.0854% |
| **Large-Cap Growth** | | | |
| AST Jennison Large-Cap Growth Portfolio | 16.66216 | ↑0.02437 | 0.1465% |
| AST Loomis Sayles Large-Cap Growth Portfolio*,18,19 | 16.75603 | ↑0.00474 | 0.0283% |
| AST MFS Growth Portfolio | 16.70922 | ↓0.01148 | -0.0687% |
| AST T. Rowe Price Large-Cap Growth Portfolio | 18.01618 | ↑0.0076 | 0.0422% |
| **Large-Cap Blend** | | | |
| AST AQR Large-Cap Portfolio* | 12.31384 | ↓0.01039 | -0.0843% |
| AST ClearBridge Dividend Growth Portfolio* | 12.38368 | ↓0.01037 | -0.0837% |
| AST QMA Large-Cap Portfolio* | 12.54895 | ↓0.0202 | -0.1607% |
| AST QMA US Equity Alpha Portfolio | 18.32126 | ↓0.0287 | -0.1564% |
| **Large-Cap Value** | | | |
| AST Goldman Sachs Large-Cap Value Portfolio*,11 | 16.65723 | ↓0.02684 | -0.1609% |
| AST Herndon Large-Cap Value Portfolio*,13 | 15.87402 | ↓0.02457 | -0.1545% |
| AST Jennison Large-Cap Value Portfolio | 15.10629 | ↓0.00073 | -0.0048% |
| AST Large-Cap Value Portfolio17 | 17.08847 | ↓0.0245 | -0.1432% |

# EXHIBIT I. Prudential Annuities Publishes Multiple Quotes for the Same Disguised Mutual Fund of the Fund

## Prudential Premier® Retirement Variable Annuity L Series[SM]

### Prices as of 06/26/2014

Show Scrollbars

| Sub-account [Group Alphabetically] | Price | +/-Price | % Change |
|---|---|---|---|
| **Asset Allocation/Balanced** | | | |
| AST Academic Strategies Asset Allocation Portfolio[*,1] | 12.99159 | ↓0.00061 | -0.0047% |
| AST Advanced Strategies Portfolio | 14.41068 | ↓0.00068 | -0.0047% |
| AST Balanced Asset Allocation Portfolio[*,3,4] | 13.87363 | ↓0.00065 | -0.0047% |
| AST BlackRock Global Strategies Portfolio | 11.40678 | ↓0.01006 | -0.0881% |
| AST BlackRock iShares ETF Portfolio | 10.83109 | ↓0.00051 | -0.0047% |
| AST Capital Growth Asset Allocation Portfolio[4] | 14.56692 | ↓0.01062 | -0.0729% |
| AST Defensive Asset Allocation Portfolio[*] | 10.01747 | ↑0.00933 | 0.0932% |
| AST FI Pyramis® Asset Allocation Portfolio[*,4,9] | 14.11158 | ↓0.00066 | -0.0047% |
| AST FI Pyramis® Quantitative Portfolio[*,4,8] | 13.31344 | ↑0.01045 | 0.0786% |
| AST Franklin Templeton Founding Funds Allocation Portfolio[10] | 13.93393 | ↓0.01029 | -0.0738% |
| AST Franklin Templeton Founding Funds Plus Portfolio | 11.35064 | ↓0.01034 | -0.0910% |
| AST Goldman Sachs Multi-Asset Portfolio[*,12] | 12.70018 | ↑0.00986 | 0.0777% |
| AST J.P. Morgan Global Thematic Portfolio[*,4,15] | 14.05814 | ↓0.00066 | -0.0047% |
| AST J.P. Morgan Strategic Opportunities Portfolio[*,4,16] | 12.75079 | ↑0.0073 | 0.0573% |
| AST New Discovery Asset Allocation Portfolio[*,4,23] | 12.44185 | ↑0.00917 | 0.0738% |
| AST Preservation Asset Allocation Portfolio[4] | 12.70659 | ↓0.0006 | -0.0047% |
| AST Prudential Growth Allocation Portfolio[*,24] | 14.3654 | ↓0.00067 | -0.0047% |
| AST RCM World Trends Portfolio[*,25] | 13.01189 | ↑0.01019 | 0.0784% |
| AST Schroders Global Tactical Portfolio[*,4,26] | 14.37994 | ↓0.00068 | -0.0047% |
| AST Schroders Multi-Asset World Strategies Portfolio[*,4,27] | 13.08385 | ↓0.00061 | -0.0047% |
| AST T. Rowe Price Asset Allocation Portfolio[4] | 14.34961 | ↓0.00067 | -0.0047% |
| AST T. Rowe Price Growth Opportunities Portfolio[*,4] | 10.50131 | ↓0.00049 | -0.0047% |
| AST Wellington Management Hedged Equity Portfolio[*,4,30] | 11.71169 | ↓0.01 | -0.0853% |
| **Large-Cap Growth** | | | |
| AST Jennison Large-Cap Growth Portfolio | 16.69849 | ↑0.02444 | 0.1466% |
| AST Loomis Sayles Large-Cap Growth Portfolio[*,18,19] | 16.79275 | ↑0.00477 | 0.0284% |
| AST MFS Growth Portfolio | 16.74589 | ↓0.01148 | -0.0685% |
| AST T. Rowe Price Large-Cap Growth Portfolio | 18.05573 | ↑0.00765 | 0.0424% |
| **Large-Cap Blend** | | | |
| AST AQR Large-Cap Portfolio[*] | 12.32113 | ↓0.01038 | -0.0842% |
| AST ClearBridge Dividend Growth Portfolio[*] | 12.39209 | ↓0.01036 | -0.0835% |
| AST QMA Large-Cap Portfolio[*] | 12.55638 | ↓0.0202 | -0.1606% |
| AST QMA US Equity Alpha Portfolio | 18.36106 | ↓0.02874 | -0.1563% |
| **Large-Cap Value** | | | |
| AST Goldman Sachs Large-Cap Value Portfolio[*,11] | 16.69359 | ↓0.02687 | -0.1607% |
| AST Herndon Large-Cap Value Portfolio[*,13] | 15.90875 | ↓0.0246 | -0.1544% |
| AST Jennison Large-Cap Value Portfolio | 15.13946 | ↓0.00071 | -0.0047% |
| AST Large-Cap Value Portfolio[17] | 17.12588 | ↓0.02453 | -0.1430% |

# EXHIBIT I. Prudential Annuities Publishes Multiple Quotes for the Same Disguised Mutual Fund of the Fund

## Prudential Premier® Retirement Variable Annuity X Series[SM]

**Prices as of 06/26/2014**                                                                 Show Scrollbars

| Sub-account  [Group Alphabetically] | Price | +/-Price | % Change |
|---|---|---|---|
| **Asset Allocation/Balanced** | | | |
| AST Academic Strategies Asset Allocation Portfolio[*,1] | 12.90697 | ↓0.00066 | -0.0051% |
| AST Advanced Strategies Portfolio | 14.31674 | ↓0.00073 | -0.0051% |
| AST Balanced Asset Allocation Portfolio[*,3,4] | 13.78307 | ↓0.00071 | -0.0052% |
| AST BlackRock Global Strategies Portfolio | 11.35165 | ↓0.01006 | -0.0885% |
| AST BlackRock iShares ETF Portfolio | 10.81191 | ↓0.00055 | -0.0051% |
| AST Capital Growth Asset Allocation Portfolio[4] | 14.47196 | ↓0.01061 | -0.0733% |
| AST Defensive Asset Allocation Portfolio[*] | 9.99969 | ↑0.00927 | 0.0928% |
| AST FI Pyramis® Asset Allocation Portfolio[*,4,9] | 14.01906 | ↓0.00072 | -0.0051% |
| AST FI Pyramis® Quantitative Portfolio[*,4,8] | 13.22642 | ↑0.01033 | 0.0782% |
| AST Franklin Templeton Founding Funds Allocation Portfolio[10] | 13.88781 | ↓0.01032 | -0.0743% |
| AST Franklin Templeton Founding Funds Plus Portfolio | 11.33048 | ↓0.01037 | -0.0914% |
| AST Goldman Sachs Multi-Asset Portfolio[*,12] | 12.61732 | ↑0.00974 | 0.0773% |
| AST J.P. Morgan Global Thematic Portfolio[*,4,15] | 13.9662 | ↓0.00071 | -0.0051% |
| AST J.P. Morgan Strategic Opportunities Portfolio[*,4,16] | 12.66755 | ↑0.0072 | 0.0569% |
| AST New Discovery Asset Allocation Portfolio[*,4,23] | 12.4009 | ↑0.00909 | 0.0734% |
| AST Preservation Asset Allocation Portfolio[4] | 12.62337 | ↓0.00065 | -0.0051% |
| AST Prudential Growth Allocation Portfolio[*,24] | 14.27146 | ↓0.00073 | -0.0051% |
| AST RCM World Trends Portfolio[*,25] | 12.92675 | ↑0.01007 | 0.0780% |
| AST Schroders Global Tactical Portfolio[*,4,26] | 14.28607 | ↓0.00073 | -0.0051% |
| AST Schroders Multi-Asset World Strategies Portfolio[*,4,27] | 12.99824 | ↓0.00067 | -0.0052% |
| AST T. Rowe Price Asset Allocation Portfolio[4] | 14.25601 | ↓0.00073 | -0.0051% |
| AST Wellington Management Hedged Equity Portfolio[*,4,30] | 11.65529 | ↓0.01 | -0.0857% |
| **Large-Cap Growth** | | | |
| AST Jennison Large-Cap Growth Portfolio | 16.58957 | ↑0.02421 | 0.1461% |
| AST Loomis Sayles Large-Cap Growth Portfolio[*,18,19] | 16.68301 | ↑0.00467 | 0.0280% |
| AST MFS Growth Portfolio | 16.63675 | ↓0.01148 | -0.0690% |
| AST T. Rowe Price Large-Cap Growth Portfolio | 17.93754 | ↑0.00752 | 0.0419% |
| **Large-Cap Blend** | | | |
| AST AQR Large-Cap Portfolio[*] | 12.29925 | ↓0.01041 | -0.0846% |
| AST ClearBridge Dividend Growth Portfolio[*] | 12.36685 | ↓0.01039 | -0.0839% |
| AST QMA Large-Cap Portfolio[*] | 12.53411 | ↓0.02021 | -0.1610% |
| AST QMA US Equity Alpha Portfolio | 18.24151 | ↓0.02863 | -0.1567% |
| **Large-Cap Value** | | | |
| AST Goldman Sachs Large-Cap Value Portfolio[*,11] | 16.58428 | ↓0.02676 | -0.1611% |
| AST Herndon Large-Cap Value Portfolio[*,13] | 15.80452 | ↓0.02451 | -0.1548% |
| AST Jennison Large-Cap Value Portfolio | 15.04034 | ↓0.00077 | -0.0051% |
| AST Large-Cap Value Portfolio[17] | 17.01436 | ↓0.02444 | -0.1434% |

## EXHIBIT J. Marcks' Letter Dated June 4, 2009

 Prudential

Christine Marcks
President, Prudential Retirement

The Prudential Insurance Company of America
280 Trumbull Street
Hartford, CT 06103
Tel 860-534-2607  Fax 860-534-5624
Christine.marcks@prudential.com

**REQUEST TO TESTIFY AT JOINT DEPARTMENT OF LABOR/SECURITIES AND EXCHANGE COMMISSION HEARING ON TARGET DATE FUNDS AND SIMILAR INVESTMENT OPTIONS**

June 4, 2009

**Submitted Electronically**

Office of Regulations and Interpretations
Employee Benefits Security Administration
Room N-5655
U.S Department of Labor
200 Constitution Ave., N.W.
Washington, D.C. 20210

Attn: Target Date Fund Joint Hearing
      e-ORI@dol.gov

Ladies and Gentleman:

This request and proposed presentation outline is submitted on behalf of Prudential Retirement Insurance and Annuity Company (Prudential), a wholly-owned subsidiary of The Prudential Insurance Company of America. Prudential and its affiliates currently provide retirement services to over 6900 plans covering over 3.7 million participants. In connection with those plans, Prudential offers institutionally priced target date funds designed to support its guaranteed lifetime income insurance product called Prudential IncomeFlex® Target (SM). Prudential requests to be selected to publicly testify and make comments at the joint hearings of the DOL and SEC on June 18, 2009. We expect that if we are selected to testify, Mark Foley, Vice President in our Retirement Income Management unit will be delivering our testimony.

We believe that the subject matter that we propose to address is unique and highly relevant, particularly in the context of defined contribution retirement plans. If selected to testify, we would provide details regarding the combination of target date funds with insurance guarantees. The presence of these insurance guarantees enable retirement plan participants to protect their retirement income against market downturns while allowing continued measured exposure to equity investments.
The following is an outline of our proposed testimony and topics:

Registered Principal
Prudential Investment Management Services, LLC
A Prudential Financial company
Three Gateway Center, 14th Floor
Newark, NJ 07102-4077
Tel 973 802-8624

## EXHIBIT J. Marcks' Letter Dated June 4, 2009

Office of Regulations and Interpretations
Employee Benefits Security Administration
U.S Department of Labor
June 4, 2009
Page 2

I. Target Date Funds Combined with Income Guarantees: What They Are and How They Work – 3 minutes

    a. Target date funds as we otherwise know them
    b. Add a guarantee of lifetime income in the periods approaching retirement and in retirement
        ▪ Guaranteed basis for income before retirement
        ▪ Guaranteed income in the form of withdrawals after retirement; insurer pays after target date fund exhausted
    c. Qualify for QDIA treatment (as noted in 29 CFR 2550.404c-5(e)(4)(vi))

II. How Target Date Funds Combined with Income Guarantees Differ From Other Target Date Funds – 2 minutes

    a. Potential for more optimal asset allocations
    b. Additional, fully disclosed guarantee fee to pay for income protections
    c. Additional regulatory oversight (from state insurance departments); while retaining existing TDF oversight
    d. Additional protection for participants, as noted in the DC annuity regulation, in the form of state guaranty funds

III. How Do Target Date Funds Combined with Income Guarantees Benefit Retirement Plan Participants – 5 minutes

    a. Simple, automatic source of guaranteed retirement income
    b. Facilitates transition from "investment framing" to "income framing"
    c. Flexibility to meet unforeseen emergencies
    d. Incentive to remain under the watchful eye of plan fiduciaries (and, by extension, DOL regulators)

If we are selected to testify at the June 18th hearings, we expect to submit more expansive written comments/testimony and provide supplemental written material to augment our oral presentation.

Thank you for your consideration. If you have any questions or would like us to provide additional information, please contact the undersigned.

Sincerely,

*Christine L. Marcks*

Christine Marcks

Registered Principal
Prudential Investment Management Services, LLC
A Prudential Financial company
Three Gateway Center, 14th Floor
Newark, NJ 07102-4077
Tel 973 802-8624

# EXHIBIT K. Prudential Annuities Privately Changed the Unit Price of AST Lord Abbett Core Fixed Income Portfolio

All our transactions

 **Prudential**

Prudential Annuities®
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

July 27, 2012

MICHAEL WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

Contract Owner: MICHAEL WU
Contract Number: E1028928

Re: Share Price Error

Dear MICHAEL WU,

Thank you for doing business with Prudential Annuities. We are writing to you today because we recently discovered an error in share price for the fund(s) listed below on the above referenced contract ("Contract"):

**AST Lord Abbett Core Fixed Income Portfolio**

This error impacted the value of the sub-account(s) held in your Contract with respect to transaction(s) that took place between 6/7/2012 up to and including 7/5/2012. Depending on the nature of your transaction(s) during this time, this adjustment may affect the number of units held within the affected sub-account(s). Your transaction(s) have been reprocessed to ensure that your account value is accurate. The reprocessed transaction(s) will be reflected on your 3rd quarter statement. No action is needed from you.

Your satisfaction is our top priority, and we apologize for any inconvenience this may have caused. If you have questions, please contact your financial professional or our Annuities Service Center at (888) 778-2888. Representatives are available to assist you Monday through Thursday between 8 a.m. and 7 p.m., and Friday between 8 a.m. and 6 p.m. ET.

Sincerely,

Joseph LaTorre
Vice President, Annuities Service

c.: CHRISTOPHER CRALLE

Annuities are issued by The Prudential Insurance Company of America and Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey), all located in Newark, NJ. Variable annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations. Prudential Annuities is a business of Prudential Financial, Inc.

GPC Correction-C 07/2012

## EXHIBIT L-1. Prudential Annuities' (Davis') Letter Dated December 8, 2011

 **Prudential**

Prudential Annuities
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

December 8, 2011

MICHAEL H WU
138 STABLEFORD DR
GLEN ELLYN IL 60137-3216

Contract Owner: Michael H. Wu
Joint Owner: Christine T. Wu
Contract Number: E1028928

Dear Mr. Wu:

I am writing in response to your email of December 1, 2011, regarding your concerns with the allocations on the above referenced annuity contract.

You have the Spousal Highest Daily Lifetime 6 Plus (SHD6 Plus) living benefit. When this benefit is elected, the entire contract value be invested according to a required allocation methodology or according to the Custom Portfolio Program. This benefit contains a proprietary formula designed to mitigate the financial risks incurred in providing the guarantees under this benefit.

The formula monitors the contract value daily and, only when specified by the formula, systematically transfers amounts between the Permitted Sub-accounts and the AST Investment Grade Bond Portfolio. Specifically, each business day, the formula monitors fluctuations in the variable contract value, the projected Annual Income Amount, and other factors, relative to certain "reallocation triggers" to determine whether contract value must be transferred to or from the AST Investment Grade Bond Portfolio. While you are not notified when the contract reaches a reallocation trigger, you will receive a confirmation statement indicating the transfer of a portion of the contract value either to or from the AST Investment Grade Bond Portfolio.

Additionally, you have a rebalancing program that is only available to clients with certain living benefits. The rebalancing program is intended to increase our investment flexibility with respect to contracts enrolled in these optional benefits by allowing them to create a customized asset allocation portfolio. The rebalancing program will automatically rebalance on the benefits "quarterversary" basis according to the most recent allocation under the program established on the contract.

Under the rebalancing program a minimum of 20% of the funds not invested in the Investment Grade Bond must be allocated between certain funds such as AST Lord Abbett Core Fixed Income, AST PIMCO Total Return Bond, AST Western Asset Core Plus Bond, AST Prudential Core Bond Portfolio, and AST Neuberger Berman Core Bond Portfolio. You may allocate more than 20% but no less than the allowed 20%. The 20% may be all in one of the above funds or split between them.

In your annuity contract and prospectus you were informed of how the optional living benefits work in regards to the transfers to and from the AST Investment Grade Bond Portfolio and/or other optional Custom Portfolio Program. When you signed your application, you authorized us to make these transfers on your annuity contract. Therefore, we are unable to comply with your request to restore your portfolio to the funds you were invested in as of July 20, 2011.

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

## EXHIBIT L-1. Prudential Annuities' (Davis') Letter Dated December 8, 2011

Kindly note, the SHD6 Plus benefit can be canceled at any time upon your request while there is remaining account value in the contract. Upon cancellation, we will remove the benefit from your contract and prorate the charge for the benefit. Any guarantees under this benefit will be terminated. If you cancel this benefit you would be able to choose from a range of investment options available under your product. Any guarantees under this benefit would be terminated.

I understand your frustration with the volatile market we are enduring. However, variable annuities may respond to fluctuations within the market. Because of this, your account may earn money as well as lose money. As with any investment, there is a certain degree of risk, and there is no guarantee that past performance is indicative of future results.

We regret any dissatisfaction you may have experienced regarding the benefit fund transfers, if the investment performance of your annuity contract has not met your expectations, as well as any confusion or inconvenience this entire matter may have caused. Quality service is our number one priority and we appreciate you bringing your concerns to our attention.

If you have questions, please contact your financial professional or our Annuity Service Center at (888) 778-2888. Representatives are available to assist you Monday through Thursday between 8:00 a.m. and 7:00 p.m., and Friday between 8:00 a.m. and 6:00 p.m. Eastern Time. You may also obtain additional information on our website, www.prudential.com. Thank you for choosing Prudential Annuities for your financial needs.

Sincerely,

Brooke Davis
Senior Customer Service Representative

EXHIBIT L-2. The Proprietary Formula Documented in Prudential VA Prospectus

## APPENDIX B – FORMULA FOR HIGHEST DAILY LIFETIME INCOME BENEFIT AND SPOUSAL HIGHEST DAILY LIFETIME INCOME BENEFIT

### TRANSFERS OF ACCOUNT VALUE BETWEEN YOUR PERMITTED SUB-ACCOUNTS AND THE AST INVESTMENT GRADE BOND SUB-ACCOUNT

**TERMS AND DEFINITIONS REFERENCED IN THE CALCULATION FORMULAS:**

- $C_u$ – the upper target is established on the effective date of the Highest Daily Lifetime Income/Spousal Highest Daily Lifetime Income benefit (the "Effective Date") and is not changed for the life of the guarantee. Currently, it is 83%.

- $C_{ut}$ – The secondary upper target is established on the Effective Date of the Highest Daily Lifetime Income/Spousal Highest Daily Lifetime Income benefit and is not changed for the life of the guarantee. Currently it is 84.5%.

- $C_t$ – the target is established on the Effective Date and is not changed for the life of the guarantee. Currently, it is 80%.

- $C_l$ – the lower target is established on the Effective Date and is not changed for the life of the guarantee. Currently, it is 78%.

- L – the target value as of the current Valuation Day.

- r – the target ratio.

- a – factors used in calculating the target value. These factors are established on the Effective Date and are not changed for the life of the guarantee. (See below for the table of "a" factors)

- $V_v$ – the total value of all Permitted Sub-accounts in the Annuity.

- $V_F$ – the Unadjusted Account Value of all elected DCA MVA Options in the Annuity.

- B – the total value of the AST Investment Grade Bond Portfolio Sub-account.   **Ps. 'B' is the total value of mispriced "Junk Bonds", not only Plaintiffs'.**

- P – Income Basis. Prior to the first Lifetime Withdrawal, the Income Basis is equal to the Protected Withdrawal Value calculated as if the first Lifetime Withdrawal were taken on the date of calculation. After the first Lifetime Withdrawal, the Income Basis is equal to the greater of (1) the Protected Withdrawal Value on the date of the first Lifetime Withdrawal, increased for additional Purchase Payments and adjusted proportionally for Excess Income*, and (2) the Protected Withdrawal Value on any Annuity Anniversary subsequent to the first Lifetime Withdrawal, increased for subsequent additional Purchase Payments and adjusted proportionately for Excess Income* and (3) any highest daily Unadjusted Account Value occurring on or after the later of the immediately preceding Annuity anniversary, or the date of the first Lifetime Withdrawal, and prior to or including the date of this calculation, increased for additional Purchase Payments and adjusted for withdrawals, as described herein.   **Ps. Neither the initial value nor the beneficiary of the 'P' is disclosed.**

- T – the amount of a transfer into or out of the AST Investment Grade Bond Portfolio Sub-account.

- $T_M$ – the amount of a monthly transfer out of the AST Investment Grade Bond Portfolio.

* Note: Lifetime Withdrawals of less than or equal to the Annual Income Amount do not reduce the Income Basis.

**DAILY TARGET VALUE CALCULATION:**
On each Valuation Day, a target value (L) is calculated, according to the following formula. If $(V_V + V_F)$ is equal to zero, no calculation is necessary. Target Values are subject to change for new elections of this benefit on a going-forward basis.

$$L = 0.05 * P * a$$

**DAILY TRANSFER CALCULATION:**
The following formula, which is set on the Benefit Effective Date and is not changed for the life of the guarantee, determines when a transfer is required:

Target Ratio r $= (L – B)/(V_V + V_F)$.

- If on the third consecutive Valuation Day r (greater than) $C_u$ and r (less or =) $C_{ut}$ or if on any day r (greater than) $C_{ut}$, and transfers have not been suspended due to the 90% cap rule, assets in the Permitted Sub-accounts and the DCA MVA Options, if applicable, are transferred to the AST Investment Grade Bond Portfolio Sub-account.

B-1

## EXHIBIT L-2. The Proprietary Formula Documented in Prudential VA Prospectus

- If r (less than) $C_t$, and there are currently assets in the AST Investment Grade Bond Portfolio Sub-account (B (greater than) 0), assets in the AST Investment Grade Bond Portfolio Sub-account are transferred to the Permitted Sub-accounts as described above.

**90% Cap Rule:** If, on any Valuation Day this benefit remains in effect, a transfer into the AST Investment Grade Bond Portfolio Sub-account occurs that results in 90% of the Unadjusted Account Value being allocated to the AST Investment Grade Bond Portfolio Sub-account, any transfers into the AST Investment Grade Bond Portfolio Sub-account will be suspended, even if the formula would otherwise dictate that a transfer into the AST Investment Grade Bond Portfolio Sub-account should occur. Transfers out of the AST Investment Grade Bond Portfolio Sub-account and into the elected Sub-accounts will still be allowed. The suspension will be lifted once a transfer out of the AST Investment Grade Bond Portfolio Sub-account occurs either due to a Daily or Monthly Transfer Calculation. Due to the performance of the AST Investment Grade Bond Portfolio Sub-account and the elected Sub-accounts, the Unadjusted Account Value could be more than 90% invested in the AST Investment Grade Bond Portfolio Sub-account.

The following formula, which is set on the Benefit Effective Date and is not changed for the life of the guarantee, determines the transfer amount:

| | | | |
|---|---|---|---|
| T | = | $\text{Min}(\text{MAX}(0, (0.90 * (V_V + V_F + B)) - B),$ $[L - B - (V_V + V_F) * C_t]/(1 - C_t))$ | Money is transferred from the Permitted Sub-accounts and the DCA MVA Options to the AST Investment Grade Bond Sub-account |
| T | = | $\{\text{Min}(B, -[L - B - (V_V + V_F) * C_t]/(1 - C_t))\}$ | Money is transferred from the AST Investment Grade Bond Sub-account to the Permitted Sub-accounts |

**MONTHLY TRANSFER CALCULATION**
On each monthly anniversary of the Annuity Issue Date and following the daily Transfer Calculation above, the following formula determines if a transfer from the AST Investment Grade Bond Sub-account to the Permitted Sub-accounts will occur:

If, after the daily Transfer Calculation is performed,

$\{\text{Min}(B, .05 * (V_V + V_F + B))\}$ (less than) $(C_u * (V_V + V_F) - L + B) / (1 - C_u)$, then

| | | | |
|---|---|---|---|
| $T_M$ | = | $\{\text{Min}(B, .05 * (V_V + V_F + B))\}$ | Money is transferred from the AST Investment Grade Bond Sub-account to the Permitted Sub-accounts. |

## EXHIBIT L-2. The Proprietary Formula Documented in Prudential VA Prospectus

**"A" Factors for Liability Calculations**
(in Years and Months since Benefit Effective Date)*

| Years | Months 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15.34 | 15.31 | 15.27 | 15.23 | 15.20 | 15.16 | 15.13 | 15.09 | 15.05 | 15.02 | 14.98 | 14.95 |
| 2 | 14.91 | 14.87 | 14.84 | 14.80 | 14.76 | 14.73 | 14.69 | 14.66 | 14.62 | 14.58 | 14.55 | 14.51 |
| 3 | 14.47 | 14.44 | 14.40 | 14.36 | 14.33 | 14.29 | 14.26 | 14.22 | 14.18 | 14.15 | 14.11 | 14.07 |
| 4 | 14.04 | 14.00 | 13.96 | 13.93 | 13.89 | 13.85 | 13.82 | 13.78 | 13.74 | 13.71 | 13.67 | 13.63 |
| 5 | 13.60 | 13.56 | 13.52 | 13.48 | 13.45 | 13.41 | 13.37 | 13.34 | 13.30 | 13.26 | 13.23 | 13.19 |
| 6 | 13.15 | 13.12 | 13.08 | 13.04 | 13.00 | 12.97 | 12.93 | 12.89 | 12.86 | 12.82 | 12.78 | 12.75 |
| 7 | 12.71 | 12.67 | 12.63 | 12.60 | 12.56 | 12.52 | 12.49 | 12.45 | 12.41 | 12.38 | 12.34 | 12.30 |
| 8 | 12.26 | 12.23 | 12.19 | 12.15 | 12.12 | 12.08 | 12.04 | 12.01 | 11.97 | 11.93 | 11.90 | 11.86 |
| 9 | 11.82 | 11.78 | 11.75 | 11.71 | 11.67 | 11.64 | 11.60 | 11.56 | 11.53 | 11.49 | 11.45 | 11.42 |
| 10 | 11.38 | 11.34 | 11.31 | 11.27 | 11.23 | 11.20 | 11.16 | 11.12 | 11.09 | 11.05 | 11.01 | 10.98 |
| 11 | 10.94 | 10.90 | 10.87 | 10.83 | 10.79 | 10.76 | 10.72 | 10.69 | 10.65 | 10.61 | 10.58 | 10.54 |
| 12 | 10.50 | 10.47 | 10.43 | 10.40 | 10.36 | 10.32 | 10.29 | 10.25 | 10.21 | 10.18 | 10.14 | 10.11 |
| 13 | 10.07 | 10.04 | 10.00 | 9.96 | 9.93 | 9.89 | 9.86 | 9.82 | 9.79 | 9.75 | 9.71 | 9.68 |
| 14 | 9.64 | 9.61 | 9.57 | 9.54 | 9.50 | 9.47 | 9.43 | 9.40 | 9.36 | 9.33 | 9.29 | 9.26 |
| 15 | 9.22 | 9.19 | 9.15 | 9.12 | 9.08 | 9.05 | 9.02 | 8.98 | 8.95 | 8.91 | 8.88 | 8.84 |
| 16 | 8.81 | 8.77 | 8.74 | 8.71 | 8.67 | 8.64 | 8.60 | 8.57 | 8.54 | 8.50 | 8.47 | 8.44 |
| 17 | 8.40 | 8.37 | 8.34 | 8.30 | 8.27 | 8.24 | 8.20 | 8.17 | 8.14 | 8.10 | 8.07 | 8.04 |
| 18 | 8.00 | 7.97 | 7.94 | 7.91 | 7.88 | 7.84 | 7.81 | 7.78 | 7.75 | 7.71 | 7.68 | 7.65 |
| 19 | 7.62 | 7.59 | 7.55 | 7.52 | 7.49 | 7.46 | 7.43 | 7.40 | 7.37 | 7.33 | 7.30 | 7.27 |
| 20 | 7.24 | 7.21 | 7.18 | 7.15 | 7.12 | 7.09 | 7.06 | 7.03 | 7.00 | 6.97 | 6.94 | 6.91 |
| 21 | 6.88 | 6.85 | 6.82 | 6.79 | 6.76 | 6.73 | 6.7 | 6.67 | 6.64 | 6.61 | 6.58 | 6.55 |
| 22 | 6.52 | 6.50 | 6.47 | 6.44 | 6.41 | 6.38 | 6.36 | 6.33 | 6.30 | 6.27 | 6.24 | 6.22 |
| 23 | 6.19 | 6.16 | 6.13 | 6.11 | 6.08 | 6.05 | 6.03 | 6.00 | 5.97 | 5.94 | 5.92 | 5.89 |
| 24 | 5.86 | 5.84 | 5.81 | 5.79 | 5.76 | 5.74 | 5.71 | 5.69 | 5.66 | 5.63 | 5.61 | 5.58 |
| 25 | 5.56 | 5.53 | 5.51 | 5.48 | 5.46 | 5.44 | 5.41 | 5.39 | 5.36 | 5.34 | 5.32 | 5.29 |
| 26 | 5.27 | 5.24 | 5.22 | 5.20 | 5.18 | 5.15 | 5.13 | 5.11 | 5.08 | 5.06 | 5.04 | 5.01 |
| 27 | 4.99 | 4.97 | 4.95 | 4.93 | 4.91 | 4.88 | 4.86 | 4.84 | 4.82 | 4.80 | 4.78 | 4.75 |
| 28 | 4.73 | 4.71 | 4.69 | 4.67 | 4.65 | 4.63 | 4.61 | 4.59 | 4.57 | 4.55 | 4.53 | 4.51 |
| 29 | 4.49 | 4.47 | 4.45 | 4.43 | 4.41 | 4.39 | 4.37 | 4.35 | 4.33 | 4.32 | 4.30 | 4.28 |
| 30 | 4.26 | 4.24 | 4.22 | 4.20 | 4.18 | 4.17 | 4.15 | 4.13 | 4.11 | 4.09 | 4.07 | 4.06** |

\* The values set forth in this table are applied to all ages.
\** In all subsequent years and months thereafter, the annuity factor is 4.06

## EXHIBIT M. Hagan's Letter Dated February 23, 2012

 **Prudential**

Prudential Annuities
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

February 23, 2012

MICHAEL H WU
138 STABLEFORD DR
GLEN ELLYN IL 60137

**Contract Owner:** Michael H. Wu &
Christine T. Wu
**Contract Number:** E1028928

Dear Mr. Wu:

The purpose of this letter is to address the questions and concerns you have expressed regarding the Prudential Premier Retirement X-Series Variable Annuity you purchased on April 16, 2010, specifically related to the "6% minimum growth guarantee," "insider trading," "unauthorized transactions," and "arbitrage pricing." It is our understanding that Citigroup is working on setting up a call with you and your financial advisor to discuss your concerns. At the time you purchased this annuity, you acknowledged receiving the appropriate prospectus that described the product, available benefits, optional programs, and investment options. In your correspondence, you reference the prospectus you received on May 10, 2010; this was an updated version from what you received at purchase. On May 1of each year, we send out updated prospectuses to our clients to remind them about the mechanics of their products & benefits, and to provide updated information on company financials. Any page references in this letter apply to the most recent prospectus that was sent to you, dated May 1, 2011.

When you purchased your annuity you elected the Spousal Highest Daily Lifetime 6 Plus ("SHD6 Plus") living benefit, which is a lifetime guaranteed minimum withdrawal benefit. Under SHD6 Plus, subject to the terms of the benefit, we guarantee your ability to take a certain annual withdrawal amount for life. The intent and operation of SHD6 Plus were clearly described in the sales material and prospectus you received and reviewed prior to purchase. We will reiterate certain key aspects of the benefit in this letter.

The purpose of the SHD6 Plus benefit is to provide you and your spouse with a guaranteed stream of retirement income, not to maximize account value. Your benefit includes a Protected Withdrawal Value (the "PWV") that is separate from your account value. The PWV is used to calculate your Annual Income Amount (the "AIA") when you begin taking lifetime income from your annuity. The 6% guarantee you mention in your correspondence is one of the methods for calculating PWV (details are included on page C-1 of the most recent prospectus). PWV is generally the greater of:

- the PWV for the immediately preceding valuation day appreciated at the daily equivalent of 6% annually during the calendar day(s) between the Prior Valuation Day and the Current Valuation Day (i.e., one day for successive Valuation Days, but more than one calendar day for Valuation Days that are separated by weekends and/or holidays), plus the amount of any Purchase Payment made on the Current Valuation Day; and
- the Unadjusted Account Value on the current Valuation Day.

SHD6 Plus is provided for a fee that is assessed against the greater of the Unadjusted Account Value (which is your Account Value prior to the application of any applicable Market Value Adjustment) and the PWV, and is taken out of the sub-accounts quarterly. Please refer to the section of your prospectus entitled "Summary of Contract Fees and Charges," beginning on page 3, for additional details.

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

## EXHIBIT M. Hagan's Letter Dated February 23, 2012

With regard to your concerns of "insider trading" and "unauthorized transactions," as outlined in the product brochure and described in the prospectus, an integral part of SHD6 Plus is the pre-determined mathematical formula used to transfer Unadjusted Account Value between the Permitted Sub-accounts and a specified bond fund within the Advanced Series Trust (the "AST Investment Grade Bond Sub-account"). The formula monitors your Unadjusted Account Value daily and, if dictated by the formula, systematically transfers amounts between the Permitted Sub-accounts you have chosen and the AST Investment Grade Bond Sub-account. The formula and transfers between the Unadjusted Account Value and the AST Investment Grade Bond Sub-account is explained on page C-8 of the prospectus, and the formula is set forth on page C-23. The primary driver of transfers to the AST Investment Grade Bond Sub-account is the difference between your Unadjusted Account Value and PWV. Other factors include:

- how long you have owned the benefit;
- the performance of the sub-accounts you have chosen;
- the performance of the AST Investment Grade Bond Sub-account;
- the amount allocated to the sub-accounts you have chosen;
- additional purchase payments and withdrawals you make to your annuity;

Upon each formula-driven transfer between the Permitted Sub-accounts you have chosen and the AST Investment Grade Bond Sub-account you receive a confirmation with details of the trade. Please note, you are free to terminate the SDH6 Plus benefit at any time. If you choose to terminate the benefit, you will lose any associated guarantees.

You also expressed concerns regarding the AST Investment Grade Bond Sub-account. This sub-account is available only with certain living benefits, and thus you (or other individuals) may not allocate Purchase Payments to or make transfers to or from the AST Investment Grade Bond Sub-account. Performance of the AST Investment Grade Bond Sub-account is readily available for viewing online. Other details, such as the objectives and composition of the portfolio, are available starting on page 113 the Advanced Series Trust fund prospectus dated May 1, 2011. A copy of this has been included for your reference.

We also noted concerns you expressed regarding "program rebalances" that you experienced on your account. As one of the conditions to your participating in SHD6 Plus, we limit the Investment Options to which you may allocate your Account Value. As described beginning on page 27 of the prospectus, we offer two groups of "Permitted Sub-accounts." Under the first group ("Group I"), your allowable Investment Options are more limited, but you are not subject to mandatory quarterly rebalancing. In your case, your initial allocations when you applied for your contract placed you in Group I (100% of payments allocated to the AST Preservation Asset Allocation). The second group ("Group II") is our "Custom Portfolios Program." Upon your first reallocation transaction you performed on 4/30/2011 through Service Online, you began participation in the Custom Portfolios Program, which is described on page 27 of the Prospectus. The Custom Portfolios Program offers a larger menu of portfolios, but you are subject to certain other restrictions. Specifically:

- you must allocate **at least** 20% of your Account Value to certain fixed income portfolios (i.e., the AST Lord Abbett Core Fixed Income Portfolio); and
- you may allocate up to 80% in additional variable portfolios; and
- on each benefit quarter (or the next Valuation Day, if the quarter-end is not a Valuation Day), we will **automatically re-balance your Sub-accounts used with this Program, so that the percentages devoted to each portfolio remain the same as those in effect on the immediately preceding quarter-end,** subject to the pre-determined mathematical formula inherent in the benefit. Note that on the first quarter-end following your participation in the Custom Portfolios Program, we will re-balance your Sub-accounts so that the percentages devoted to each portfolio remain the same as those in effect when you began the Custom Portfolios Program; and

## EXHIBIT M. Hagan's Letter Dated February 23, 2012

- between quarter-ends, you may re-allocate your Account Value among the Investment Options permitted within this category. **If you reallocate, the next quarterly rebalancing will restore the percentages to those of your most recent reallocation.**

Please note, when you performed this transaction, you received the following message on Service Online: "**By allocating the minimum required allocations of your contract value between the allowable bond portfolios, you are enrolled in the Custom Portfolios Program. In accordance with the rules of this program, your contract will be rebalanced quarterly to your selected allocations.**" You acknowledged this statement by clicking "continue" to process your reallocation. When you performed your asset reallocation transaction through Service Online on 7/1/2011, you allocated your funds in the following manner:

- 40% AST High Yield Portfolio
- 40% AST Lord Abbett Core Fixed Income Portfolio (which is higher than the 20% minimum required by the Custom Portfolios Program)
- 20% AST T. Rowe Price Global Bond Portfolio

Following your enrollment in the Custom Portfolios Program, your first quarterly "Program Rebalance" occurred on 7/18/2011 (based on your benefit election date). This Program Rebalance bought and sold units accordingly to match the allocations you selected on 7/1/2011. Since that time, Program Rebalances have occurred on each benefit anniversary to match the allocation percentages you established with your most recent reallocation. You received confirmation statements for each of these rebalances. Please note, Program Rebalances only apply to funds that are not currently invested in the AST Investment Grade Bond Fund.

In your e-mail to me on 1/24/2012, you expressed concerns with the pricing of your selected sub-accounts, including a reference to an account value shortage of $666.24 when comparing sub-account unit values between two Prudential Websites. The cause of this expected difference is that the "Prices and Performance" as viewed on www.annuities.prudential.com do not include the Insurance Charges associated with your specific annuity. These charges are, however, represented within the unit values on your contract-specific "Service Online" page, hence the difference in the values you calculated. The Insurance Charge is assessed daily at an annualized rate against the assets allocated to the sub-accounts. Details of the Insurance Charge, as well as example calculations, can be found on page 3 of your prospectus in the section titled "Summary of Contract Fees and Charges."

Lastly, I wanted to remind you that based on our review and our discussions with Citigroup, we decided to offer you a rescission, where you will receive the greater of the total Purchase Payment (s) less any withdrawals, or the current Contract Value (without the imposition of Contingent Deferred Sales Charges) plus an amount representing the fees paid for the SHD6 Plus living benefit. We mailed you a Settlement and Release Agreement which you received on January 23, 2012, that described this offer. We have enclosed a copy of the agreement for your convenience  This offer is good until March 9, 2012. To accept the offer, you must sign the agreement and return it to us by March 9, 2012, otherwise the agreement may no longer be accepted and the offer may no longer be available.

Sincerely,

Christopher Hagan
Vice President, Annuity Operations

## EXHIBIT N. Weissberger's Letter Dated May 14, 2012

 **Prudential**

Prudential Annuities
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

May 14, 2012

MICHAEL WU
138 STABLEFORD DR
GLEN ELLYN IL 60137

**Contract Owner:** Michael Wu, Christine Wu
**Contract Number:** E1028928

Dear Mr. Wu:

I am writing in response to your recent emails regarding your above referenced contract. I appreciate your patience while we reviewed your concerns.

Your concerns have been previously addressed numerous times in our multiple letters to you. Prudential stands by its prior responses and reiterates unequivocally that it in no way participates in any so-called Ponzi schemes, and that no transfers under your Spousal Highest Daily Six (SHD6) optional living benefit constitute unauthorized transactions. The Benefit Fund Transfers as well as the benefit fees and program rebalances associated with the (SHD6) optional living benefit elected by you were clearly explained to you multiple times, both in our correspondence as well as the contract and prospectus. We have adequately and appropriately responded to you regarding your benefit related questions and concerns and, therefore, do not plan to comment any further on those same issues.

In your letter dated April 22, 2012, you raise a new issue referencing a page from the FINRA website that contains the following language, "In most cases, brokerage firms are required to provide customers with written notification of trade confirmations at or before completion of a transaction." In response, we note that Prudential Annuities is not a brokerage firm. As all annuity financial transactions are priced as of the close of business on the day in which they are received, transaction confirmations are produced and mailed the next business day, meeting the requirements of FINRA and the SEC. Prudential has provided you with timely confirmations of the automatic asset transfers made within your contract.

In response to your further comments and information regarding the dividends issue, we cannot speak to what you discussed with Neuberger Berman Management. However, any dividends paid within the underlying subaccounts are reinvested and reflected in the unit values of the subaccount. Please refer to our letter from March 20, 2012 for further explanation.

Our offer to cancel your contract and return to you the greater of your total purchase payment(s) less any withdrawals or the Account Value, without the imposition of any Contingent Deferred Sales Charges had a final deadline of May 1, 2012. You did not accept this offer, but instead made a counter-offer. In a further effort to resolve this matter, Prudential is prepared to agree to that portion of your counter-proposal, where Prudential will cancel your contract and return to you your Contract Value adjusted to reflect the amount it would have been had you never elected SHD6. This offer is outlined in the enclosed Settlement and Release Agreement (the "Agreement"), and it is $11,500 more than your contract value as of April 24, 2012.

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

## EXHIBIT N. Weissberger's Letter Dated May 14, 2012

If you would like to accept this offer, please sign the Agreement in the presence of a witness, who also should sign the Agreement, and return it by June 8, 2012. Otherwise, the Agreement may no longer be accepted and this offer may no longer be available. Once we receive the signed Agreement by June 8, we will sign the Agreement and return a copy for your records.

Please note, however, Prudential cannot provide you with advice about the tax treatment as applied to your individual situation. You should consult with your tax advisors as to how the general tax information applies to your individual situation. Any taxable income is generally reportable to you and the IRS by Prudential and may be subject to withholding.

If you have questions, please contact your financial professional or our Annuity Service Center at (888) 778-2888. Representatives are available to assist you Monday through Thursday between 8:00 a.m. and 7:00 p.m., and Friday between 8:00 a.m. and 6:00 p.m. Eastern Time. You may also obtain additional information on our website, www. prudentialannuities.com. Thank you for choosing Prudential Annuities for your financial needs.

Sincerely,

Michael Weissberger
Senior Customer Service Representative

Enclosure

## **EXHIBIT O. Pruco Life's Misrepresentations on Asset Transfers**

### **1. What Prudential Financial Companies Have Been Saying**



### **2. What Prudential Financial Companies Have Been Doing**



## EXHIBIT P. Hagan's Letter Dated June 15, 2012

 **Prudential**

Prudential Annuities
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

June 15, 2012

MICHAEL H WU
138 STABLEFORD DR
GLEN ELLYN IL 60137

**Contract Owner:** Michael H. Wu
**Joint Owner:** Christine T. Wu
**Contract Number:** E1028928

Dear Mr. Wu:

We are writing to acknowledge receiving your recent communications to me and others at Prudential and to follow up on our previous correspondence regarding your annuity.

Per your application, your contract was issued with the Spousal Highest Daily Lifetime Six Plus (SHD6) living benefit. The SHD6 Plus is an optional benefit for an extra cost that guarantees the investor can withdraw an Annual Income Amount each year for the Annuitant's life based on 4%-6% (based on age of youngest spouse) of the Protected Withdrawal Value, regardless of the performance of the underlying investments.

A key feature of the SHD6 Plus living benefit, which is fully disclosed in your prospectus and contract, is a predetermined mathematical formula that helps us manage your guarantee through all market cycles. Each business day, the formula determines if any portion of the account value needs to be transferred into or out of the AST Investment Grade Bond Portfolio. The asset transfers you have noted between the Bond Portfolio and your sub-accounts are entirely normal and based upon this formula.

We have made several efforts to reach out to you to discuss your concerns, and have proposed two alternative offers for resolving this matter, both of which we believe address your concerns fairly. We recognize that you have indicated dissatisfaction with both offers. We are extending the deadline to accept our May 14 offer until June 22, 2012.

We hope to resolve this matter and would welcome a telephone conversation to address any questions or concerns you may have. You may contact me directly at 215-784-8209.

Sincerely,

Christopher Hagan
Vice President, Annuity Operations

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

**EXHIBIT Q-1. The Auto-rebalance Feature of Grier**

1. **Strangfeld** el at predetermine a 13% to 14 % of ROE arbitrage for PRU.

2. **PI** benchmarks the market cap needs for PRU.



**1. Arbitrage**

2. Benchmarked the Projected Annual Income Amount for PRU
(Based on Arbitrage Pricing Model)

Milestone on Day X

Market Cap of PRU at the Beginning of underlying Year, which includes PFI own capital; and the capital funds and the market gains, which PFI has embezzled from VA individuals.

1/1

12/31

**PFI et al Manipulated Market Cap of PRU from 1/1 to 12/31**

Wu v PRU et al

# EXHIBIT Q-1. The Auto-rebalance Feature of Grier

3. **PI** Monitors Market Cap Consistence of PRU after **the Trust** Prices its Shares to Facilitate PRU **Market Timer.**

4. Whenever PRU Market Cap Is Inconsistent with Its Predetermined Benchmark, It Trigs PRU **Market Timer** and Then PI Directs PIM et al to Conduct Prohibited **"Benefit Fund Transfers"** to **Auto-rebalance** Market Cap Consistency for PRU:

   a. **Market Downturns**: PIM et el Transfer Needed Disguised Mutual Funds at Lower Unit Prices from VA Individuals to PFI and Mispriced "Junk Bonds" from PFI to VA Individual, and

   b. **Market Upturns**: PIM et el Transfer Spare Disguised Mutual Funds at Higher Unit Prices from PFI Back to VA Individuals and Mispriced "Junk Bonds" from VA Individual Back to PFI.

**[Example]** As Shown in Figure below. Assume that the Starting Price and the Ending Price of Disguised Mutual Fund Are the Same; and the Price of Mispriced "Junk Bonds" Does Not Change. PFI Buys in Disguised Mutual Fund at Lower Price in Step 4a and Sell It Back at Higher Price in Step 4b.

If There Were No Said PFI Embezzlements, VA Individuals Make Even at the End of the Sample Period. Due to Misappropriations ,PFI Made $8 per Share and VA Individuals Lost $8 per Share.



Wu v PRU et al

**EXHIBIT Q-1. The Auto-rebalance Feature of Grier**



Wu v PRU et al

**EXHIBIT Q-1. The Auto-rebalance Feature of Grier**



- PFI et al Made 17 Prohibited "Benefit Fund Transfers" in 2011:

  6 Big Buy-ins (i.e., Step 4a) and 11 Small Sell-backs (i.e., Step 4b).

- AST Investment Grade Bond Portfolio ("IGB") Contains 100% of Non-investment Grade "Junk Bonds", Which Are Mispriced and Have No Capital Value.

- AST Lord Abbett Core Fixed Income Portfolio ("LAC") Is One of PFI Designated CPP Portfolios, Which Contain Scalable Amounts of Mispriced "Junk Bonds".

Wu v PRU et al

**EXHIBIT Q-1. The Auto-rebalance Feature of Grier**

Paired Illegal and/or Prohibited Transactions of Unregistered Funds and Mispriced "Junk Bonds" between Plaintiffs and Prudential Financial Companies

| Description | Date | 8/5 | 8/8 | 8/9 | 8/15 | 8/16 | 8/18 | 8/29 | 9/16 | 9/22 | 10/3 | 10/6 | 10/14 | 10/24 | 10/28 | 11/21 | 11/30 | 12/16 | | Date | 12/31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unreg. Funds | CSR | 11.45275 | 10.33459 | 11.15272S | 12.12017 | 12.06183 | 11.56045 | 12.07308 | 12.13880 | 10.94463 | 10.32421 | 10.95582 | 11.31582 | 12.00016 | 12.4577 | 11.84348 | 11.84348 | 11.9293B | | CSR | 11.71326 |
| Disguised as | LAC | 11.56151 | 11.58062 | 11.64268 | 11.61822 | 11.65938 | 11.89994 | 11.58817 | 11.64089 | 11.77377 | 11.70867 | 11.57693 | 11.55017 | 11.54547 | 11.58471 | 11.60468 | 11.60468 | 11.71128 | | LAC | 11.71326 |
| Registered | | 11.77473 | 9.99791 | 10.59862 | 10.83580 | 10.65363 | 10.00304 | 10.79192 | 10.95525 | 10.10910 | 9.60247 | 10.34713 | 10.07258 | 11.17573 | 11.48647 | 11.16714 | 11.16714 | 10.75577 | | NBM | 11.08602 |
| Mutual Funds | NBM | 11.79614 | 11.13211 | 11.32610 | 11.44295 | 11.00552 | 11.76654 | 11.98250 | 11.10163 | 11.60780 | 11.34713 | 11.23474 | 12.24474 | 12.24413 | 12.21055 | 11.72032 | | | NBM | 11.95206 |
| (Unit Price) | SGS | 11.93264 | 10.87737S | 11.66279 | 12.05661 | 11.77896 | 11.91505 | 12.05861 | 12.11857 | 11.07878 | 10.49871 | 11.55517 | 12.18887 | 12.62378 | 13.03367 | 11.70846 | 12.34117 | 11.94269 | | SGS | 12.27464 |
| Transaction of | per Day | | | 12466.21 | 8539.93 | 5011.16 | 1046.13 | 9860.03 | 5024.20 | 18903.75 | -11252.05 | 6028.84 | 5504.78 | 6225.02 | 6755.06 | 5847.82 | 45.23.65 | | | per Day | (acct. val.) |
| Unreg. Funds | Accumulated | | | | | | | | | | | | | | | | | | | Accumulated | 5650-48) |
| % of Acct Value | Accumulated | 27.69% | -48.62% | 35.58% | 26.26% | 20.44% | -3.20% | 32.08% | 26.72% | 47.67% | 61.05% | 53.64% | 47.08% | 40.06% | 32.61% | 53.98% | 47.04% | 42.24% | | Accumulated | 13.10% |
| Transaction of | per Day | 27508.44 | 19900.94 | 12466.21 | -8539.93 | 5011.16 | 21246.83 | -9860.03 | -5024.20 | 18903.75 | 11229.05 | 6028.84 | -5504.78 | -6225.02 | -6755.06 | 18887.94 | -5847.82 | | | per Day | (acct. val.) |
| "Junk Bonds" | Accumulated | 27508.44 | 46508.96 | 34040.77 | 25500.84 | 20489.66 | 41736.51 | 31876.48 | 26852.28 | 45756.03 | 57048.03 | 51019.24 | 45514.46 | 39289.44 | 32534.38 | 51421.32 | 45574.50 | 40150.95 | | Accumulated | 41371.09 |
| (Unit Price) | VGB | 11.37447 | 11.39000 | 11.42997 | 11.50354 | 11.54145 | 11.57885 | 11.45679 | 11.54042 | 11.61588 | 11.53239 | 11.54953 | 11.39143 | 11.46242 | 11.53888 | 11.50353 | 11.49023 | | | VGB | 11.71012 |

Return on Equity ("ROE") of Prudential Financial Inc. ("PRU"); and Performance of Standard and Poor 500 ("S&P 500")

| PRU ROE | [yr 2011] | | | | | | | | | | | | | | | | | | | | 10.47% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S&P 500 Index | S&P 500 | 199.31 | 1119.46 | 1172.53 | 1204.49 | 1192.76 | 1140.65 | 1210.08 | 1216.01 | 1128.96 | 1099.23 | 1164.97 | 1224.58 | 1285.09 | 1254.19 | 1392.98 | 1246.96 | 1219.66 | | S&P 500 | 1257.60 |
| | Change | -58.20 | -138.10 | 33.07 | 31.96 | -11.73 | -116.99 | 47.54 | 11.59 | 41.63 | -56.33 | 65.74 | 60.47 | 33.86 | -30.90 | 139.41 | -46.45 | -46.65 | | Change | 37.94 |
| Base (123110) | Accumulated | -4.63% | -10.99% | -6.77% | -4.23% | -5.16% | -9.30% | 3.78% | -3.31% | -10.18% | -12.60% | -7.37% | -2.63% | -0.27% | -2.18% | -5.14% | -0.85% | | | Accumulated | -0.00226 |
| 1,257.64 | | | | | | | | | | | | | | | | | | | | | |

5. PI Commingles Investments of VA Individuals with that of Prudential Financial Companies in Unregistered PICA Omnibus Accounts.

6. PI Is the Overall Investment Manager of the Commingled Vehicles.

7. PI et el Use Prohibited Transactions and Illegal "Late Trading and Market Timing" Practices et al to Steal Capital, Dividends, and Market Gains of VA Individuals in the Commingled Vehicles; and Give Them to PFI.

8. PRU Gained 10.47% of ROE Arbitrage but Plaintiffs Lost 11.10% of Their VA Account Value, Even after It Was Inflated with Over 43% of Mispriced "Junk Bonds", by the End of 2011.

9. S&P 500 Index Made Even, after It Distributed 2.09% of Dividends, in 2011.

Wu v PRU et al

# EXHIBIT Q-2. Nine Benefit Fund Transfers et al in 2011Q3 Statement

8045419 02503 E1028928

 **Prudential**

Annuities Services
P.O. Box 13467
Philadelphia, PA 19176



E1024938, PC
E-CO, E-AC

Page 1 of 9

**Premier Retirement X Series**
**Annuity Statement**
July 01, 2011 through September 30, 2011

»02503 8041419 001 092001
MICHAEL H. WU
CHRISTINE T. WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

**Financial Professional:**
CHRISTOPHER J. CRALLE
CITIGROUP GLOBAL MARKETS INC.
1900 SPRING ROAD
OAKBROOK, IL 60523

| Contract Number: E1028928 | | Type: Non Qualified | Contract Issue Date: 04/16/2010 |
|---|---|---|---|
| Owner Name(s): | MICHAEL H. WU | | Annuity Date: 02/01/2042 |
| | CHRISTINE T. WU | | |
| Annuitant: | MICHAEL H. WU | | |

Please review your statement and contact us within 30 days if you find any information you believe to be inaccurate. Note that any living benefit or death benefit values you may have are shown in the "Your Benefit Detail" section of this statement. If you do not see a benefit that you selected, please contact us.

## Your Portfolio

| | **Previous Period** | | |
|---|---|---|---|
| Ending Account Value as of 06/30/2011 | $110,351.67 | | |
| Surrender Value as of 06/30/2011 | $101,133.24 | | |

| **Your Annuity Activity** | **Current Period** | **Year-to-Date** | **Since Issue** |
|---|---|---|---|
| Beginning Account Value | $110,351.67 | $110,096.13 | .00 |
| Purchase Payments | .00 | .00 | $100,000.00 |
| Credits | .00 | .00 | $6,000.00 |
| Withdrawals | .00 | .00 | .00 |
| Contract Fees and Charges* | ($274.45) | ($811.53) | ($1,328.53) |
| Investment Performance | ($15,222.68) | ($14,430.06) | ($9,816.93) |
| **Ending Account Value (as of 09/30/2011)**\** | **$94,864.64** | **$94,864.64** | **$94,864.64** |

* "Contract Fees and Charges" reflects certain fees and charges including, but not limited to: Contingent Deferred Sales Charge (CDSC), transfer fees, annual maintenance fees, or other benefit fees or charges, if applicable or imposed during the period covered by this statement as of this statement date.

** "Ending Account Value" is your value prior to the application of any Surrender Charge (CDSC), Market Value Adjustment (MVA) and any Other Fees and Charges that may be applicable to your annuity contract.

## Benefit Summary

**Spousal Highest Daily Lifetime(SM) 6 Plus**

| | |
|---|---|
| Estimated Protected Withdrawal Value(PWV) | $116,985.18 |
| Estimated Annual Income Amount | $4,679.41 |
| PWV Cumulative Step-ups*** | 4 |
| Date of last Step-up | 11/04/2010 |

Past performance does not guarantee future results. PWV is separate from your Account Value and not available as a lump sum.

*** PWV Cumulative Step-ups - The total number of times the PWV locked in a highest daily value prior to taking the first Lifetime Withdrawal under the benefit since the effective date of your benefit. Step-ups pertain only to your PWV and not your Account Value, as your Account Value is subject to variation each business day based on the investment performance of your individual fund allocations.

Please refer to the "Your Benefit Detail" section on the next page for additional information regarding your benefit.

Agent ID # BTGGT2 Office # 2708IW

# EXHIBIT Q-2. Nine Benefit Fund Transfers et al in 2011Q3 Statement

8045419 02503

E1Q859QB, FC

Page 4 of 9

### **Premier Retirement X Series**
### **Annuity Statement**
### **July 01, 2011 through September 30, 2011**

## Portfolio Detail [continued]

**VARIABLE INVESTMENTS [continued]**

| As of June 30, 2011 | # of Units | Unit Price | Portfolio Value |
|---|---|---|---|
| **Mid/Small Cap:** | | | |
| AST Neuberger Berman Mid Cap Growth | 1,320.46427 | 12.94326 | $17,091.11 |
| AST Small Cap Growth | 1,215.27391 | 14.11388 | $17,152.23 |
| **Special Equity:** | | | |
| AST T. Rowe Price Natural Resources | 3,201.06491 | 11.61940 | $37,194.45 |
| **Bond:** | | | |
| AST PIMCO Total Return Bond | 2,153.26903 | 10.55807 | $22,734.37 |
| | **Total Variable Investments** | | **$110,351.67** |

Withdrawals made prior to the statement date are reflected in the values shown above. The Maturity Date is the end of your Guarantee Period. The surrender value may change daily to reflect the investment performance of the Sub-Accounts in which you are invested and fluctuations in our current fixed rates. Our current fixed rates are sensitive to interest rate fluctuations in the market.

## Surrender Value Calculation as of September 30, 2011

| | |
|---|---|
| Ending Account Value | $94,854.54 |
| Surrender Charge [CDSC] | [$9,000.00] |
| Other Fees and Charges | [$224.70] |
| **Surrender Value*** | **$85,629.84** |

* "Surrender Value" is the value of your Annuity that would have been available if you had surrendered this contract effective as of this statement date. I equals the "Ending Account Value" for the current period, less any applicable fees and charges and any other adjustments as shown above. Depending o your contract, the charges and adjustments include, but are not limited to: Contingent Deferred Sales Charge (CDSC), MVA, and other miscellaneous fee applicable reaptured bonus, any charges due for optional benefits provided by rider or endorsement, any applicable maintenance fee and any applicable Credits recoverable upon surrender. The Surrender Value shown on this statement may increase or decrease prior to your next statement.

## Investment Transaction Activity

July 01, 2011 through September 30, 2011

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| 07/01/2011 Transaction Type: Reallocation | | | | |
| | AST Goldman Sachs Large-Cap Value Port | [1,433.91280] | 11.43172 | [$16,392.09] |
| | AST Neuberger Berman Mid Cap Growth | [1,320.46427] | 13.15297 | [$17,368.03] |
| | AST Small Cap Growth | [1,215.27391] | 14.35238 | [$17,442.07] |
| | AST PIMCO Total Return Bond | [2,153.26903] | 10.55753 | [$22,733.20] |
| | AST T. Rowe Price Natural Resources | [3,201.06491] | 11.71002 | [$37,484.53] |
| | AST High Yield | 3,997.54324 | 11.14884 | $44,567.97 |
| | AST Lord Abbett Core Fixed Income Port | 3,936.88072 | 11.32063 | $44,567.97 |
| | AST T. Rowe Price Global Bond | 2,089.21649 | 10.66619 | $22,283.98 |
| | **Total:** | | | **$0.00** |

Page 2 of 5

# EXHIBIT Q-2. Nine Benefit Fund Transfers et al in 2011Q3 Statement

80 45 419 02 503 E1028928

**Prudential** 

X:C0890B, YC
X-CC, X-AC

Page 5 of 9

## Premier Retirement X Series
### Annuity Statement
### July 01, 2011 through September 30, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| 07/18/2011 Transaction Type: Benefit Fee | | | | |
| This transaction includes the benefit fees for the following Benefit(s): Spousal Highest Daily Lifetime(SM) 6 Plus | | | | |
| | AST High Yield | (9.81229) | 11.16967 | ($109.60) |
| | AST Lord Abbett Core Fixed Income Port | (9.66340) | 11.40489 | ($110.21) |
| | AST T. Rowe Price Global Bond | (5.12719) | 10.65691 | ($54.64) |
| | **Total:** | | | **($274.45)** |
| 07/18/2011 Transaction Type: Program Rebalance | | | | |
| | AST Lord Abbett Core Fixed Income Port | (15.17332) | 11.40489 | ($173.05) |
| | AST High Yield | 6.69581 | 11.16967 | $74.79 |
| | AST T. Rowe Price Global Bond | 9.22031 | 10.65691 | $98.26 |
| | **Total:** | | | **$0.00** |
| 07/20/2011 Transaction Type: Reallocation | | | | |
| | AST High Yield | (3,994.42676) | 11.18379 | ($44,672.83) |
| | AST Lord Abbett Core Fixed Income Port | (1,954.27263) | 11.41417 | ($22,306.40) |
| | AST T. Rowe Price Global Bond | (2,093.30961) | 10.70369 | ($22,406.14) |
| | AST Cohen & Steers Realty | 1,666.64852 | 13.40795 | $22,346.34 |
| | AST Marsico Capital Growth | 1,855.25018 | 12.04492 | $22,346.34 |
| | AST Neuberger Berman Mid Cap Growth | 1,731.21824 | 12.90787 | $22,346.34 |
| | AST Small Cap Growth | 1,600.91686 | 13.95847 | $22,346.35 |
| | **Total:** | | | **$0.00** |

08/05/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | Investments | Units | Unit Price | Value |
|---|---|---|---|---|
| | AST Cohen & Steers Realty | (456.77414) | 11.45275 | ($5,231.32) |
| | AST Lord Abbett Core Fixed Income Port | (536.56140) | 11.56151 | ($6,203.46) |
| Capital | AST Marsico Capital Growth | (508.46342) | 10.77578 | ($5,479.09) |
| | AST Neuberger Berman Mid Cap Growth | (474.47042) | 11.29474 | ($5,359.02) |
| | AST Small Cap Growth | (438.75873) | 11.93264 | ($5,235.55) |
| "Junks" | AST Investment Grade Bond | 2,418.43708 | 11.37447 | $27,508.44 |
| | **Total:** | | | **$0.00** |

08/08/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| Investments | Units | Unit Price | Value |
|---|---|---|---|
| AST Cohen & Steers Realty | (337.51218) | 10.33459 | ($3,488.05) |
| AST Lord Abbett Core Fixed Income Port | (396.46668) | 11.58062 | ($4,591.33) |
| AST Marsico Capital Growth | (375.70572) | 9.97914 | ($3,749.22) |
| AST Neuberger Berman Mid Cap Growth | (350.58854) | 10.39783 | ($3,645.36) |
| AST Small Cap Growth | (324.20124) | 10.87775 | ($3,526.58) |

00503 8045419 008787 016350 00000/00005

# EXHIBIT Q-2. Nine Benefit Fund Transfers et al in 2011Q3 Statement

8045419 02503

E100890%. PC

Page 6 of 9

## Premier Retirement X Series
### Annuity Statement
### July 01, 2011 through September 30, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

08/08/2011 Transaction Type: Benefit Fund Transfer [continued]

| | | | | |
|---|---|---|---|---|
| | AST Investment Grade Bond | 1,667.88448 | 11.39200 | $19,000.54 |
| | **Total:** | | | **$0.00** |

08/09/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (1,090.83488) | 11.42997 | ($12,468.21) |
| AST Cohen & Steers Realty | 216.32566 | 11.52725 | $2,493.64 |
| AST Lord Abbett Core Fixed Income Port | 214.18093 | 11.64268 | $2,493.64 |
| AST Marsico Capital Growth | 235.39074 | 10.59362 | $2,493.64 |
| AST Neuberger Berman Mid Cap Growth | 224.00425 | 11.13211 | $2,493.64 |
| AST Small Cap Growth | 215.66162 | 11.56279 | $2,493.65 |
| **Total:** | | | **$0.00** |

08/15/2011 Transaction Type: Benefit Fund Transfer (4)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (742.37409) | 11.50354 | ($8,539.93) |
| AST Cohen & Steers Realty | 140.92129 | 12.12017 | $1,707.99 |
| AST Lord Abbett Core Fixed Income Port | 147.00961 | 11.61822 | $1,707.99 |
| AST Marsico Capital Growth | 157.65120 | 10.83398 | $1,707.99 |
| AST Neuberger Berman Mid Cap Growth | 146.91376 | 11.62580 | $1,707.99 |
| AST Small Cap Growth | 141.89793 | 12.03661 | $1,707.97 |
| **Total:** | | | **$0.00** |

08/16/2011 Transaction Type: Benefit Fund Transfer (5)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (434.18657) | 11.54149 | ($5,011.16) |
| AST Cohen & Steers Realty | 83.09104 | 12.06183 | $1,002.23 |
| AST Lord Abbett Core Fixed Income Port | 85.95912 | 11.65938 | $1,002.23 |
| AST Marsico Capital Growth | 94.07404 | 10.65363 | $1,002.23 |
| AST Neuberger Berman Mid Cap Growth | 87.58493 | 11.44295 | $1,002.23 |
| AST Small Cap Growth | 85.08716 | 11.77898 | $1,002.24 |
| **Total:** | | | **$0.00** |

Case: 1:14-cv-05392 Document #: 1 Filed: 07/15/14 Page 131 of 198 PageID #:131

# EXHIBIT Q-2. Nine Benefit Fund Transfers et al in 2011Q3 Statement

8045419 02503 E1028928

 Prudential

E1028928, PC
E-CC, E-AC

Page 7 of 9

### Premier Retirement X Series
### Annuity Statement
### July 01, 2011 through September 30, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

08/18/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Cohen & Steers Realty | (369.20622) | 11.56045 | ($4,268.19) |
| AST Lord Abbett Core Fixed Income Port | (413.97905) | 11.69994 | ($4,843.53) |
| AST Marsico Capital Growth | (410.12832) | 10.00304 | ($4,102.53) |
| AST Neuberger Berman Mid Cap Growth | (383.82083) | 10.68522 | ($4,101.21) |
| AST Small Cap Growth | (360.17884) | 10.91505 | ($3,931.37) |
| AST Investment Grade Bond | 1,834.96893 | 11.57885 | $21,246.83 |
| **Total:** | | | **$0.00** |

08/29/2011 Transaction Type: Benefit Fund Transfer (7)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (860.62763) | 11.45679 | ($9,860.03) |
| AST Cohen & Steers Realty | 163.33943 | 12.07308 | $1,972.01 |
| AST Lord Abbett Core Fixed Income Port | 170.46862 | 11.56817 | $1,972.01 |
| AST Marsico Capital Growth | 183.92322 | 10.72192 | $1,972.01 |
| AST Neuberger Berman Mid Cap Growth | 167.59472 | 11.76654 | $1,972.01 |
| AST Small Cap Growth | 163.53377 | 12.05861 | $1,971.99 |
| **Total:** | | | **$0.00** |

09/16/2011 Transaction Type: Benefit Fund Transfer (8)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (435.28134) | 11.54242 | ($5,024.20) |
| AST Cohen & Steers Realty | 82.77919 | 12.13880 | $1,004.84 |
| AST Lord Abbett Core Fixed Income Port | 86.31986 | 11.64089 | $1,004.84 |
| AST Marsico Capital Growth | 91.72223 | 10.95525 | $1,004.84 |
| AST Neuberger Berman Mid Cap Growth | 83.82538 | 11.98730 | $1,004.84 |
| AST Small Cap Growth | 82.23876 | 12.21857 | $1,004.84 |
| **Total:** | | | **$0.00** |

09/22/2011 Transaction Type: Benefit Fund Transfer (9)

This transaction is associated with your election of Spousal Highest Daily Lifetime[SM] 6 Plus. Please refer to the 'Your Benefit Detail' section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Cohen & Steers Realty | (327.82221) | 10.94453 | ($3,587.86) |
| AST Lord Abbett Core Fixed Income Port | (362.29367) | 11.77277 | ($4,265.20) |
| AST Marsico Capital Growth | (364.77619) | 10.19935 | ($3,720.48) |
| AST Neuberger Berman Mid Cap Growth | (339.57476) | 11.10162 | ($3,769.83) |
| AST Small Cap Growth | (321.36932) | 11.07878 | ($3,560.38) |
| AST Investment Grade Bond | 1,627.41416 | 11.61582 | $18,903.75 |
| **Total:** | | | **$0.00** |

02503 8045419 008788 016352 00004/00005

# EXHIBIT Q-3. Eight Benefit Fund Transfers et al in 2011Q4 Statement

8130484 00774 E1028928

 **Prudential**



Annuities Services
P.O. Box 13467
Philadelphia, PA 19176

E1C28928, PC
E-CC, E-AC

Page 1 of 9

**Premier Retirement X Series**
**Annuity Statement**
**October 01, 2011 through December 31, 2011**

>00774 8130484 001 092001
MICHAEL H. WU
CHRISTINE T. WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

**Financial Professional:**
CHRISTOPHER J. CRALLE
CITIGROUP GLOBAL MARKETS INC.
1900 SPRING ROAD
OAKBROOK, IL 60523

| Contract Number: E1028928 | | Type: Non Qualified | Contract Issue Date: 04/16/2010 | |
|---|---|---|---|---|
| Owner Name(s): | MICHAEL H. WU | | Annuity Date: | 02/01/2042 |
| | CHRISTINE T. WU | | | |
| Annuitant: | MICHAEL H. WU | | | |

Please review your statement and contact us within 30 days if you find any information you believe to be inaccurate. Note that any living benefit or death benefit values you may have are shown in the "Your Benefit Detail" section of this statement. If you do not see a benefit that you selected, please contact us.

## Your Portfolio

| Your Annuity Activity | Current Period | Year-to-Date | Since Issue |
|---|---|---|---|
| Beginning Account Value | $94,854.54 | $110,096.13 | .00 |
| Purchase Payments | .00 | .00 | $100,000.00 |
| Credits | .00 | .00 | $6,000.00 |
| Withdrawals | .00 | .00 | .00 |
| Contract Fees and Charges* | ($278.46) | ($1,089.99) | ($1,606.99) |
| Investment Performance | $3,300.49 | ($11,129.57) | ($6,516.44) |
| **Ending Account Value**\*\* | **$97,876.57** | **$97,876.57** | **$97,876.57** |

\* "Contract Fees and Charges" reflects certain fees and charges including, but not limited to Contingent Deferred Sales Charge (CDSC), transfer fees, annual maintenance fees, or other benefit fees or charges, if applicable or imposed during the period covered by this statement as of this statement date.

\*\* "Ending Account Value" is your value prior to the application of any Surrender Charge (CDSC), Market Value Adjustment (MVA) and any Other Fees and Charges that may be applicable to your annuity contract.

## Benefit Summary

### Spousal Highest Daily Lifetime(SM) 6 Plus

| | | |
|---|---|---|
| Estimated Protected Withdrawal Value(PWV) | $118,716.01 | Past performance does not guarantee future results. PWV is separate from your Account Value and not available as a lump sum. |
| Estimated Annual Income Amount | $4,748.64 | |
| PWV Cumulative Step-ups\*\*\* | 4 | Please refer to the "Your Benefit Detail" section on the next page for additional information regarding your benefit. |
| Date of last Step-up | 11/04/2010 | |

\*\*\* PWV Cumulative Step-ups - The total number of times the PWV locked in a highest daily value prior to taking the first Lifetime Withdrawal under the benefit since the effective date of your benefit. Step-ups pertain only to your PWV and not your Account Value. as your Account Value is subject to variation each business day based on the investment performance of your individual fund allocations.

Agent ID # B7GGT2 Office # Z70XW

007748130484 006757 012383 00001/00010

# EXHIBIT Q-3. Eight Benefit Fund Transfers et al in 2011Q4 Statement

8130484 00774 E1028928

E1028928, FC
E-CC, E-AC

 **Prudential**

Page 5 of 9

## Premier Retirement X Series
### Annuity Statement
### October 01, 2011 through December 31, 2011

### Investment Transaction Activity

October 01, 2011 through December 31, 2011

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

10/03/2011 Transaction Type: Benefit Fund Transfer  ⑩

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | Investments | # of Units | Unit Price | Value |
|---|---|---|---|---|
| **Capital** | AST Cohen & Steers Realty | (204.97258) | 10.32421 | ($2,116.18) |
| | AST Lord Abbett Core Fixed Income Port | (226.52553) | 11.70367 | ($2,651.18) |
| | AST Marsico Capital Growth | (228.07798) | 9.60347 | ($2,190.34) |
| | AST Neuberger Berman Mid Cap Growth | (212.32070) | 10.47830 | ($2,224.76) |
| | AST Small Cap Growth | (200.93802) | 10.49871 | ($2,109.59) |
| **"Junks"** | AST Investment Grade Bond | 979.15957 | 11.53239 | $11,292.05 |
| | **Total:** | | | **$0.00** |

10/06/2011 Transaction Type: Benefit Fund Transfer ⑪

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| Investments | # of Units | Unit Price | Value |
|---|---|---|---|
| AST Investment Grade Bond | (527.24861) | 11.43453 | ($6,028.84) |
| AST Cohen & Steers Realty | 110.05749 | 10.95582 | $1,205.77 |
| AST Lord Abbett Core Fixed Income Port | 104.15283 | 11.57693 | $1,205.77 |
| AST Marsico Capital Growth | 116.19494 | 10.37713 | $1,205.77 |
| AST Neuberger Berman Mid Cap Growth | 106.26286 | 11.34705 | $1,205.77 |
| AST Small Cap Growth | 104.25787 | 11.56517 | $1,205.76 |
| **Total:** | | | **$0.00** |

10/14/2011 Transaction Type: Benefit Fund Transfer ⑫

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| Investments | # of Units | Unit Price | Value |
|---|---|---|---|
| AST Investment Grade Bond | (483.23872) | 11.39143 | ($5,504.78) |
| AST Cohen & Steers Realty | 97.29388 | 11.31582 | $1,100.96 |
| AST Lord Abbett Core Fixed Income Port | 95.56803 | 11.52017 | $1,100.96 |
| AST Marsico Capital Growth | 99.43121 | 11.07258 | $1,100.96 |
| AST Neuberger Berman Mid Cap Growth | 92.18732 | 11.94264 | $1,100.96 |
| AST Small Cap Growth | 90.32339 | 12.18887 | $1,100.94 |
| **Total:** | | | **$0.00** |

10/17/2011 Transaction Type: Benefit Fee

This transaction includes the benefit fees for the following Benefit(s):
Spousal Highest Daily Lifetime(SM) 6 Plus

| Investments | # of Units | Unit Price | Value |
|---|---|---|---|
| AST Cohen & Steers Realty | (2.51125) | 11.02639 | ($27.69) |
| AST Lord Abbett Core Fixed Income Port | (2.69013) | 11.54962 | ($31.07) |
| AST Marsico Capital Growth | (2.75022) | 10.79913 | ($29.70) |
| AST Neuberger Berman Mid Cap Growth | (2.55384) | 11.67652 | ($29.82) |
| AST Small Cap Growth | (2.43639) | 11.84537 | ($28.86) |
| AST Investment Grade Bond | (11.49097) | 11.42810 | ($131.32) |
| **Total:** | | | **($278.46)** |

# EXHIBIT Q-3. Eight Benefit Fund Transfers et al in 2011Q4 Statement

8130484 00774

XICGBVZE, FC

Page 6 of 9

**Premier Retirement X Series**
**Annuity Statement**
**October 01, 2011 through December 31, 2011**

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| **10/17/2011 Transaction Type: Program Rebalance** | | | | |
| | AST Lord Abbett Core Fixed Income Port | (48.65701) | 11.54962 | ($561.97) |
| | AST Marsico Capital Growth | (8.72292) | 10.79913 | ($94.20) |
| | AST Neuberger Berman Mid Cap Growth | (11.50771) | 11.67652 | ($134.37) |
| | AST Cohen & Steers Realty | 54.08388 | 11.02639 | $596.35 |
| | AST Small Cap Growth | 16.39375 | 11.84537 | $194.19 |
| | **Total:** | | | **$0.00** |

10/24/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (543.08078) | 11.46242 | ($6,225.02) |
| AST Cohen & Steers Realty | 103.74862 | 12.00016 | $1,245.00 |
| AST Lord Abbett Core Fixed Income Port | 107.83450 | 11.54547 | $1,245.00 |
| AST Marsico Capital Growth | 111.39215 | 11.17673 | $1,245.00 |
| AST Neuberger Berman Mid Cap Growth | 101.67631 | 12.24474 | $1,245.00 |
| AST Small Cap Growth | 98.59374 | 12.62778 | $1,245.02 |
| **Total:** | | | **$0.00** |

10/28/2011 Transaction Type: Benefit Fund Transfer 

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Investment Grade Bond | (585.52031) | 11.53685 | ($6,755.06) |
| AST Cohen & Steers Realty | 108.44779 | 12.45770 | $1,351.01 |
| AST Lord Abbett Core Fixed Income Port | 116.62010 | 11.58471 | $1,351.01 |
| AST Marsico Capital Growth | 117.61751 | 11.48647 | $1,351.01 |
| AST Neuberger Berman Mid Cap Growth | 108.26416 | 12.47883 | $1,351.01 |
| AST Small Cap Growth | 103.65615 | 13.03367 | $1,351.02 |
| **Total:** | | | **$0.00** |

11/21/2011 Transaction Type: Benefit Fund Transfer (15)

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| AST Cohen & Steers Realty | (338.72430) | 11.42776 | ($3,870.86) |
| AST Lord Abbett Core Fixed Income Port | (329.94909) | 11.64319 | ($3,841.66) |
| AST Marsico Capital Growth | (349.56227) | 10.63553 | ($3,717.78) |
| AST Neuberger Berman Mid Cap Growth | (322.73662) | 11.61712 | ($3,749.27) |
| AST Small Cap Growth | (316.72568) | 11.70846 | ($3,708.37) |
| AST Investment Grade Bond | 1,641.92557 | 11.50353 | $18,887.94 |
| **Total:** | | | **$0.00** |

# EXHIBIT Q-3. Eight Benefit Fund Transfers et al in 2011Q4 Statement

8130484 00774 E1028928

X1028928, PC
X-CC, X-AC

 **Prudential**

Page 7 of 9

### Premier Retirement X Series
### Annuity Statement
### October 01, 2011 through December 31, 2011

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

11/30/2011 Transaction Type: Benefit Fund Transfer  (16)

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (508.58436) | 11.49823 | ($5,847.82) |
| AST Cohen & Steers Realty | 98.75138 | 11.84348 | $1,169.56 |
| AST Lord Abbett Core Fixed Income Port | 100.76611 | 11.60668 | $1,169.56 |
| AST Marsico Capital Growth | 104.73228 | 11.16714 | $1,169.56 |
| AST Neuberger Berman Mid Cap Growth | 95.78275 | 12.21055 | $1,169.56 |
| AST Small Cap Growth | 94.76291 | 12.34217 | $1,169.58 |
| **Total:** | | | **$0.00** |

12/16/2011 Transaction Type: Benefit Fund Transfer (17)

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (414.33137) | 11.64201 | ($4,823.65) |
| AST Cohen & Steers Realty | 80.87009 | 11.92938 | $964.73 |
| AST Lord Abbett Core Fixed Income Port | 82.37614 | 11.71128 | $964.73 |
| AST Marsico Capital Growth | 89.94556 | 10.72571 | $964.73 |
| AST Neuberger Berman Mid Cap Growth | 82.29357 | 11.72303 | $964.73 |
| AST Small Cap Growth | 80.77861 | 11.94289 | $964.73 |
| **Total:** | | | **$0.00** |

Transactions in your variable annuity contract are priced at the end of the business day (generally 4 p.m. Eastern time) on the day the transaction was processed.

## Special Programs as of December 31, 2011

Program Rebalancing                    Quarterly Rebalance of variable investment options.

Some special programs may not be available due to age requirements, minimum account value, or other optional programs selected.

## Primary Beneficiary Information

CHRISTINE T. WU                    MICHAEL H. WU

007748130484 008760 012389 00004/00010

# EXHIBIT R. The Robust Capital Protection Framework of Strangfeld

- **Group Insurance** reported pre-tax adjusted operating income of $208 million for the year, compared to $215 million a year ago.

- **Individual Life** reported pre-tax adjusted operating income of $517 million for the year, compared to $500 million a year ago.

One of the ways that we measure our aggregate success is through *total assets under management*, which were $901 billion as of year-end 2011, up from $784 billion from the previous year.

## International

Expanding our international operations is a vital component of our long-term strategy.

For more than 20 years, Prudential has achieved extensive growth and success in international insurance operations, and we remain committed to achieving growth in both new and existing markets, channels, and products that offer solid returns on our investment.

In Japan, a developed market with deep insurance product penetration, we see significant opportunity. Because Japan has an aging population and the world's largest pool of assets invested in low-return savings accounts, we see opportunity for retirement-oriented products. Accordingly, we believe in Japan's retirement market prospects and are positioned to invest for growth.

To this end, we built on our strategic acquisition of AIG Star and AIG Edison by completing the successful legal merger of those two distinct entities with our existing Gibraltar Life operations on January 1 of this year. This is an exceptional accomplishment, not only due to the merger's ambitious timeline, and not only because of its importance to our continued growth in Japan, but also in light of the extraordinary circumstances faced by all of our Japan-based businesses in the wake of the Tohoku earthquake and tsunami in March 2011.

The combination of resources will augment our service of the Japanese broad middle-income market, which is enhanced by our rapidly growing bank channel, our sizeable independent agent channel, and our valuable relationship with the Teachers' Association of Japan.

In China, a major emerging market where insurance penetration and density are still far below global average levels—an indication of vast growth potential—Prudential took two important steps this year to extend our presence. In April 2011, Prudential signed a definitive agreement with Fosun Group, a large privately owned holding company in China, to establish a private equity fund for the Chinese marketplace. In September 2011, Prudential and Fosun received regulatory approval to develop a life insurance joint venture to be headquartered in Shanghai.

## Building and Deploying Financial Strength

Prudential actively manages its capital, liquidity, and investment portfolio to retain financial strength as a competitive advantage, allowing the company to not only withstand but also compete effectively in a wide range of market conditions. Our investment portfolio remains of high quality and is broadly diversified.

As a result of prudent and proactive capital management, we are not capital constrained, which gives us the ability to pursue attractive acquisitions and act on organic opportunities to innovate and grow. Our 2011 dividend—the highest that Prudential has ever paid— was a demonstration of our financial strength and our commitment to return capital to our shareholders.

Our capital deployment strategy has also included share buybacks. Under an authorization by Prudential's Board of Directors issued in June 2011 to repurchase at management's discretion up to $1.5 billion of the company's outstanding Common Stock through June 2012, the company acquired 19.8 million shares of its Common Stock at a total cost of approximately $1.0 billion, representing the repurchases made during the second half of 2011.

In addition, we employ a robust capital protection framework to ensure availability of adequate capital under reasonably foreseeable stress scenarios. This framework is used to assess potential capital needs arising from market-related distress and identify sources of capital available to meet those needs.

The strength and flexibility afforded by our financial position endows us with the freedom to pioneer new products and services that anticipate the evolving needs of our clients.

For example, one area where we are putting capital and innovation to work is the pension risk transfer market. Here, we have expanded our product platform to help clients meet pension funding requirements, thereby increasing the security of the promise that pension plans offer to participants around the world. In 2011, Prudential completed four pension risk transfer transactions, including its first longevity reinsurance transaction and the U.S.'s first pension plan risk transfer transaction utilizing a buy-in of a specially designed annuity product.

Another product that differentiates us from our peers is our Highest Daily Lifetime Income benefit. We pioneered this innovative variable annuity living benefit in 2006.

## Engaging with Stakeholders

Further supporting our financial strength is appropriate, meaningful regulation of our industry and our company. We are active participants in the ongoing regulatory dialogue on the modernization and improvement of insurance regulation in the United States. We are constructively engaged with the Federal Reserve and the Treasury Department, with other stakeholders in

## **EXHIBIT R. The Robust Capital Protection Framework of Strangfeld**

### 1.   Investments of VA Individuals: Stage 1

**Unregistered Insurance Company Separate Accounts for the Fund**



### 2.   Reallocations of VA Individuals: Stag 1

**Unregistered Insurance Company Separate Accounts for the Fund**

## **EXHIBIT R. The Robust Capital Protection Framework of Strangfeld**

**3.** **Benefit Fund Transfers: Stage 1 (when PRU Market Timer Is Trigged)**



**4.** **Benefit Fees: Stage 1**

PFI et al Use Auto-rebalance Scheme to Protect PFI Capital in These Accounts.



## EXHIBIT R. The Robust Capital Protection Framework of Strangfeld

### 5. Program Rebalances: Stage 1



### 6. Pension Plan Risk Transfers: Stage 2



## EXHIBIT R. The Robust Capital Protection Framework of Strangfeld

### 7. Distributions and Dividends of the Trust



### 8. Bonuses, Distributions, and Dividends of PRU



## EXHIBIT R. The Robust Capital Protection Framework of Strangfeld

### 9. Participants of "Investment" Transactions

| Seller | Broker-dealers | Compliance Reviewers | the trust | Securities Exchanges | Buyer |
|--------|----------------|----------------------|-----------|----------------------|-------|
| PFI | | | | | VA Ind. |
| VA Groups | Buyer's & Seller's | PFI Subsidiaries | the Fund | Unregistered Exchanges | VA Individuals |

Ps. **Broker-dealers of VA Individuals** bought PFI's unregistered funds (including hedged funds) from PFI via Pruco Life Insurance (the issuer of VA contracts) and PFI broker-dealers for **VA individuals** without the knowledge of **VA individuals**.

**Broker-dealers of VA Individuals do not involve in all other types of transaction of VA Individuals.**

### 10. Participants of "Reallocation" Transactions

| Seller Buyer | Broker-dealers | Compliance Reviewers | the trust | Securities Exchanges | Buyer Seller |
|--------------|----------------|----------------------|-----------|----------------------|--------------|
| PFI | | | | | VA Ind. |
| VA Group | PFI Subsidiaries | PFI Subsidiaries | the Fund | Unregistered Exchanges | VA Individuals |

### 10. Participants of "Benefit Fee" Transactions

| Buyer | Broker-dealers | Compliance Reviewers | the trust | Securities Exchanges | Seller |
|-------|----------------|----------------------|-----------|----------------------|--------|
| PFI | | | | | VA Ind. |
| VA Group | PFI Subsidiaries | PFI Subsidiaries | the Fund | Unregistered Exchanges | VA Group |

Ps. **VA Groups** posed as Buyer and Seller for both **VA Individuals** and **PFI** of underlying prohibited transactions between **VA Individuals** and **PFI** without agreements and the knowledge of **VA individuals**.

## EXHIBIT R. The Robust Capital Protection Framework of Strangfeld

### 12. Participants of "Benefit Fund Transfer" and "Program Rebalance" Transactions

| Seller Buyer | Broker-dealers | Compliance Reviewers | the trust | Securities Exchanges | Buyer Seller |
|---|---|---|---|---|---|
| PFI ← | | | | | → VA Ind. |
| VA Group | PFI Subsidiaries | PFI Subsidiaries | the Fund | Unregistered Exchanges | VA Group |

Ps. VA Group posed as Buyers and Sellers for both VA Individuals and PFI of underlying prohibited transactions between VA Individuals and PFI without agreements and the knowledge of VA individuals.

### 13. Participants of "Pension Plan Risk Transfer" Transactions

| Seller Buyer | Broker-dealers | Compliance Reviewers | the trust | Securities Exchanges | Buyer Seller |
|---|---|---|---|---|---|
| PICA ← | | | | | → MFCs |
| PICA | Buyer's & Seller's | Contracted Intermediaries | the Trust | Registered Exchanges | MFCs |

Ps. MFCs stand for underlying Mutual Fund Companies of the Trust.

Prudential Financial Company of America, the ("PICA") is registered as the owner of underlying insurance company registered and unregistered separate accounts of the commingled vehicles under the Trust (registered) and the Fund (unregistered) respectively.

Underlying synthesized "Pension Risk Plan Transfer" transactions are transactions done between underlying unregistered commingled vehicles of the Fund (unregistered) and underlying 1-to-1 corresponding registered commingled vehicles of the Trust (registered).

## EXHIBIT S. The Trust Is Not Available for Direct Investment by VA Individuals

**From:** ClientServices <Clientservices@LordAbbett.com>
**To:** 'Michael Wu' <cs555iit@yahoo.com>
**Sent:** Monday, June 11, 2012 4:27 PM
**Subject:** RE: Questions on Dividends and Voting Proxy Information

Dear Mr. Wu:

Lord, Abbett & Co. LLC ("Lord Abbett") acts as sub-advisor to Prudential Investments LLC with regard to the AST Lord Abbett Core Fixed-Income Portfolio (the "Portfolio"), an investment portfolio of the Advanced Series Trust, (the "Trust"). The Trust is an investment vehicle for life insurance companies writing variable annuity contracts and variable life insurance policies as well as to certain tax-deferred retirement plans and is not available for direct investment by individuals. Lord Abbett is not the investment manager of the Portfolio or the Trust. Should you have any questions regarding the Portfolio, the Trust, or your contract or policy, you should speak with your financial advisor or the entity through whom you purchased your variable annuity contract or life insurance policy. Sincerely,

Tom Granaghan
Director, Marketing Information

# EXHIBIT T-1. 2003 Mutual Fund Scandal (Partial)

From Wikipedia, the free encyclopedia

The **mutual fund scandal** of 2003 was the result of the discovery of illegal late trading and market timing practices on the part of certain hedge fund and mutual fund companies.

## Contents

- 1 Spitzer investigation
    - 1.1 "Late trading"
    - 1.2 "Market timing"
- 2 SEC investigation
- 3 Settlements and trials
- 4 List of implicated fund companies
- 5 Timeline
- 6 External links
    - 6.1 Articles

### Spitzer investigation

On September 3, 2003, New York Attorney General Eliot Spitzer announced the issuance of a complaint against New Jersey hedge fund company Canary Capital Partners LLC, charging that they had engaged in "late trading" in collusion with Bank of America's Nations Funds. Bank of America is charged with permitting Canary to purchase mutual fund shares, after the markets had closed, at the closing price for that day. Spitzer's investigation was initiated after his office received a ten-minute June 2003 phone call from a Wall Street worker alerting them to an instance of the *late trading* problem.

### "Late trading"

In the United States, mutual fund prices are set once daily at 4:00 p.m. Eastern time. "Late trading" occurs when traders are allowed to purchase fund shares after 4:00 p.m. at that day's closing price. Under law, most mutual fund trades received after 4:00 p.m. must be executed at the following day's closing price, but because some orders placed before 4:00 p.m. cannot be executed until after 4:00 p.m., brokers can collude with investors and submit post-4:00 p.m. trades as if they had been placed before 4:00 p.m. Such trades can be made with information about after-hours market

## EXHIBIT T-1. 2003 Mutual Fund Scandal (Partial)

developments in other countries, for example. Late trading was illegal under U.S. Securities and Exchange Commission (SEC) regulations prior to 2003, and New York's Martin Act can be interpreted to prohibit late trading as well, due to the unfair advantage the late trader gains over other traders.

Canary Capital settled the complaint for US$40 million, while neither admitting nor denying guilt in the matter. Bank of America stated that it would compensate its mutual fund shareholders for losses incurred by way of the illegal transactions.

### "Market timing"

Spitzer and later the U.S. Securities and Exchange Commission (SEC) also charged that major mutual fund groups such as Janus, Bank One's One Group, and Strong Capital Management and others facilitated "market timing" trading for favored clients. Market timing is an investment strategy in which an investor tries to profit from short-term market cycles by trading into and out of market sectors as they heat up and cool off. In a novel interpretation of New York's Martin Act, Spitzer contended that fund firms committed fraud when they allowed some clients to trade more frequently than allowed in their fund documents and prospectus. In many cases, funds bar or limit market timing because the practice may increase the cost of administering a mutual fund borne by all shareholders in the fund. Market timers also can make managing the fund more difficult since the fund may need to keep extra cash to meet liquidity demands of selling timers, although if timers are trading opposite flows of other investors, they can moderate cash fluctuations. Those funds that did not limit market timing in their prospectus—as well as a small number of funds that cater specifically to market timers—were not charged. Spitzer contended that some advisors allowed market timers in order to increase their assets under management (fund advisors are paid based on the amount of assets in the fund).

. . .

### External links[edit]

- How Widespread is Late Trading in Mutual Funds? / Eric Zitzewitz (September 2003)
- New York's complaint against Canary Capital Partners LLC
- Mutual Fund Scandal Information (About Mutual Funds)
- Mutual Fund Industry Scandal / James Atkinson, University of Notre Dame (April 2004)

## EXHIBIT T-1. 2003 Mutual Fund Scandal (Partial)

- Summary of SEC initiatives in response to scandal / SEC (March 1, 2004)

**Articles[edit]**

- Tamar Frankel & Lawrence A. Cunningham, The Mysterious Ways of Mutual Funds: Market Timing, Annual Review of Financial and Banking Law (2007)
- MSN Money - Mutual Funds - 12/9/2003
- Massachusetts Stiffs Putnam Whistle-Blower - TheStreet.com 3/16/2007

[Ref] http://en.wikipedia.org/wiki/2003_mutual_fund_scandal#SEC_investigation

**New York Attorney General and Securities and Exchange Commission Bring Criminal and Civil Actions Against Hedge Fund Executive**

**FOR IMMEDIATE RELEASE
2003-132**

**Trader Pleads Guilty to a Felony in NYAG's Action; Agrees to Lifetime Bar From Association With an Investment Adviser or Mutual Fund in SEC Action**

     

*Contact:*
Juanita Scarlett - AG          John Nester - SEC
(212) 416-8060                (202) 942-0020

*New York, N.Y. and Washington, D.C., October 2, 2003* — New York State Attorney General Eliot Spitzer and the Securities and Exchange Commission (SEC) today announced criminal and civil actions against Steven B. Markovitz, formerly an executive and senior trader with the prominent hedge fund firm Millennium Partners, L.P.

In the New York Attorney General's criminal action, Markovitz pleaded guilty in State Supreme Court to a violation of New York's Martin Act, General Business Law Section 3.52-c(6). The count is a felony, punishable by a maximum of four years in prison.

The SEC's administrative order finds that Markovitz committed securities fraud. In partial settlement of that action, Markovitz has agreed to a lifetime bar from association with an investment adviser or mutual fund.

According to the criminal charges and the SEC findings, Markovitz engaged in "late" trading of mutual fund shares on behalf of Millennium, one of the nation's largest hedge fund operators, with more than $4 billion under management. With the assistance of certain registered broker-dealers, Markovitz placed mutual fund orders after 4:00 p.m. ET, but obtained the prices that had been set as of 4:00 p.m. ET. By SEC rule, Markovitz's post-4:00 p.m. orders should have received the prices set on the following day. This illegal trading allowed Millenium to take advantage of events that occurred after the markets closed.

The SEC's administrative order finds that Markovitz willfully violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and willfully aided and abetted and caused violations of Rule 22c-1 promulgated

EXHIBIT T-2. Late Trading of Mutual Funds on Behalf of a Hedge Fund Operator (Sample)

under Section 22(c) of the Investment Company Act of 1940. Without admitting or denying the SEC's findings, Markovitz consented to cease and desist from violations of those provisions, and to be permanently barred from associating with an investment adviser or from working in any capacity with or for a registered investment company. The SEC also is seeking disgorgement and civil penalties in amounts to be determined later.

Attorney General Spitzer said: "This guilty plea is a clear step forward in the investigation and prosecution of wrongdoing in the mutual fund industry. Working with the SEC, my office will continue to pursue this matter aggressively."

Stephen M. Cutler, Director of the SEC's Division of Enforcement, said: "I am pleased that once again close cooperation between the Commission and Attorney General Spitzer has resulted in expeditious and aggressive action on behalf of investors. We will continue to pursue abusive trading practices involving mutual funds to ensure that investors are treated fairly."

Spitzer and the SEC last month announced parallel criminal and civil charges against an official at Bank of America for unlawful trading of mutual funds. Earlier last month, Spitzer's office obtained a settlement and cooperation agreement with Edward Stern, principal of another leading hedge fund, Canary Capital Partners, LLC.

The investigation resulting in today's conviction was led by Assistant Attorney General Kevin Suttlehan of the Criminal Prosecutions Bureau with Charles Caliendo of the Investor Protection Bureau under the supervision of Criminal Prosecutions Bureau Chief Janet Cohn.

The SEC's civil investigation is being overseen by Wayne M. Carlin and Mark K. Schonfeld of the SEC's Northeast Regional Office.

The investigations are continuing.

# EXHIBIT T-3. Market Timing of Mutual Funds through VAs (Sample)

## SEC Brings First Enforcement Action Against Insurance Companies for Permitting Market Timing of Mutual Funds Through Variable Annuities - Insurance Companies to Pay $20 Million in Settlement

**FOR IMMEDIATE RELEASE**
**2004-109**

**Washington, D.C., Aug. 9, 2004** - The Securities and Exchange Commission today brought the first enforcement action charging insurance companies with securities fraud for facilitating market timing of mutual funds through the sale of variable annuities. The insurance companies are subsidiaries of Conseco, Inc. (CIHC, Inc., Conseco Services, LLC, and Conseco Equity Sales, Inc.), and the company to which Conseco sold its variable annuity business in 2002, Inviva, Inc., and its subsidiary Jefferson National Life Insurance Company.

The insurance companies have agreed to settlements that include a total payment of $20 million in disgorgement and penalties as well as undertakings of compliance reforms. The Commission's Orders find that the prospectuses through which the insurance companies sold the variable annuities misleadingly represented, among other things, that the annuities were "not designed for professional market timing organizations." In fact, the insurance companies affirmatively marketed and sold the annuities to professional market timers. Eventually, market timing assets constituted the majority of assets invested in the variable annuity products. The insurance companies profited by the fees earned from the sales of the annuities to the market timers.

Mark K. Schonfeld, Director of the Commission's Northeast Regional Office, said, "It is particularly troubling when variable annuities, which are designed for and sold to retail investors to save for retirement and purchase life insurance, are affirmatively marketed to professional market timers. This settlement achieves our primary missions of stopping the misconduct and compensating investors."

Stephen M. Cutler, Director of the Commission's Division of Enforcement, added: "The variable annuity products at issue here became vehicles for market timing in mutual funds. The insurance company sponsors were well aware of this - indeed, they encouraged it, but left their retail investors and the mutual funds themselves in the dark."

The Commission's Orders find:

> Variable annuities are combined securities and insurance products designed primarily for individual retirement and tax purposes. Nevertheless, from late 1999 through October 2002, Conseco Variable Insurance Company (CVIC) (CIHC was the corporate parent of CVIC), Conseco Services, and Conseco Equity Sales, Inc. (CES), sold the Monument and Advantage Plus variable annuity products to hedge funds and other individuals and entities to market time the mutual fund portfolios offered through the variable annuities. Conseco Services employees were aware that these market timers, in contrast to the typical variable annuity customer, had no interest in the tax deferral or retirement features of variable annuities.

> The Monument and Advantage Plus prospectuses stated that these products were "not designed for professional market timing organizations" and indicated that CVIC in its "sole discretion" could restrict exchanges "that we consider disadvantageous"

# EXHIBIT T-3. Market Timing of Mutual Funds through VAs (Sample)

to other annuity contract holders. The prospectuses failed to disclose that CVIC was marketing and selling the products to market timers. In addition, the prospectuses failed to disclose the risk that market timing might have a negative impact on other variable annuity purchasers' investment returns.

In October 2002, Inviva purchased CVIC and later renamed it Jefferson National. Inviva and Jefferson National continued to allow a group of hedge funds and other select customers to engage in market timing through the Monument and Advantage Plus variable annuity products.

The Jefferson National prospectuses repeated the above language from the CVIC prospectuses. Further, the Jefferson National prospectus reserved the right to limit any "substantive" transfers that it determined "in its sole discretion, could adversely affect the management of the investment portfolio." However, as at CVIC, Inviva and Jefferson National failed to disclose that Jefferson National was selling the products to market timing customers, and was facilitating the market timers in carrying out a market timing strategy.

In some cases, mutual fund advisers were aware of and permitted the market timing of the mutual funds. In other cases, Respondents did not inform the underlying fund complexes that Conseco Services and Inviva employees tolerated and actively solicited market timers. Many of these complexes prohibited market timing or did not tolerate timers.

Ultimately, hedge funds and other market timers invested approximately $120 million in Monument and Advantage Plus variable annuities. In the Monument product, the market timing assets dwarfed the assets of other variable annuity purchasers. Through their frequent trading, the market timers diluted the value of the underlying mutual funds that were timed, and caused the funds to incur additional costs.

The Commission's Orders find that CIHC, Conseco Services, CES, Inviva, and Jefferson National violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and Section 34(b) of the Investment Company Act of 1940. The Orders require Conseco Services, CES, Inviva, and Jefferson National to cease and desist from violating these provisions. CIHC, Conseco Services, CES, Inviva, and Jefferson National consented to entry of the respective Orders without admitting or denying the findings.

Under the settlements, CIHC, Conseco Services, and CES have agreed to pay $15 million, including disgorgement of $7.5 million and civil penalties of $7.5 million. Inviva and Jefferson National will pay $5 million, including disgorgement of $3.5 million and a civil penalty of $1.5 million. These amounts will be distributed to shareholders of mutual funds affected by the market timing.

Inviva and Jefferson National will also undertake compliance measures to protect against future violations. These measures include retaining an independent consultant to review compliance procedures designed to prevent and detect market timing.

The Commission acknowledges the assistance of the New York Attorney General in connection with this matter.

EXHIBIT U. Prudential Annuities Privately Reversed Transactions and Altered Books

2167236 O2204 E1028928

E1028928, PC

**Premier Retirement X Series**
**Annuity Statement**
**July 01, 2012 through September 30, 2012**

Page 4 of 8

## Portfolio Detail [continued]

**VARIABLE INVESTMENTS [continued]**

| As of June 30, 2012 | # of Units | Unit Price | Portfolio Value |
|---|---|---|---|
| **Mid/Small Cap:** | | | |
| AST Neuberger Berman Mid Cap Growth | 1,069.00557 | 12.86157 | $13,749.09 |
| AST Small Cap Growth | 1,065.75467 | 12.66084 | $13,493.35 |
| **Special Equity:** | | | |
| AST Cohen & Steers Realty | 1,054.84830 | 13.83501 | $14,593.84 |
| **Bond:** | | | |
| AST Lord Abbett Core Fixed Income Port | 1,183.27456 | 12.05571 | $14,265.21 |
| AST Investment Grade Bond | 2,624.59370 | 12.21218 | $32,052.01 |
| | | **Total Variable Investments** | **$101,603.39** |

Withdrawals made prior to the statement date are reflected in the values shown above. The Maturity Date is the end of your Guarantee Period. The surrender value may change daily to reflect the investment performance of the Sub-Accounts in which you are invested and fluctuations in our current fixed rates. Our current fixed rates are sensitive to interest rate fluctuations in the market.

## Investment Transaction Activity     July 01, 2012 through September 30, 2012

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| 06/15/2012 Transaction Type: Benefit Fund Transfer Reversal | | | | **Plaintiffs** |

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

**Sell** (PFI)

| | | | | |
|---|---|---|---|---|
| AST Cohen & Steers Realty | (91.63985) | 13.38337 | ($1,226.45) |
| AST Lord Abbett Core Fixed Income Port | (101.74943) | 12.05363 | ($1,226.45) |
| AST Marsico Capital Growth | (103.75452) | 11.82069 | ($1,226.45) |
| AST Neuberger Berman Mid Cap Growth | (95.81581) | 12.80008 | ($1,226.45) |
| AST Small Cap Growth | (99.15876) | 12.36865 | ($1,226.46) |

**Buy** (PFI)

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | 502.57588 | 12.20166 | $6,132.26 |
| **Total:** | | | **$0.00** |

06/15/2012 Transaction Type: Benefit Fund Transfer

*Change from selling to buying disguised mutual funds and from buying to selling mispriced "junk bonds".*

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

**Sell** (PFI)

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (478.91025) | 12.20166 | ($5,843.50) |

**Buy** (PFI)

| | | | |
|---|---|---|---|
| AST Cohen & Steers Realty | 87.32479 | 13.38337 | $1,168.70 |
| AST Lord Abbett Core Fixed Income Port | 97.54392 | 11.98127 | $1,168.70 |
| AST Marsico Capital Growth | 98.86902 | 11.82069 | $1,168.70 |
| AST Neuberger Berman Mid Cap Growth | 91.30412 | 12.80008 | $1,168.70 |
| AST Small Cap Growth | 94.48889 | 12.36865 | $1,168.70 |
| **Total:** | | | **$0.00** |

EXHIBIT U. Prudential Annuities Privately Reversed Transactions and Altered Books

E1028928, FC
E-CC, E-AC

 **Prudential**

**Premier Retirement X Series**
**Annuity Statement**
**July 01, 2012 through September 30, 2012**

Page 5 of 8

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|
| | 06/18/2012 Transaction Type: Benefit Fund Transfer Reversal | | | **Plaintiffs** |

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| **Sell** | AST Cohen & Steers Realty | (75.07520) | 13.45824 | ($1,010.38) |
| | AST Lord Abbett Core Fixed Income Port | (83.83651) | 12.05179 | ($1,010.38) |
| | AST Marsico Capital Growth | (84.82996) | 11.91065 | ($1,010.38) |
| | AST Neuberger Berman Mid Cap Growth | (78.01939) | 12.95037 | ($1,010.38) |
| **Buy** | AST Small Cap Growth | (81.54075) | 12.39086 | ($1,010.36) |
| | AST Investment Grade Bond | 414.74974 | 12.18055 | $5,051.88 |
| | **Total:** | | | **$0.00** |

*Change from selling to buying disguised mutual funds and from buying to selling mispriced "junk bonds".*

06/18/2012 Transaction Type: Benefit Fund Transfer

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | | |
|---|---|---|---|---|
| **Sell** | AST Investment Grade Bond | (414.49278) | 12.18055 | ($5,048.75) |
| | AST Cohen & Steers Realty | 75.02838 | 13.45824 | $1,009.75 |
| **Buy** | AST Lord Abbett Core Fixed Income Port | 84.21510 | 11.99013 | $1,009.75 |
| | AST Marsico Capital Growth | 84.77707 | 11.91065 | $1,009.75 |
| | AST Neuberger Berman Mid Cap Growth | 77.97075 | 12.95037 | $1,009.75 |
| | AST Small Cap Growth | 81.49152 | 12.39086 | $1,009.75 |
| | **Total:** | | | **$0.00** |

07/16/2012 Transaction Type: Benefit Fee

This transaction includes the benefit fees for the following Benefit(s):
Spousal Highest Daily Lifetime(SM) 6 Plus

| | | | | |
|---|---|---|---|---|
| | AST Cohen & Steers Realty | (2.99964) | 14.01501 | ($42.04) |
| | AST Lord Abbett Core Fixed Income Port | (3.36777) | 12.11188 | ($40.79) |
| | AST Marsico Capital Growth | (3.23662) | 11.79627 | ($38.18) |
| | AST Neuberger Berman Mid Cap Growth | (3.03920) | 12.57895 | ($38.23) |
| | AST Small Cap Growth | (3.02955) | 12.55963 | ($38.05) |
| | AST Investment Grade Bond | (7.56230) | 12.37455 | ($93.58) |
| | **Total:** | | | **($290.87)** |

07/16/2012 Transaction Type: Program Rebalance

| | | | | |
|---|---|---|---|---|
| | AST Cohen & Steers Realty | (64.25682) | 14.01501 | ($900.56) |
| | AST Lord Abbett Core Fixed Income Port | (38.35573) | 12.11188 | ($464.56) |
| | AST Marsico Capital Growth | 37.69920 | 11.79627 | $444.71 |
| | AST Neuberger Berman Mid Cap Growth | 34.07359 | 12.57895 | $428.61 |
| | AST Small Cap Growth | 39.15720 | 12.55963 | $491.80 |
| | **Total:** | | | **$0.00** |

2167236 02204 E1028928

E1028928, PC

Page 6 of 8

## Premier Retirement X Series
### Annuity Statement
### July 01, 2012 through September 30, 2012

## Investment Transaction Activity [continued]

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

07/16/2012 Transaction Type: Benefit Fund Transfer

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (410.44159) | 12.37455 | ($5,079.03) |
| AST Cohen & Steers Realty | 72.48015 | 14.01501 | $1,015.81 |
| AST Lord Abbett Core Fixed Income Port | 83.86890 | 12.11188 | $1,015.81 |
| AST Marsico Capital Growth | 86.11281 | 11.79627 | $1,015.81 |
| AST Neuberger Berman Mid Cap Growth | 80.75475 | 12.57895 | $1,015.81 |
| AST Small Cap Growth | 80.87738 | 12.55963 | $1,015.79 |
| **Total:** | | | **$0.00** |

08/16/2012 Transaction Type: Benefit Fund Transfer

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (419.19460) | 12.23990 | ($5,130.90) |
| AST Cohen & Steers Realty | 73.74012 | 13.91617 | $1,026.18 |
| AST Lord Abbett Core Fixed Income Port | 85.53817 | 11.99675 | $1,026.18 |
| AST Marsico Capital Growth | 84.54387 | 12.13784 | $1,026.18 |
| AST Neuberger Berman Mid Cap Growth | 78.88274 | 13.00893 | $1,026.18 |
| AST Small Cap Growth | 78.27269 | 13.11032 | $1,026.18 |
| **Total:** | | | **$0.00** |

09/17/2012 Transaction Type: Benefit Fund Transfer

This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus. Please refer to the "Your Benefit Detail" section of this statement for additional information on how this benefit works.

| | | | |
|---|---|---|---|
| AST Investment Grade Bond | (425.57455) | 12.41148 | ($5,282.01) |
| AST Cohen & Steers Realty | 73.30923 | 14.41019 | $1,056.40 |
| AST Lord Abbett Core Fixed Income Port | 87.42384 | 12.08366 | $1,056.40 |
| AST Marsico Capital Growth | 84.27784 | 12.53473 | $1,056.40 |
| AST Neuberger Berman Mid Cap Growth | 78.46161 | 13.46391 | $1,056.40 |
| AST Small Cap Growth | 76.23970 | 13.85643 | $1,056.41 |
| **Total:** | | | **$0.00** |

Any transactions that are marked with an asterisk were processed during this statement period, but had an effective date prior to the start date of this statement period.

Transactions in your variable annuity contract are priced at the end of the business day (generally 4 p.m. Eastern time) on the day the transaction was processed.

## Special Programs as of September 30, 2012

Program Rebalancing          Quarterly Rebalance of variable investment options.

Some special programs may not be available due to age requirements, minimum account value, or other optional programs selected.

# EXHIBIT V. The PICA Offer Package Dated January 20, 2012

 **Prudential**

**The Prudential Insurance Company of America**
Policyowner Relations Department
PO Box 8520
Philadelphia, PA 19176
(800) 201-6690

January 20, 2012

Mr. Michael Wu
Mrs. Christine Wu
138 Stableford Drive
Glen Ellyn, IL 60137

Inquiry Number:   111200101-01
Contract Number:   E1028928

Re:  Annuitant:   Michael H Wu
    Owners:   Michael H Wu, Christine T. Wu

Dear Mr. and Mrs. Wu:

This letter is in response to your emails to John Strangfeld, Chairman and Chief Executive Officer of Prudential, regarding the contract listed above. Thank you for bringing this inquiry to our attention and for your patience while we reviewed the matter.

We have reviewed your concerns and after careful consideration of your inquiry, we will provide you with the following option:

- Pruco will cancel the above referenced contract and pay to you the greater of your total Purchase Payment(s), less any withdrawals, or your current Account Value (without the application of the Contingent Deferred Sales Charge) as of the date we receive the enclosed Settlement and Release Agreement.

This option is set forth in the accompanying Settlement and Release Agreement.

*Please note, however, Prudential cannot provide you with tax advice about the tax treatment as applied to your individual situation. You should consult with your tax advisor as to how the general tax information applies to your individual situation. Any taxable income is generally reportable to you and the Internal Revenue Service by Prudential and may be subject to withholding.*

In making your selection of the Settlement and Release, please ensure that you:

- Both owners sign and date the Settlement and Release Agreement where indicated, and have your signatures witnessed, making no other comments or marks of any kind on the Settlement and Release Agreement. (Comments or marks of any kind on the Settlement and Release Agreement will not be accepted. If the owner makes comments or marks on the document, the Settlement and Release Agreement will be null and void.); and
- Include instructions where the funds should be sent, including any applicable paperwork; and
- Complete, sign and date the Tax Withholding Election Form.

Please use the enclosed envelope. (Note that the delivery address is a post office box. Many delivery services may not be used when the delivery address is a post office box.) We will notify you as soon as possible about the implementation of your selection.

## EXHIBIT V. The PICA Offer Package Dated January 20, 2012

It is important that you return the signed Settlement and Release Agreement and other required documents on or before **February 20, 2012**, otherwise the Settlement and Release Agreement may not be accepted and this offer may no longer be available. Once we receive your signed Settlement and Release Agreement, we will sign it and return a copy to you for your records.

Please read all of the accompanying materials carefully before you make your decision.

If you have any questions, please contact me at (800) 201-6690, ext. 4825. I can be reached Monday through Friday, 9:00 a.m. to 4:30 p.m. Eastern Time. Hearing and speech-impaired policyholders with TDD/TTY equipment can contact us at (800) 526-8061.

You are a valued Prudential customer. It is our hope that you will give Prudential an opportunity to serve you in the future.

Sincerely,

*Angella Anderson*

Angella Anderson
Senior Analyst

Enclosures

cc: Citigroup Global Markets
cc: Office of the Chairman, et al.

---

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc., Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

# EXHIBIT V. The PICA Offer Package Dated January 20, 2012

## SETTLEMENT AND RELEASE AGREEMNT

1. The undersigned, Michael Wu, and Christine Wu, of 138 Stableford Drive, Glen Ellyn, IL,60137-3216, agree to this Settlement and Release Agreement ("Agreement"), concerning:

   Annuity Contract Number E1028928, including any and all riders and endorsements (the "Contract"), which is jointly owned by Michael H. Wu and Christine T. Wu and issued by Pruco Life Insurance Company ("Pruco").

2. To avoid and resolve any actual or potential dispute regarding the Contract, the undersigned agree to the following:

a) Upon receipt of this fully executed Agreement, Pruco will cancel the Contract and pay to Michael H. Wu and Christine T. Wu the greater of the total Purchase Payment(s), less any withdrawals, or the current Contract value (without the imposition of Contingent Deferred Sales Charges) as of the date Pruco receives this Agreement (the "Payment")

b) Michael H. Wu, and Christine T. Wu acknowledge and understand that upon cancellation of the Contract, the Spousal Highest Daily Lifetime Six Plus living benefit on the Contract will terminate, and any and all guarantee amounts associated with Spousal Highest Daily Lifetime Six Plus also will be forfeited.

3. Michael H. Wu, and Christine T. Wu, in exchange for the consideration in paragraph 2 above, the adequacy and sufficiency of which they hereby acknowledge, on behalf of themselves, their heirs, executors, administrators, successors, representatives, and assigns, hereby completely release and discharge Pruco, and its parent corporations, affiliates, subsidiaries, successors, assigns, subcontractors, divisions, predecessors, and representatives (including, without limitation, its current and former agents, employees, directors, officers, and shareholders); and CGMI Inc.("CGMI"), and its parent corporations, affiliates, subsidiaries, divisions, predecessors, and representatives (including, without limitation, its current and former agents, employees, directors, officers, and shareholders), (Pruco together with CGMI, hereinafter collectively, the "Released Parties") from any and all claims whether asserted or unasserted, known or unknown, or other liabilities, demands, debts, rights, causes of action or other liability of any kind that may be asserted now or in the future regarding the Payment or the Contract, specifically including but not limited to, any and all of their personal tax liabilities and all actions that the Released Parties took or may have failed to take in connection with the Payment or the Contract..

4. Michael H. Wu, and Christine T. Wu acknowledge and agree that neither this Agreement nor the Payment and other consideration provided in paragraph 2 constitute an admission by the Released Parties of any liability or wrongdoing with respect to the Contract.

5. Michael H. Wu, and Christine T. Wu acknowledge that they understand and agree that the Released Parties are not providing them with any legal, financial or tax advice with respect to the Contract, the Payment or this Agreement and that they may seek their own advice in these areas before signing this Agreement. The Released Parties make no representations regarding tax obligations or consequences relating to or arising from this Agreement. Michael H. Wu, and Christine T. Wu acknowledge that this Agreement may result in taxable income to them under applicable federal, state, and local income tax laws. They also have been advised that Pruco may be required to make reports of their taxable income to the appropriate federal, state, and local taxing authorities.

6. Confidentiality. Michael H. Wu and Christine T. Wu hereby agree that they will keep the terms of this Agreement; the discussions and communications relating to the settlement of this matter; and the facts underlying their claims completely and strictly confidential; and will not use this Agreement or its terms, the amount of the settlement, or the underlying facts in any other litigation or arbitration. Michael H. Wu and Christine T. Wu will not disclose any information concerning the terms of this Agreement to anyone, except as required by a court of competent jurisdiction, or in the response to a request for information from any government, regulatory

## EXHIBIT V. The PICA Offer Package Dated January 20, 2012

organization, or as otherwise required by law, rule or regulation. Michael H. Wu and Christine T. Wu further understand that they have the right to discuss anything related to this Agreement with a lawyer, accountant or similar advisor as is necessary for the preparation and filing of federal, state or local returns.

Any non-disclosure provision in this Agreement does not prohibit or restrict any Party (or its attorney) from responding to any inquiry about this settlement or its underlying facts and circumstances made by the Securities and Exchange Commission (SEC), FINRA or any securities self-regulatory organization. Each of the Parties and its attorneys agree that this confidentiality provision is a material aspect of this settlement. Michael H. Wu and Christine T. Wu acknowledge and agree that Released Parties will suffer irreparable harm in the event Michael H. Wu and Christine T. Wu breach this agreement not to disclose; that money damages may be inadequate to remedy such breach; and accordingly, that this agreement not to disclose shall be specifically enforceable by Released Parties by injunction against Michael H. Wu and Christine T. Wu and that Michael H. Wu and Christine T. Wu shall be responsible for all damages arising from a breach of this agreement not to disclose and all costs and legal expenses incurred by Released Parties in seeking to enforce same.

7. This Agreement may be executed in counterparts. This Agreement contains the entire understanding between Released Parties on the one hand and Michael H. Wu, and Christine T. Wu on the other hand regarding the settlement of this matter.

8. MICHAEL H. WU AND CHRISTINE T. WU HAVE REVIEWED AND UNDERSTAND THIS AGREEMENT AND ENTER INTO IT VOLUNTARILY, AND AGREE THAT ANY AMBIGUITY IN THIS AGREEMENT WILL NOT BE PRESUMPTIVELY CONSTRUED AGAINST THE RELEASED PARTIES OR THEM.

DATED:_____, 2012_        _____
                                 Michael Wu


                                 _____
                                 Witness:


DATED:_____, 2012_        _____
                                 Christine Wu


                                 _____
                                 Witness:


Consent to this Settlement and Release Agreement:


DATED:_____, 2012_    By:_____
                                 Pruco Life Insurance Company


DATED:_____, 2012_    By:_____
                                 CGMI

## EXHIBIT V. The PICA Offer Package Dated January 20, 2012

## Taxpayer Information
Please provide the following information.

### Part 1. General Information:

**Owner's Name:** _____

**Business Name:** (if applicable) _____

**Street Address:** _____

**City, State, Country, Zip Code:** _____

### Part 2. Tax Certification/Election Section

1. Check one: ☐ I am a U.S. person (including a U.S. resident alien). ☐ I am a Citizen of _____. (Attach
   applicable Form W-8 (BEN, IMY, ECI or EXP).)

2. I do not want federal or state income tax withheld from my Form 1099-R reportable payment unless I check the appropriate boxes below. I understand
   the penalties for underpayment of taxes as stated in the Federal and State Withholding section of the Important Taxpayer Information section below.

   Check the box(es) to the right only if you want federal       ☐   Withhold federal income tax on any taxable portion of cash payments
   and/or state income tax withheld from your payment – this
   election is only applicable to Form 1099-R reportable payments. ☐  Withhold state income tax on any taxable portion of cash payments.

**Under Penalties of Perjury I certify that:**

1. My Taxpayer Identification Number is
   Social Security Number: _ _ _ / _ _ / _ _ _ _     Employer Identification Number: _ _ / _ _ _ _ _ _ _ _
   (For individuals, the taxpayer identification number is your Social Security Number)

2. **I am not subject to backup withholding** for the reason stated in the Backup Withholding section on the Important Taxpayer Information section
   below

   Check the box to the right only if you are subject to backup   ☐   I have been notified by the Internal Revenue Service that I am subject
   withholding.                                                        to backup withholding as a result of underreporting of interest or
                                                                       dividends on my tax return.

   **The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid
   backup withholding.**

   **Owner's Signature:** _____     **Date:** _____

## IMPORTANT TAXPAYER INFORMATION
The Prudential and its Representatives and associates may not give legal or tax advice. We encourage you to consult your attorney or tax professional
regarding tax questions and for tax advice.

| | |
|---|---|
| **Taxpayer Identification Number**<br>You must give your taxpayer identification number in the Tax Certification/Election section of this form. If the policy owner is an individual, this is the Social Security Number.<br><br>**United States Citizenship**<br>You must state whether you are or are not a United States Citizen or United States Resident Alien. If you are not a United States Citizen or United States Resident Alien, you must provide the Country in which you are a Citizen and submit a completed Form W-8 (BEN, IMY, ECI or EXP).<br><br>**Backup Withholding**<br>You must tell us if the IRS has notified you that you are subject to backup withholding because you didn't report all your taxable interest and dividends on your tax return. You are not subject to backup withholding if (a) you did not receive such a notice from the IRS, or (b) you are exempt from backup withholding, or (c) if the IRS recently told you that you are no longer subject to a backup withholding order. If you have been notified that you are subject to backup withholding, please check the appropriate box. | **Federal and State Withholding**<br>Federal and some State tax laws require us to withhold tax from certain cash payments. By simply signing and dating this election, you have elected not to have Federal and/or State income tax withheld on certain types of payments, but you are still liable for payment of any Federal and/or State income tax on the taxable portion of any payment made. If you wish to have Federal and/or State income taxes withheld on these payments, please check the appropriate box(es).<br><br>You can change your decision at any time, and your decision remains in effect until you change it. You may be subject to tax penalties under the estimated tax payment rules if your payments of estimated tax and withholding , if any, are not adequate.<br><br>**Penalties**<br>You may be subject to IRS penalties, including fines and imprisonment, if you fail to provide your correct taxpayer identification number, fail to report taxable interest or dividends on your tax return, or give false tax information. |

## EXHIBIT W. Weissberger's Letter Dated April 5, 2012

 **Prudential**

Prudential Annuities
A Business of Prudential Financial, Inc.
P.O. Box 7960
Philadelphia, PA 19176
(888) 778-2888

April 5, 2012

MICHAEL H WU
138 STABLEFORD DR
GLEN ELLYN IL 60137

**Contract Owners: Michael H. Wu**
Christine T. Wu
**Contract Number: E1028928**

Dear Mr. Wu:

I am writing in response to your correspondence sent to the U.S. Securities and Exchange Commission ("SEC") regarding the above referenced Prudential Premier Retirement X annuity contract, issued in Illinois with the Spousal Highest Daily Lifetime Six Plus (SHD6 Plus) optional living benefit.

We note that the concerns you raise in your correspondence to the SEC are the same concerns you previously raised with us and to which we have responded on several prior occasions. Therefore, while we take exception with your statements, we do not undertake to respond to each of them again in this letter. We will provide the SEC with copies of the following letters previously sent to you that adequately responded to your concerns:

- Our letter of December 8, 2011 that explains the benefit fund transfers associated with SHD6 as well as the rebalancing associated with the Custom Portfolio Program you are invested in within this contract, as fully disclosed in the prospectus that you acknowledged you received in your application.

- Our letter dated January 20, 2012 that outlines our offer to resolve your concerns, as described again below.

- Our letter of February 23, 2012 that further explains the SHD6 benefit and the benefit fund transfers associated therein as well as the Custom Portfolio Program.

- Our letter of March 20, 2012 that specifically answers additional questions you raised.

Additionally, it is our understanding that Citigroup and/or your Citigroup financial professional offered to speak with you to address many of these same concerns that you separately raised in writing with Citigroup. It is also our understanding that you declined to speak with them. We are open to participating in a discussion with you and your Citigroup financial professional and/or other Citigroup representatives to review our prior responses to these concerns.

Finally, given your most recent communications, we will further extend the deadline until May 1, 2012 for you to respond to the offer we extended to you on January 20, 2012 to resolve your concerns. As outlined in our letter dated January 20, 2012 referenced above, while we believe that all disclosures in your contract and SHD6 Plus benefit are accurate, based on your dissatisfaction and what we believe is a misunderstanding of your purchase, we have offered to cancel your contract and return to you the greater of your total purchase payment(s) less any withdrawals or your Account Value, without imposition of any Contingent Deferred Sales Charges. This offer originally had a deadline of February 20, 2012 to bring closure to this matter. However, you raised several additional questions, presumably in the context of evaluating our offer, and we therefore

Variable annuities are issued by Pruco Life Insurance Company (in New York, by Pruco Life Insurance Company of New Jersey) and fixed annuities are issued by The Prudential Insurance Company of America, all located in Newark, NJ. Annuities are distributed by Prudential Annuities Distributors, Inc. Shelton, CT. All are Prudential Financial companies and each is solely responsible for its own financial condition and contractual obligations.

## EXHIBIT W. Weissberger's Letter Dated April 5, 2012

extended the deadline for you to respond to our offer to April 1, 2012. Please note that we do not anticipate granting any further extensions of the deadline to accept our offer.

Please reach out to us or Citigroup should you wish to arrange a time to discuss your concerns and additional questions.

Sincerely,

Michael Weissberger
Senior Customer Service Representative

c. Karen R. Flemming-McDowell, U.S. Securities and Exchange Commission (with enclosures)
   Steve Shine, Vice President, Corporate Counsel, Prudential Financial

# EXHIBIT X. Applying Financial Economic Concepts to Defined Benefit ("DB") Schemes (Partial)

8

### FINANCIAL ECONOMICS AND ACTUARIAL PRACTICE

**Section 3 - Applying Financial Economic Concepts to Defined Benefit Schemes**

**3.1   No-Arbitrage**

3.1.1   The cornerstone of financial economics has become the principle of no-arbitrage. Financial models should strive to be free of situations where an individual could simply and easily earn a profit without risk (an arbitrage). If an arbitrage can be constructed from the model then it is wrongly specified.

3.1.2   One seemingly trivial example is constraining models so that one dollar of equities is valued the same as one dollar of bonds. Bader (2001) uses this relationship to construct a zero-valued swap that is short one dollar of bonds and long one dollar of equities - the Bader swap. We can write this constraint in terms of Equation 1 (assuming a constant discount rate for both bonds and equities) as:

$$V^0_{baderswap} = V^0_{equities} - V^0_{bonds}$$
$$= \sum_{j=0}^{\infty} CF^j_{equities} (1 + i_{equities})^{-j} - \sum_{j=0}^{n} CF^j_{bonds} (1 + i_{bonds})^{-j}$$
$$= 0$$

3.1.3   Reworking the example contained in Gold (2002) using the author's long-term expected return assumptions and a typical duration estimate for defined benefit liabilities, imagine a Bader swap that consisted of the following assets:

- $1 worth of short 15-year zero-coupon bonds yielding 6%, and
- $1 worth of long equities with dividends reinvested, with an expected return of 8% per annum and with an expected standard deviation of return of 16% p.a.

Institute of Actuaries of Australia, 2003

# EXHIBIT Y. Arbitrageurs Use APM to Take the Benefit of the Mispriced Securities as Profit (Partial)

Devinaga Rasiah et.al , Int. J Eco. Res , 2011 2(3), 125-135          ISSN: 2229-6158

## [THE EFFECTIVENESS OF ARBITRAGE PRICING MODEL IN MODERN FINANCIAL THEORY

DevinagaRasiah, Faculty of Business and Law,
Multimedia University (Malacca Campus)
Devinaga.rasiah@mmu.edu.my
PeongKwee Kim, Faculty of Business and law,
Multimedia University (Malacca Campus)
kkpeong@mmu.edu.my

### ABSTRACT
The Arbitrage Pricing Model (AP) is a famous model used to determine the factors such as market portfolio which influences expected returns on individual asset prices in the financial markets. Many investors believe that the stochastic returns of capital assets are consistent with a factor structure. One of the benefits on the Arbitrage Pricing Model is taking the benefit of the mispriced securities as profit by arbitrageurs. In this study AP is compared with CAPM and also how AP is used in other parts of the globe. Keywords: The Arbitrage Pricing Model, Capital Asset Pricing Model (CAPM), Common Stock.

## INTRODUCTION

Asset prices are universally believed to react sensitively to economic news. Every day experience seems to carry the view that individual asset prices are influenced by a broad variety of unpredictable events and that some events have a more pervasive outcome on asset prices than o others (Chen et al., 1986). Thus, various asset pricing models can be used to determine equity returns.

Investopedia.com defines arbitrage pricing model as an asset pricing model using one or more common factors to price returns. It is called a single factor model with only one factor, representing the market portfolio. It is called a multifactor model with more factors. Primarily, Ross (1976a, 1976b) developed the Arbitrage Pricing Theory (APT). It is a one-period model in which every investor believes that the stochastic properties of returns of capital assets are consistent with a factor structure. Ross argues that if equilibrium prices offer no arbitrage opportunities over static portfolios of the assets, then the expected returns on the assets are approximately linear related to the factor loadings. The factor loadings or betas are proportional to the returns' co-variance with the factors.

According to Azhar Bin Zakaria (2006), the equilibrium-pricing model using Arbitrage Pricing Theory (APT) has developed into one of the modern financial theory. However, the use of APT in determining the factors which influences expected returns is too general. APT often viewed as a substitute to the capital asset pricing model (CAPM). Market's expected return is used in the CAPM formula, whileAPT uses risky asset's expected return and the risk premium. APT model are used by arbitrageurs to profit by taking benefit of mispriced securities (Azhar Bin Zakaria, 2006). A mispriced security will have a price which is different from the model prediction hypothetical price. By going short an overpriced security, while in going long the portfolio the APT calculations were based on the arbitrageur to make a risk-free turnover.

## BACKGROUND RESEARCH

**The Arbitrage Pricing Theory (APT) Model**The return on a stock can be calculated by the following APT formula stated by Ross (1976): Expected Return = $rf + b1 \times (factor\ 1) + b2 \times (factor\ 2)... + bn \times (factor\ n)$
Where:

- $rf$= The risk free interest rate (interest rate the investor would expect to receive from a risk free investment)
- $b$ =The sensitivity of the stock to each factor

# EXHIBIT Z. Prudential News 0222360-00001-00 Dated April 9, 2012

 **Prudential**

### Judy Rice receives lifetime achievement award from Fund Industry Intelligence

NEWARK, N.J., April 09, 2012 - Prudential Investments Chairman, Judy Rice was recently honored with a lifetime achievement award at Fund Industry Intelligence's 19th Annual Mutual Fund Industry Awards. Prudential Investments is the mutual fund family of Prudential Financial, Inc. (NYSE: PRU) and offers funds across a range of asset classes and sectors, including equity, fixed income, real estate and specialty securities.

Rice has been recognized among the industry's most influential executives. She has long been an advocate for diversity through her leadership in the National Association of Female Executives, and through her leadership to help create The Gateway to Leadership Program in partnership with the Money Management Institute.

While at Prudential, she launched one of the industry's first separately managed account businesses. She also led Prudential's effort to convert its mutual fund distribution platform from a proprietary channel to primarily third-party distribution through an overhaul of the company's infrastructure, retaining and attracting talent, and changing the mix of Prudential's investments business. During her tenure, the company's net flow ranking, as determined by Simfund climbed from 575 in 2008 to 18 at the end of 2011, while the distribution team increased to 60 wholesalers from 22 during that same period. Rice, a 20-year company veteran was named chair of Prudential Investments in January and will retire at the end of the year.

"Judy's positive and sustained impact on the improvement of our retail mutual fund business could never be overstated," said Charlie Lowrey, executive vice president and COO, U.S. Businesses. "Her leadership and advocacy for diversity in the workplace and for making the industry more accessible to women has been equally as impressive, so I can't think of anyone who is more deserving of this honor," Lowery added.

Mutual fund investing involves risk. Some mutual funds have more risk than others. The investment return and principal value will fluctuate and shares when sold may be worth more or less than the original cost.

**Consider a fund's investment objectives, risks, charges, and expenses carefully before investing. The prospectus and summary prospectus, contain this and other information about the fund. Contact your financial professional for a prospectus and summary prospectus. Read them carefully before investing.**

Mutual funds are distributed by Prudential Investment Management Services LLC, a Prudential Financial company and member SIPC. Prudential Investments, Prudential, the Prudential logo, and the Rock symbol are service marks of Prudential Financial, Inc., and its related entities, registered in many jurisdictions worldwide.

Prudential Financial, Inc. (NYSE: PRU), a financial services leader with approximately $901 billion of assets under management as of December 31, 2011, has operations in the United States, Asia, Europe, and Latin America. Prudential's diverse and talented employees are committed to helping individual and institutional customers grow and protect their wealth through a variety of products and services, including life insurance, annuities, retirement-related services, mutual funds and

investment management. In the U.S., Prudential's iconic Rock symbol has stood for strength, stability, expertise and innovation for more than a century. For more information, please visit http://www.news.prudential.com/.

0222360-00001-00

## EXHIBIT AA. Prohibited Transactions Were Not Forwarded to Underlying Contractual Intermediaries for Compliance Review

**From:** Janeen Whoolery <Janeen.Whoolery@EagleAsset.com>
**To:** Michael Wu <cs555iit@yahoo.com>
**Sent:** Tuesday, June 5, 2012 3:40 PM
**Subject:** RE: Questions on dividends and voting right

Mr. Wu - Thank you for your correspondence. We have investigated your concerns over the past two weeks to ensure that our industry partners are trading in an appropriate manner and to confirm that we are adhering to our internal procedures. However, as you are not a direct shareholder of the Eagle Family of Funds, we are not at liberty to discuss specific trades that may have occurred in a Prudential omnibus account.

Omnibus accounts combine the investments of many underlying shareholders into one large account that is then registered with a mutual fund company. The fund company's only customer, therefore, is the intermediary whose name is registered on the omnibus account. Prudential has a sales agreement with the Eagle Family of Funds to offer our funds on their platform, along with other funds, in an omnibus arrangement.

As part of our investigation into your concerns, we have confirmed that the Eagle Family of Funds is in compliance with SEC Rule 22c-2, which dictates a fund company's responsibility to contract with intermediaries for the purpose of detecting potential market timing activities. Regarding your concerns about specific trades within your account at Prudential, your questions are best directed to them.

Best regards,

Janeen Whoolery
Eagle Fund Services

# EXHIBIT AB. New Subadvisory Arrangements (Partial)

**ADVANCED SERIES TRUST**
AST Advanced Strategies Portfolio
AST International Growth Portfolio
AST Marsico Capital Growth Portfolio
AST BlackRock Value Portfolio

**Supplement dated June 28, 2013 to the**
**Summary Prospectuses and Prospectus of Advanced Series Trust, dated April 29, 2013**

**PRUDENTIAL SERIES FUND**
SP International Growth Portfolio
Global Portfolio

**Supplement dated June 28, 2013 to the**
**Summary Prospectuses and Prospectus of Prudential Series Fund, each dated May 1, 2013**

This supplement should be read in conjunction with your Advanced Series Trust ("AST") and Prudential Series Fund ("PSF") prospectuses and summary prospectuses, and should be retained for future reference. The Portfolios discussed in this supplement may not be available under your variable contract. For more information about the portfolios available under your variable contract, please refer to your contract prospectus. Defined terms used herein and not otherwise defined herein shall have the meanings given to them in the Prospectuses.

**A.**     **AST Advanced Strategies Portfolio: New Subadvisory Arrangements.**

The Board of Trustees of AST approved replacing Marsico Capital Management, LLC (Marsico) as sole subadviser to the large-cap growth segment of the AST Advanced Strategies Portfolio with Brown Advisory, LLC (Brown Advisory) and Loomis, Sayles & Company, L.P. (Loomis Sayles). This change is effective on June 17, 2013.

To reflect these changes, the AST Prospectus for the AST Advanced Strategies Portfolio and the AST Advanced Strategies Portfolio Summary Prospectus are revised as follows:

    *I.*     All references to Marsico are hereby deleted.

    *II.*     The following information replaces the information relating to Marsico in the table in the "Management of the Portfolio" section of the Summary Section of the Prospectus and the Summary Prospectus for the AST Advanced Strategies Portfolio:

| Investment Managers | Subadvisers | Portfolio Managers | Title | Service Date |
|---|---|---|---|---|
| Prudential Investments LLC | Brown Advisory, LLC | Kenneth M. Stuzin, CFA | Partner | June 2013 |
| AST Investment Services, Inc. | Loomis, Sayles & Company, L.P. | Aziz Hamzaogullari | Vice President | June 2013 |

    *III.*     The following information replaces the information relating to Marsico in the table in the "More Detailed Information on How the Portfolios Invest — AST Advanced Strategies Portfolio" section of the Prospectus:

| Investment Category | Investment Sub-Category | Traditional or Non-Traditional | Subadviser or Underlying Trust Portfolio | Approximate Allocation of Portfolio Assets |
|---|---|---|---|---|
| US Large-Cap Growth | N/A | Traditional | Brown Advisory, LLC | 7.95% |
| US Large-Cap Growth | N/A | Traditional | Loomis, Sayles & Company, L.P. | 7.95% |

# EXHIBIT AC. PAI Fabricated Annuity Transaction Confirmation
## Dated December 13, 2013 (Sample)

 **Prudential**

K1028928, CC

Annuities Service
P.O. Box 13467
Philadelphia, PA 19176

**ANNUITY TRANSACTION CONFIRMATION**
**December 13, 2013**

Page 1 of 2



>00447 2702551 001 092001
MICHAEL H. WU
CHRISTINE T. WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

**Financial Professional:**
CHRISTOPHER J. CRALLE
CITIGROUP GLOBAL MARKETS, INC.
1900 SPRING ROAD
OAKBROOK, IL 60523

---

**Product: Premier Retirement X Series**
**Owner Name(s): MICHAEL H. WU**
**CHRISTINE T. WU**
**Annuitant: MICHAEL H. WU**

**Contract Number: E1028928**
**Contract Issue Date: 04/16/2010**
**Annuity Date: 02/01/2042**
**Type: Non Qualified**

---

Please review your statement and contact us within 30 days if you find any information you believe to be inaccurate.

---

**Total Investment Value $108,327.71**

---

## Spousal Highest Daily Lifetime(SM) 6 Plus
## Values as of December 13, 2013

---

| | |
|---|---|
| **Estimated Protected Withdrawal Value:** | **$133,027.80** |
| **Estimated Annual Income Amount:** | **$5,321.11** |

The Benefit Fund Transfer(s) described below are associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus, an optional benefit designed to provide lifetime income to both you and your spouse.

**If you had taken a Lifetime Withdrawal on 12/13/2013, your Protected Withdrawal Value would have been $133,027.80 and your Annual Income Amount would have been $5,321.11 for life.** Please be aware that the actual amounts will be determined when you and your spouse choose to exercise this benefit by taking your first Lifetime Withdrawal.

In order to manage your Spousal Highest Daily Lifetime(SM) 6 Plus living benefit guarantee through all market cycles, each business day our mathematical formula determines if any portion of your Account Value should be transferred to or from the AST Investment Grade Bond Portfolio (the "Bond Portfolio"). Amounts transferred by the formula depend on a number of factors unique to your annuity and include: (i) the difference between your Account Value and the Protected Withdrawal Value; (ii) how long you have owned Spousal Highest Daily Lifetime(SM) 6 Plus; (iii) the amount allocated to, and the performance of, the Permitted Sub-accounts, (iv) the amount allocated to, and the performance of the Bond Portfolio; and (v) the impact of additional purchase payments made to and withdrawals taken from the annuity. Therefore, at any given time, some, none, or most of your Account Value may be allocated to the Bond Portfolio. If you make additional Purchase Payments to your Annuity, they will be allocated according to your allocation instructions. Once they are allocated to your Annuity, they will also be subject to the mathematical formula and therefore may be transferred to the Bond Portfolio, if dictated by the formula. Any Account Value in the Bond Portfolio will not be available to participate in the investment experience of the Permitted Sub-accounts if there is a subsequent market recovery until it is transferred out of the Bond Portfolio. Please see your contract and prospectus for complete details and/or contact your financial professional.

---

**Annuities Service Center: (888) 778-2888**
**Hours: Mon-Thurs 8 AM to 7 PM ET, Fri 8 AM to 6 PM ET**
Agent ID #I97GGT2 Office #Z7OXW

**Website: www.prudentialannuities.com**
**Join the e-Movement. Enroll in e-Delivery today!**
00447 2702551 000448 000894 00001/00001

# EXHIBIT AC. PAI Fabricated Annuity Transaction Confirmation
# Dated December 13, 2013 (Sample)

E1028928, CC

Contract Number: E1028928
Page 2 of 2

## Investment Transaction Activity

| Transaction Date | Investments | # of Units/ *Unadjusted Account Value | Unit Price/ *MVA | Value/ Account Value |
|---|---|---|---|---|

**12/13/2013    Transaction Type:  Benefit Fund Transfer**
This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus

| | | | | |
|---|---|---|---|---|
| | AST Cohen & Steers Realty | (275.33071) | 13.87535 | ($3,820.31) |
| | AST Neuberger Berman Mid Cap Growth | (254.27020) | 16.37687 | ($4,164.15) |
| | AST Small Cap Growth | (237.94010) | 16.96759 | ($4,037.27) |
| | AST PIMCO Total Return Bond | (374.01329) | 10.90365 | ($4,078.11) |
| | AST T. Rowe Price Natural Resources | (376.76171) | 10.52315 | ($3,964.72) |
| | AST Investment Grade Bond | 1,672.47733 | 11.99691 | $20,064.56 |
| | **Transaction Total:** | | | **$0.00** |

Transactions in your variable annuity contract are priced at the end of the business day (generally 4 p.m. Eastern time) on the day the transaction was processed.

## Account Value as of  December 13, 2013

| Variable Investments | # of Units | Unit Price | Value |
|---|---|---|---|
| AST Cohen & Steers Realty | 1,143.85558 | 13.87535 | $15,871.40 |
| AST Neuberger Berman Mid Cap Growth | 1,056.35988 | 16.37687 | $17,299.87 |
| AST Small Cap Growth | 988.51793 | 16.96759 | $16,772.77 |
| AST PIMCO Total Return Bond | 1,553.83173 | 10.90365 | $16,942.44 |
| AST T. Rowe Price Natural Resources | 1,565.24627 | 10.52315 | $16,471.32 |
| AST Investment Grade Bond | 2,081.36150 | 11.99691 | $24,969.91 |
| **Total Investment Value** | | | **$108,327.71** |

"Total Investment Value" reflects all charges that have been imposed, as of this statement date, but does not include charges that may be imposed in the future.

## Important Disclosures

For the Prudential Premier Retirement and Prudential Premier Advisor annuities, please note that if you submit an additional Purchase Payment but do not provide instructions as to how it should be allocated, and you have no Account Value invested in a variable Sub-account, then your additional Purchase Payment will be invested in the AST Money Market Portfolio Sub-account. Subject to any applicable restrictions, you are free to transfer that Purchase Payment out of the AST Money Market Portfolio Sub-account into any investment(s) available (subject to any optional benefit restrictions) for your annuity contract.

For ease of reference, we use a single set of defined terms in this statement. In certain cases, your contract may use a different name for a contract feature than what is used in this statement.

Annuity is issued by Pruco Life Insurance Company, and offered through Prudential Annuities Distributors, Inc., a registered broker-dealer that is not a member of SIPC. The third party broker-dealer identified on the top of page one of this statement, on whose behalf this confirmation statement is being issued, is the selling broker-dealer, and acted as agent in the listed transaction(s). For information on that broker-dealer's membership in SIPC, please contact that broker-dealer. Pruco Life Insurance Company and Prudential Annuities Distributors, Inc. are Prudential Financial, Inc. companies. Pruco Life Insurance Company is solely responsible for its financial condition and contractual obligations.

---

**Standard Address:** Annuities Service, P.O. Box 7960, Philadelphia, PA 19176          **Fax Number:** (800) 576-1217
**Overnight Address:** Annuities Service, 2101 Welsh Road, Dresher, PA 19025

## EXHIBIT AD-1. E-mail Dated February 13, 2014 to Weissberger

Date: Thu, 13 Feb 2014 12:04:51 -0600
Message-ID: <CAJY5vMOA3CFt5gQFfsU23JL8-QDjbK2rL7xww0c2isEE83otcA@mail.gmail.com>
Subject: Re: Your Letter dated June 27, 2013
From: Michael W <mhw2000usa@gmail.com>
To: "michael.weissberger" <michael.weissberger@prudential.com>
Cc: "john.strangfeld" <john.strangfeld@prudential.com>,
    "mark.grier" <mark.grier@prudential.com>,
    "brooke.davis" <brooke.davis@prudential.com>,
    "richard.carbone" <richard.carbone@prudential.com>,
    judy.rice@prudential.com,
    christine.marcks@prudential.com,
    "steve.shine" <steve.shine@prudential.com>,
    timothy.cronin@prudential.com, timothy.knierim@prudential.com,
    "Ms. Elizabeth M. Murphy" <Rulecomments@sec.gov>,
    "Ms. Jennifer J. Johnson" <reg.comments@federalreserve.gov>,
    "Mr. John W. Walsh" <regs.comments@occ.treas.gov>,
    "Mr. Robert E. Feldman" <comments@fdic.gov>,
    "Mr. David A. Stawick" <VolckerRule@CFTC.gov>,
    "scott.haggerty" <scott.haggerty@prudential.com>,
    InvestorRelations@nyx.com,
    "Karen L. Barr" <karen.Barr@investmentadviser.org>,
    Richard.Ketchum@finra.org, david.tittsworth@investmentadviser.org,
    SchapiroM@sec.gov, CaseyK@sec.gov, WalterE@sec.gov,
    "luz.aguilar" <luz.aguilar@sec.gov>,
    ParedesT@sec.gov, McHugJ@sec.gov, HuH@sec.gov, diFlorioC@sec.gov,
    talktosolis@dol.gov, letters@fortune.com,
    "staff.writers@wallstcheatsheet.com" <staff.writers@wallstcheatsheet.com>,
    "editors@wallstcheatsheet.com" <editors@wallstcheatsheet.com>,
    mschnitzel@iiintelligence.com,
    cscott@iiintelligence.com, njardine@iiintelligence.com,
    swilson@iiintelligence.com, vbelitski@iiintelligence.com,
    smurray@iiintelligence.com, acullop@virginia.edu,
    eric.durant@prudential.com,
    edward.baird@prudential.com,
    "charlie.lowrey" <charlie.lowrey@prudential.com>,
    robert.denicola@prudential.com, robert.falzon@prudential.com,
    "michael.l.corbat" <michael.l.corbat@citi.com>,
    john.c.gerspach@citi.com,
    "chris.cralle" <chris.cralle@citi.com>,
    "Chief, Sean McKessy" <McKessyS@sec.gov>,
    Christopher Hagan <christopher.hagan@prudential.com>,
    Vikram Pandit <vikram.pandit@citi.com>,
    NJ Attorney General <AskConsumerAffairs@lps.state.nj.us>,
    Anna Lascurain <Anna.Lascurain@dol.lps.state.nj.us>,
    "Mr. Robin Webster" <consumer_complaints@ins.state.il.us>,
    **James.Papagiannis@finra.org**, "Cheryl G. Weiss" <cweiss@ilsos.net>,

## EXHIBIT AD-1. E-mail Dated February 13, 2014 to Weissberger

"Ramos, Caridad" <cramos@atg.state.il.us>,
"Wang, Linda" <linda.wang@citi.com>,
Angella Anderson <angella.anderson@prudential.com>,
"Forde, Steven M" <steven.m.forde@citi.com>,
Director Robert Cook <tradingandmarkets@sec.gov>

Mr. Weissberger,

This is a follow-up of my e-mail to you dated December 19, 2013.

Were you speaking for PFI SEC, PICA SEC, PI SEC, PIM SEC, PIMS SEC, Pruco Life SEC, Pruco Securities SEC, Prudential Annuities' SEC, Strangfeld's SEC, Grier's SEC, FINRA, or your own SEC and FINRA when you said on May 14, 2012 that Prudential Annuities is **not a brokerage firm**; and **pricing financial transactions on the day in which they were received** and **producing transaction confirmations on the next business day** meet the requirements of FINRA and the SEC (Ref. Your Letter dated May 14, 2012)?

More specifically, please tell me who is/are the brokerage firm(s) who submitted and/or received those prohibited "benefit fund transfer" paired trade transactions of unregistered variable insurance trusts ("VITs"), which consist of PFI hedge funds and mispriced PICA "junk bonds", between PFI, the proprietary variable annuities group, and variable annuities individuals?

**Who is the fund?**

**When is the time when the fund prices its shares?**

**When is the time when such brokerage firm receives those paired trade transactions?**

Please note that the requirements that particular information be disclosed is not determinative of a broker-dealer's obligation under the general antifraud provisions of the federal securities laws to disclose additional information to a customer at the time of the customer's investment decision.

ps. I still do not receive the answers from Christopher Hagan to our questions, which we requested on July 16, 2012. I will send another e-mail to Christopher Hagan asking him to provide the particular information, which I asked on July 16, 2012.

Thanks.

Michael Wu

## EXHIBIT AD-2. E-mail Dated February 13, 2014 to Hagan

Date: Thu, 13 Feb 2014 14:03:03 -0600
Message-ID: <CAJY5vMNYO-4OVigffnPN9GeH_2BgiiVoq9xpm6Ab_KYvUX5-Yw@mail.gmail.com>
Subject: Re: Waiting for Your Answers to My Questions Dated July 16, 2012
From: Michael W <mhw2000usa@gmail.com>
To: Christopher Hagan <christopher.hagan@prudential.com>
Cc: "john.strangfeld" <john.strangfeld@prudential.com>,
        "mark.grier" <mark.grier@prudential.com>,
        "brooke.davis" <brooke.davis@prudential.com>,
        "richard.carbone" <richard.carbone@prudential.com>,
        judy.rice@prudential.com, christine.marcks@prudential.com,
        "steve.shine" <steve.shine@prudential.com>,
        timothy.cronin@prudential.com, timothy.knierim@prudential.com,
        "Ms. Elizabeth M. Murphy" <Rulecomments@sec.gov>,
        "Ms. Jennifer J. Johnson" <reg.comments@federalreserve.gov>,
        "Mr. John W. Walsh" <regs.comments@occ.treas.gov>,
        "Mr. Robert E. Feldman" <comments@fdic.gov>,
        "Mr. David A. Stawick" <VolckerRule@cftc.gov>,
        "scott.haggerty" <scott.haggerty@prudential.com>,
        InvestorRelations@nyx.com
        "Karen L. Barr" <karen.Barr@investmentadviser.org>,
        Richard.Ketchum@finra.org, david.tittsworth@investmentadviser.org,
        SchapiroM@sec.gov, CaseyK@sec.gov, WalterE@sec.gov, ParedesT@sec.gov,
        McHugJ@sec.gov, HuH@sec.gov, diFlorioC@sec.gov, talktosolis@dol.gov,
        letters@fortune.com,
        "staff.writers@wallstcheatsheet.com" <staff.writers@wallstcheatsheet.com>,
        **James.Papagiannis@finra.org,**
        "editors@wallstcheatsheet.com" <editors@wallstcheatsheet.com>,
        mschnitzel@iiintelligence.com, "luz.aguilar" <luz.aguilar@sec.gov>,
        cscott@iiintelligence.com, njardine@iiintelligence.com,
        swilson@iiintelligence.com, vbelitski@iiintelligence.com,
        smurray@iiintelligence.com, acullop@virginia.edu,
        eric.durant@prudential.com, edward.baird@prudential.com,
        "charlie.lowrey" <charlie.lowrey@prudential.com>,
        robert.denicola@prudential.com, robert.falzon@prudential.com,
        "michael.l.corbat" <michael.l.corbat@citi.com>,
        john.c.gerspach@citi.com, "chris.cralle" <chris.cralle@citi.com>,
        "Chief, Sean McKessy" <McKessyS@sec.gov>,
        Vikram Pandit <vikram.pandit@citi.com>,
        NJ Attorney General <AskConsumerAffairs@lps.state.nj.us>,
        Anna Lascurain <Anna.Lascurain@dol.lps.state.nj.us>,
        "Mr. Robin Webster" <consumer_complaints@ins.state.il.us>,
        "Cheryl G. Weiss" <cweiss@ilsos.net>,
        "Ramos, Caridad" <cramos@atg.state.il.us>,
        "Wang, Linda" <linda.wang@citi.com>,
        Angella Anderson <angella.anderson@prudential.com>,
        "Forde, Steven M" <steven.m.forde@citi.com>,
        Director Robert Cook <tradingandmarkets@sec.gov>,
        "michael.weissberger" <michael.weissberger@prudential.com>,
        "martin.cohen@cohenandsteers.com" <mcohen@cohenandsteers.com>,
        Janeen Whoolery <Janeen.Whoolery@EagleAsset.com>,
        ClientServices <Clientservices@LordAbbett.com>,
        MarsicoFunds <MarsicoFunds@umb.com>,
        donna.borgogelli@nb.com,
        AskConsumerAffairs AskConsumerAffairs <AskConsumerAffairs@dca.lps.state.nj.us>

## EXHIBIT AD-2. E-mail Dated February 13, 2014 to Hagan

Mr. Hagan,

More than one year has passed since I sent you the letter dated July 16, 2012 (attached). Those questions documented in Figure 1 of the attachment relate only to "Benefit Fund Transfer" transactions, which are done during stage 1 of each benefit quarter. I add more questions for transactions, which are done at stage 2 on each benefit quarter, in this e-mail.

More specifically, who are those broker-dealer(s) who submitted and/or received PFI orders of prohibited "Benefit Fund Transfer" transactions?

When such broker-dealer(s) received PFI orders of those prohibited "Benefit Fund Transfer" transactions?

Who is the registered national securities exchanges who executed those prohibited transactions of "Benefit Fund Transfer"?

Who is the fund who priced the shares?

When the fund priced its shares?

Who conducted compliance review for those prohibited "Benefit Fund Transfer" paired trade transactions of unregistered variable insurance trusts ("VITs"), which consist of PFI hedge funds and mispriced PICA "junk bonds", between variable annuities individuals and Prudential Financial, Inc. ("PFI"), the proprietary variable annuities group, during stage 1 of each benefit quarter?

When PICA updated records and data in the books of the Prudential Series Fund ("the Fund") after those prohibited "Benefit Fund Transfer" transactions were reviewed and executed?

When underlying Mutual Fund Companies of the Advanced Series Trust ("the Trust") updated records and data in the books of the Trust after those prohibited "Benefit Fund Transfer" transactions were reviewed and executed?

Who is/are the broker-dealer(s) of those synthesized "defined benefit pension risk transfer" transactions submitted and received at stage 2 on each benefit quarter?

Who is the registered exchanges who executed those synthesized "defined benefit pension risk transfer" transactions submitted and received at stage 2 on each benefit quarter?

Who conducts compliance review of underlying registered mutual funds of the Advanced Series trust ("the Trust") between PICA and underlying Mutual Fund Companies at stage 2 on each benefit quarter?

## EXHIBIT AD-2. E-mail Dated February 13, 2014 to Hagan

The requirements under § 240.10b-10 Confirmation of transactions that particular information be disclosed is not determinative of a broker-dealer's obligation under the general antifraud provisions of the federal securities laws to disclose additional information to a customer at the time of the customer's investment decision.

Please furnish the particular information to me at your earliest convenience.

Sincerely,

Michael Wu

Att.
Attachment 17q7. Response to and Questions for Christopher Hagan (071612)

## EXHIBIT AE. Prudential CEO Can Be Rewarded for Missing Target

http://www.bloomberg.com/news/2012-03-19/prudential-ceo-can-be-rewarded-for-missing-target.html

### Prudential CEO Can Be Rewarded for Missing Target

By Andrew Frye Mar 19, 2012 11:00 PM CT

**Prudential Financial Inc. (PRU)** Chief Executive Officer John Strangfeld, who told investors to expect return on equity of at least 13 percent next year, can miss that goal and still qualify for his performance share awards.

Prudential set an ROE target of 12 percent, on average, for the three years through 2014 as the only measure of achievement for Strangfeld and other executives, the **Newark**, New Jersey- based life insurer said March 16 in a filing. Prudential's ROE was 11 percent to 11.5 percent in 2011, Strangfeld said Feb. 15.

Strangfeld, 58, told investors last year he was focusing on boosting ROE, a measure of how well the company reinvests shareholder money, to 13 percent to 14 percent in 2013. That target, which Strangfeld has reiterated at least twice this year, is "a stretch objective," said **Bob DeFillippo**, a spokesman for Prudential.

"If they want to give a stretch goal to investors, they should be thinking about maybe the same stretch goal for executives," said Wayne Guay, a professor of accounting at the **University of Pennsylvania**'s Wharton School of Business.

Prudential, the second-biggest U.S. life insurer, gained less than 1 percent to $64.11 yesterday in New York and has surged **28 percent** this year.

Prudential targeted 2012 ROE of 10.9 percent to 11.9 percent, meaning Strangfeld would qualify for 100 percent of his performance share awards by achieving the low end of the ranges this year and next, and turning in less than 13 percent in 2014.

# EXHIBIT AF. Plaintiffs' Account Values on 12/31 from 2010 to 2013

7805584 00190 E1028928

**Prudential** 

E1028928, FC
E-CC, E-AC

Annuities Services
P.O. Box 13467
Philadelphia, PA 19176

Page 1 of 9

**Premier Retirement X Series**
**Annuity Statement**
**October 01, 2010 through December 31, 2010**

>00190 7805584 001 092001
MICHAEL H. WU
CHRISTINE T. WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

**Financial Professional:**
CHRISTOPHER J. CRALLE
CITIGROUP GLOBAL MARKETS INC.
1900 SPRING ROAD
OAKBROOK, IL 60523

| Annuity #: | E1028928 | Type: Non Qualified | Statement Date: | 01/03/2011 |
|---|---|---|---|---|
| Owner Name(s): | MICHAEL H. WU | | Issue Date: | 04/16/2010 |
| | CHRISTINE T. WU | | Annuity Date: | 02/01/2042 |
| Annuitant: | MICHAEL H. WU | | | |

Please review your statement and contact us within 30 days if you find any information you believe to be inaccurate. Note that any living benefit or death benefit values you may have are shown in the "Your Benefit Values" section of this statement. If you do not see a benefit that you selected, please contact us.

## Your Portfolio

| | **Previous Period** | | |
|---|---|---|---|
| Ending Account Value as of 09/30/2010 | $107,482.21 | | |
| Surrender Value as of 09/30/2010 | $98,266.44 | | |

| **Your Annuity Activity** | **Current Period** | **Year-to-Date** | **Since Issue** |
|---|---|---|---|
| Beginning Account Value | $107,482.21 | .00 | .00 |
| Purchase Payments | .00 | $100,000.00 | $100,000.00 |
| Credits | .00 | $6,000.00 | $6,000.00 |
| Withdrawals | .00 | .00 | .00 |
| Contract Fees and Charges* | ($260.40) | ($517.00) | ($517.00) |
| Investment Performance | $2,874.32 | $4,613.13 | $4,613.13 |
| **Ending Account Value (as of 12/31/2010)**\*\* | **$110,096.13** | **$110,096.13** | **$110,096.13** |

**Your Surrender Value calculation if you had surrendered your annuity as of 12/31/2010:**

| Ending Account Value | $110,096.13 |
|---|---|
| Surrender Charge (CDSC) | ($9,000.00) |
| Other Fees and Charges | ($215.12) |
| **Surrender Value**\*\*\* | **$100,881.01** |

**Spousal Highest Daily Lifetime(SM) 6 Plus**
Estimated Protected Withdrawal Value: $111,996.24
Estimated Annual Income Amount: $4,479.85
(Please refer to the "Your Benefit Values" section of this statement for additional details on these benefit values.)

\* "Contract Fees and Charges" reflects certain fees and charges including, but not limited to Contingent Deferred Sales Charge (CDSC), transfer fees, annual maintenance fees, or other benefit fees or charges, if applicable or imposed during the period covered by this statement as of this statement date.

\*\* "Ending Account Value" is your value prior to the application of any Surrender Charge (CDSC), Market Value Adjustment (MVA) and any Other Fees and Charges that may be applicable to your annuity contract.

\*\*\* "Surrender Value" is the value of your Annuity that would have been available if you had surrendered this contract effective as of this statement date. It equals the "Ending Account Value" for the current period, less any applicable fees and charges and any other adjustments as shown above. Depending on your contract, the charges and adjustments include, but are not limited to: Contingent Deferred Sales Charge (CDSC), MVA, and other miscellaneous fees, applicable recaptured bonus, any charges due for optional benefits provided by rider or endorsement, any applicable maintenance fee and any applicable Credits recoverable upon surrender. The Surrender Value shown on this statement may increase or decrease prior to your next statement.

Agent ID # B7GGT2 Office # 2T0XXW

Page 1 of 3

# EXHIBIT AF. Plaintiffs' Account Values on 12/31 from 2010 to 2013

8130484 00774 E1028928

 **Prudential**



KI02WGK, PC
K-CC, K-AC

Annuities Services
P.O. Box 13467
Philadelphia, PA 19176

Page 1 of 9

**Premier Retirement X Series**
**Annuity Statement**
**October 01, 2011 through December 31, 2011**

>00774 8130484 001 092001
MICHAEL H. WU
CHRISTINE T. WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

**Financial Professional:**
CHRISTOPHER J. CRALLE
CITIGROUP GLOBAL MARKETS INC.
1900 SPRING ROAD
OAKBROOK, IL 60523

| Contract Number: E1028928 | Type: Non Qualified | Contract Issue Date: 04/16/2010 |
|---|---|---|
| Owner Name(s): MICHAEL H. WU | | Annuity Date: 02/01/2042 |
| CHRISTINE T. WU | | |
| Annuitant: MICHAEL H. WU | | |

Please review your statement and contact us within 30 days if you find any information you believe to be inaccurate. Note that any living benefit or death benefit values you may have are shown in the "Your Benefit Detail" section of this statement. If you do not see a benefit that you selected, please contact us.

## Your Portfolio

| Your Annuity Activity | Current Period | Year-to-Date | Since Issue |
|---|---|---|---|
| Beginning Account Value | $94,854.54 | $110,096.13 | .00 |
| Purchase Payments | .00 | .00 | $100,000.00 |
| Credits | .00 | .00 | $6,000.00 |
| Withdrawals | .00 | .00 | .00 |
| Contract Fees and Charges* | ($278.46) | ($1,089.99) | ($1,606.99) |
| Investment Performance | $3,300.49 | ($11,129.57) | ($6,516.44) |
| **Ending Account Value**** | **$97,876.57** | **$97,876.57** | **$97,876.57** |

* "Contract Fees and Charges" reflects certain fees and charges including, but not limited to  Contingent Deferred Sales Charge (CDSC), transfer fees, annual maintenance fees, or other benefit fees or charges, if applicable or imposed during the period covered by this statement as of this statement date.

** "Ending Account Value" is your value prior to the application of any Surrender Charge (CDSC), Market Value Adjustment (MVA) and any Other Fees and Charges that may be applicable to your annuity contract.

## Benefit Summary

**Spousal Highest Daily Lifetime(SM) 6 Plus**

Estimated Protected Withdrawal Value(PWV)   $118,716.01
Estimated Annual Income Amount   $4,748.64

PWV Cumulative Step-ups***   4
Date of last Step-up   11/04/2010

Past performance does not guarantee future results. PWV is separate from your Account Value and not available as a lump sum.

Please refer to the "Your Benefit Detail" section on the next page for additional information regarding your benefit.

*** PWV Cumulative Step-ups - The total number of times the PWV locked in a highest daily value prior to taking the first Lifetime Withdrawal under the benefit since the effective date of your benefit. Step-ups pertain only to your PWV and not your Account Value, as your Account Value is subject to variation each business day based on the investment performance of your individual fund allocations.

Agent ID # 367(X)T2 Office # 2700XW

Page 2 of 3

# EXHIBIT AF. Plaintiffs' Account Values on 12/31 from 2010 to 2013

 **Prudential**

Annuities Service
P.O. Box 13467
Philadelphia, PA 19176


Winner of the
DALBAR ANNUITY
SERVICE AWARD
2006 through 2011

Page 1 of 7

**Premier Retirement X Series**
**Annuity Statement**
**October 01, 2012 through December 31, 2012**

>01170 2274951 001 092001
MICHAEL H. WU
CHRISTINE T. WU
138 STABLEFORD DR
GLEN ELLYN, IL 60137-3216

**Financial Professional:**
CHRISTOPHER J. CRALLE
CITIGROUP GLOBAL MARKETS INC.
1900 SPRING ROAD
OAKBROOK, IL 60523

| Contract Number: E1028928 | | Type: Non Qualified | Contract Issue Date: 04/16/2010 | |
|---|---|---|---|---|
| Owner Name(s): | MICHAEL H. WU | | Annuity Date: | 02/01/2042 |
| | CHRISTINE T. WU | | | |
| Annuitant: | MICHAEL H. WU | | | |

Please review your statement and contact us within 30 days if you find any information you believe to be inaccurate. The living or death benefit values you have are provided in the "Your Benefits" section of this statement. If you do not see a benefit that you selected, please contact us.

## Your Portfolio

| Your Annuity Activity | Current Period | Year-to-Date |
|---|---|---|
| Beginning Account Value | $104,152.81 | $97,876.57 |
| Purchase Payments | .00 | .00 |
| Credits | .00 | .00 |
| Withdrawals | .00 | .00 |
| Contract Fees and Charges* | ($295.26) | ($1,155.34) |
| Investment Performance | ($281.77) | $6,854.55 |
| **Ending Account Value**\** | **$103,575.78** | **$103,575.78** |

\* "Contract Fees and Charges" reflects certain fees and charges imposed as of this statement date, including but not limited to Contingent Deferred Sales Charge(CDSC), transfer fees, annual maintenance fees, or if applicable or imposed during the period covered by this statement, other benefit fees or charges. It does not reflect contract fees that are included in the daily calculation of the unit price of the applicable portfolios. Those are reflected in the values provided under "Portfolio Detail". Please refer to your annuity prospectus for information regarding those fees.

\** "Ending Account Value" is your value prior to the application of any Surrender Charge (CDSC), Market Value Adjustment (MVA) and any Other Fees and Charges that may be applicable to your annuity contract.

## Your Benefits

### Spousal Highest Daily Lifetime(SM) 6 Plus

Estimated Protected Withdrawal Value(PWV)
Estimated Annual Income Amount

PWV Cumulative Step-ups***
Date of last Step-up


$125,859.07
$5,034.36
4
11/04/2010

Past performance does not guarantee future results. PWV is separate from your Account Value and not available as a lump sum.

*** PWV Cumulative Step-ups - The total number of times the PWV locked in a highest daily value prior to taking the first Lifetime Withdrawal under the benefit since the effective date of your benefit. Step-ups pertain only to your PWV and not your Account Value, as your Account Value is subject to variation each business day based on the investment performance of your individual fund allocations.

**Annuities Service Center:** (888) 778-2888
**Hours:** Mon-Thurs 8 AM to 7 PM ET, Fri 8 AM to 6 PM ET
Agent ID # B7GGT2 Office # Z70XW

Page 3 of 3

**Website:** www.prudentialannuities.com
**Join the e-Movement. Enroll in e-Delivery today!**

Page 3 of 4

# EXHIBIT AF. Plaintiffs' Account Values on 12/31 from 2010 to 2013

E1028928, CC

Contract Number: E1028928
Page 3 of 6

 **Portfolio Detail [continued]**

| Variable Investments | As of March 31, 2014 | | | As of December 31, 2013 | | |
|---|---|---|---|---|---|---|
| | # of Units | Unit Price | Portfolio Value | # of Units | Unit Price | Portfolio Value |
| **Mid/Small Cap:** | | | | | | |
| AST Neuberger Berman Mid Cap Growth | 1,310.77640 | 17.05964 | $22,361.37 | 1,122.28329 | 17.10150 | $19,192.73 |
| AST Small Cap Growth | 1,220.49285 | 18.12685 | $22,123.69 | 1,052.06877 | 17.92962 | $18,863.19 |
| **Special Equity:** | | | | | | |
| AST Cohen & Steers Realty | 1,529.16007 | 15.43555 | $23,603.43 | 1,222.05626 | 14.14285 | $17,283.36 |
| AST T. Rowe Price Natural Resources | 2,041.72833 | 11.32640 | $23,125.43 | 1,667.82788 | 11.04815 | $18,426.41 |
| **Bond:** | | | | | | |
| AST PIMCO Total Return Bond | 2,053.65347 | 10.94026 | $22,467.50 | 1,653.53285 | 10.84947 | $17,939.96 |
| "Junks" AST Investment Grade Bond | 0.00000 | 0.00000 | $0.00 | 1,627.91854 | 11.94846 | $19,451.12 |
| **Total Variable Investments** | | | **$113,681.42** | | | **$111,156.77** |

Withdrawals made prior to the statement date are reflected in the values shown above. The Maturity Date is the end of your Guarantee Period. The surrender value may change daily to reflect the investment performance of the Sub-Accounts in which you are invested and fluctuations in our current fixed rates. Our current fixed rates are sensitive to interest rate fluctuations in the market.

## Investment Transaction Activity

January 01, 2014 through March 31, 2014

| Transaction Date | Investments | # of Units/ Unadjusted Account Value | Unit Price/ MVA | Value/ Account Value |
|---|---|---|---|---|

**01/16/2014    Transaction Type: Benefit Fund Transfer**
This transaction is associated with your election of Spousal Highest Daily Lifetime(SM) 6 Plus.

| | | | | |
|---|---|---|---|---|
| "Junks" AST Investment Grade Bond | | (463.56933) | 12.06950 | ($5,595.05) |
| Disguised AST Cohen & Steers Realty | | 76.75324 | 14.57932 | $1,119.01 |
| Mutual AST Neuberger Berman Mid Cap Growth | | 65.58850 | 17.06107 | $1,119.01 |
| Funds AST Small Cap Growth | | 60.93073 | 18.36528 | $1,119.01 |
| AST PIMCO Total Return Bond | | 102.63934 | 10.90235 | $1,119.01 |
| AST T. Rowe Price Natural Resources | | 102.22266 | 10.94679 | $1,119.01 |
| **Transaction Total:** | | | | **$0.00** |

**01/16/2014    Transaction Type: Benefit Fee**
This transaction includes the benefit fees for the following Benefit(s):
Spousal Highest Daily Lifetime(SM) 6 Plus

| | |
|---|---|
| AST Cohen & Steers Realty | (3.45901) | 14.57932 | ($50.43) |
| AST Neuberger Berman Mid Cap Growth | (3.17624) | 17.06107 | ($54.19) |
| AST Small Cap Growth | (2.97790) | 18.36528 | ($54.69) |
| AST PIMCO Total Return Bond | (4.67973) | 10.90235 | ($51.02) |
| AST T. Rowe Price Natural Resources | (4.72011) | 10.94679 | ($51.67) |

**Annuities Service Center:** (888) 778-2888
**Hours:** Mon-Thurs 8 AM to 7 PM ET, Fri 8 AM to 6 PM ET

**Website:** www.prudentialannuities.com
**Join the e-Movement. Enroll in e-Delivery today!**

01419 2848433 004257 007489 00002/00003

# EXHIBIT AG. Prudential Workers Get $57 Million as CEO Beats Target

**Prudential Workers Get $57 Million as CEO Beats Target**

By Zachary Tracer Feb 6, 2014 3:21 PM CT

**Prudential Financial Inc. (PRU)** is spending about $57 million to reward workers after topping Chief Executive Officer John Strangfeld's profitability goal last year.

Prudential, the No. 2 U.S. life insurer, is distributing a one-time bonus of $1,300 to about 44,000 **employees** who don't usually get such payouts, said **Bob DeFillippo**, a company spokesman. The cost hurt fourth-quarter earnings by about 9 cents per share, Strangfeld said on a conference call with analysts today.

Prudential's adjusted **return on equity** in 2013 was 15.2 percent, beating Strangfeld's target of 13 percent to 14 percent. The **Newark**, New Jersey-based insurer didn't announce the payout when it reported earnings yesterday. Profit missed estimates by 3 cents a share, sending the stock lower and prompting remarks on the call about the lack of disclosure.

"It changes the perception of your quarterly results overall," **John Nadel**, an analyst at Sterne Agee & Leach Inc., told Prudential executives. "I'm just trying to understand why it wasn't necessarily called out."

Strangfeld said the insurer didn't release more information last night because the company hadn't yet given employees details about the payout. The company told employees today, DeFillippo said.

**'Bashful' Strangfeld**

"We're a little bashful about how much we say about that," Strangfeld said.

Prudential had 48,498 **employees** and sales associates at the end of 2012, with 61 percent based outside the U.S.

Bonuses for executives are also linked to the return on equity targets. **Strangfeld's total compensation for 2012 was $30.7 million**.

# EXHIBIT AG. Prudential Workers Get $57 Million as CEO Beats Target

"Rewarding the general, non-executive-management, for all the efforts and successes of the past several years is a smart move," Nadel said in an e-mail. "Has to a go a long way toward further solidifying morale and loyalty."

Prudential slipped 0.6 percent to $82.25 at 4:15 p.m. in **New York** after trading as low as $79.54. The stock has gained 41 percent in the past 12 months.

# EXHIBIT AH. The E-mail Dated May 14, 2103 and the Letter Dated June 13, 2013 from FINRA

From: "Sampat, Eugenia" <Eugenia.Sampat@finra.org>
To: Michael W <mhw2000usa@gmail.com>
CC: "Gauch, Bonnie L." <GauchB@sec.gov>,
    "Ketchum, Rick"
       <Rick.Ketchum@finra.org>
Subject: RE: Late Trading Orders of Prudential Variable Annuities
Thread-Topic: Late Trading Orders of Prudential Variable Annuities
Thread-Index: AQHOUF84kp6L6fiHtkmYodCigi1z55kEYW+AgABchfA=
Date: Tue, 14 May 2013 14:41:30 +0000
Message-ID:
<00B0B620D7B8FF43884F56EDFE3696B10DBE7AA6@NY4WNEXMBP001.corp.root.
nasd.com>


Dr. Wu:

The first entry on page 4 of 8 reverses an entry dated 6/15/12 that was on your April to June 2012 statement. The second 6/15/12 entry corrects the price of the Lord Abbett Core Fixed Income Portfolio. The second 6/15/12 entry is replacing the one on the previous statement.

Also the two 6/18/12 entries on page 5 of 8 reversed an entry for June 18, 2012 that was on your previous statement. The second entry corrected the Lord Abbett Portfolio price. The annuity is "undoing" a mistake and "redoing" the full trade as it should have been in June 2012.

If you have further questions, feel free to contact me again.


Eugenia T. Sampat
Principal Examiner
FINRA District Office
55 West Monroe Street
Suite 2700
Chicago, Illinois 60603

(312) 899-4380
**Eugenia.Sampat@FINRA.org**
Fax (312) 606-0742

# EXHIBIT AH. The E-mail Dated May 14, 2103 and the Letter Dated June 13, 2013 from FINRA



Financial Industry Regulatory Authority

June 13, 2013

Dr. Michael Wu
40 East 9th Street
Apt. 1805
Chicago, IL 60605

Re: FINRA Matter IDs 20120317931, 20120244294, 20120333979
Citigroup Global Markets and Pruco Securities

Dear Mr. Wu:

This is to advise you that FINRA has completed its review of the matter that you brought to our attention in your initial correspondence regarding the above noted matters.

Our investigation included an analysis of the information you provided and additional details we collected during the examination process. Based on our assessment of the information, FINRA has closed its investigation of this matter. If new information develops, FINRA may re-open its investigation.

It is our view that a determination by FINRA not to take action against a FINRA member or a member's associated person has no evidentiary weight in any mediation, arbitration, or judicial proceeding that you have filed or may file. Further, it is inconsistent with just and equitable principles of trade for a FINRA member or a member's associated person to attempt to introduce such a determination into evidence in any of these forums.

If you feel you are entitled to monetary relief, you may wish to initiate an individual action, such as mediation or arbitration. Please be advised that FINRA provides a forum for resolving individual disputes through its Dispute Resolution Division. Information about our mediation and arbitration programs is available at www.finra.org.

Sincerely,

James Papagiannis
Examination Manager

Ls/scolal/papagiannis/nfa20120317931, 20120244294, 20120333979.doc

cc: Ms. Julie Mohanco
Director, Regulatory Control
Pruco Securities, LLC
213 Washington Street
Newark, NJ 07102-2917

Investor protection. Market integrity.

## EXHIBIT AI. IAA Was Lobbying for Proprietary Trading with Misrepresentations for IAA Members

# INVESTMENT ADVISER
### A S S O C I A T I O N

February 13, 2012

*VIA ELECTRONIC MAIL*

Ms. Elizabeth M. Murphy
Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Rule-comments@sec.gov

Mr. Jennifer J. Johnson
Secretary
Board of Governors of the Federal Reserve
20th Street and Constitution Avenue, N.W.
Washington, DC 20551
Regs.comments@federalreserve.gov

Mr. Robert E. Feldman
Executive Secretary
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, DC 20429
comments@fdic.gov

Mr. John G. Walsh
Acting Comptroller of the Currency
Office of the Comptroller of the Currency
250 E Street, S.W.
Washington, DC 20219
regs.comments@occ.treas.gov

Mr. David A. Stawick
Secretary
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
VolckerRule@CFTC.gov

Re: **Prohibitions and Restrictions on Proprietary Trading and Certain Interests in, and Relationships With, Hedge Funds and Private Equity Funds (SEC Rel. No. 34-65545, File No. S7-41-11; Federal Reserve Board Docket No. R-1432, RIN 7100-AD 82; FDIC RIN 3064-AD85; OCC Docket ID OCC-2011-14; CFTC RIN 3038-AD05)**

Dear Ladies and Gentlemen:

The Investment Adviser Association[1] appreciates the opportunity to submit comments on the Agencies' proposed rules to implement Section 619 of the Dodd-Frank Wall Street

---

[1] The Investment Adviser Association is a not-for-profit association that represents the interests of SEC-registered investment adviser firms. Founded in 1937, the IAA's membership consists of more than 530 advisers that collectively manage in excess of $10 trillion for a wide variety of individual and institutional investors, including pension plans, trusts, investment companies, private funds, endowments, foundations, and corporations. For more information, please visit our web site: www.investmentadviser.org.

1050 17th Street N.W. · Suite 725 · Washington, DC 20036-5503 · (202) 293-4222 ph · (202) 293-4223 fx · www.investmentadviser.org

## EXHIBIT AI. IAA Was Lobbying for Proprietary Trading with Misrepresentations for IAA Members

February 13, 2012
Page 2 of 6

Reform and Consumer Protection Act (the "Dodd-Frank Act"), known as the "Volcker rule."[2] The Proposal prohibits a "banking entity," which includes any affiliate of an insured depository institution, from engaging in "proprietary trading" and from acting as a sponsor of a hedge fund or a private equity fund.

Our members are SEC-registered investment advisers that manage assets, typically on a discretionary basis, for individual and institutional clients, including pension plans, trusts, endowments, mutual funds, foundations, and corporations. Advisers also may organize, sponsor, and manage assets for private funds. Investment advisers are subject to a fiduciary duty to, among other things, act in the best interests of their clients and place the interests of their clients before their own, including serving their clients with the highest duties of loyalty and care. Investment advisers are an important segment of the buy-side, managing more than $43.8 trillion in assets in 2011. Accordingly, the effective functioning of the securities markets, including the ability of market makers to provide liquidity, is of critical importance to advisers and their clients.

We fully support the goal of ensuring that the safety and soundness of banking entities are protected. We recommend several important changes to the Proposal that are consistent with this goal. First, we urge the Agencies to reconsider the proposed approach to distinguish between impermissible proprietary trading and permissible market making in order to ensure that market makers continue to provide essential liquidity to the markets. Second, we recommend that the Agencies narrow the definition of "covered funds" to exclude certain non-U.S. retail funds that are governed by substantive regulation in the home jurisdiction. Finally, we urge the Agencies to modify restrictions in the sponsored fund exemption where such restrictions conflict with non-U.S. law that governs the arrangement. Our concerns are further discussed below.

<u>Effects of the Proposed Market-Making Limitations on Market Liquidity</u>

Section 619(d) enumerates specific activities that are not considered "proprietary trading," including the purchase or sale of securities or instruments in connection with market-making activities. The Agencies elaborated upon this statutory test for market making in the Proposal and include seven specific requirements that must be met in order for an activity to be deemed made in connection with market-making activities.[3]

---

[2] *Prohibitions and Restrictions on Proprietary Trading and Certain Interests in, and Relationships With, Hedge Funds and Private Equity Funds*, SEC Rel. No. 34-65545 (Oct. 13, 2011) ("Proposal" or "Proposed Rules"), available at http://www.sec.gov/rules/proposed/2011/34-65545.pdf. The Volcker Rule is jointly proposed by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Securities and Exchange Commission. The Commodity Futures Trading Commission issued its release proposing the Volcker rule on January 11, 2012.

[3] The Proposal's seven conditions necessary to conclude that trading activity is "market making" and not "proprietary trading" include: (i) an internal compliance program to ensure no proprietary trading; (ii) the trading desk or unit holds itself out as being willing to buy and sell, including through entering into long and short positions in, the covered financial position for its own account on a regular and continuous basis; (iii) the market-making activities are designed not to exceed the reasonably expected near term demands of clients, customers, or counterparties; (iv) the banking entity is a securities dealer or a swap dealer or a security-based

## EXHIBIT AI. IAA Was Lobbying for Proprietary Trading with Misrepresentations for IAA Members

February 13, 2012
Page 3 of 6

Although the Agencies attempted to tackle challenging definitional issues, the proposed tests for determining whether a trade is an impermissible proprietary trade or a permissible act of market making are complex, lack clarity, and will generate uncertainty. Proposed Appendix B establishes an "after-the-fact" test for determining whether a trade is a proprietary trade or a permissible market-making activity. It is unclear whether the requirements must be applied on a transaction by transaction basis or based on overall activities. Further, the rule would create a presumption that the trading is proprietary unless proven otherwise. In addition, many aspects of the guidance that are intended to establish parameters around permissible conduct are highly subjective and too narrowly drafted. For example, the requirement that activities be "designed not to exceed the reasonably expected near term demands of clients, customers, or counterparties" is subjective and would be difficult to administer in a broad range of scenarios. Because the proposal lacks the sufficient regulatory clarity and certainty, we are concerned that market making activities may be adversely impacted. The regulatory uncertainty posed by the rule could cause covered banking entities to cease or decrease market making in certain market sectors.

Market makers play a critical role in the effective functioning of the securities markets. They provide liquidity so that buyers and sellers can engage in desired transactions on an ongoing basis and provide price quotes on which market participants can rely in their decision-making process. As buyers and sellers of securities on behalf of their advisory clients, investment advisers have a strong interest in ensuring that there is sufficient liquidity and price discovery to execute their investment strategies in a manner that is most beneficial to their clients. We are concerned that the Proposal as drafted will result in a reduction of liquidity for investors in the market, not merely for banking entities trading on their own behalf. A reduction in liquidity would likely increase volatility, impact transparency and price discovery, and therefore result in greater costs imposed on clients of investment advisers.[4] These developments would result in negative consequences for advisers' clients, including pension plans, municipalities, and individual investors.

Covered banking entities provide much of the current market making activities in the markets. The extent to which other market participants would replace the market making functions of covered banking entities and the effectiveness of those functions is uncertain. Accordingly, we urge the Agencies to revise the rule to provide greater clarity in delineating the line between proprietary trading and market making.

---

swap dealer or municipal securities dealer or a government securities dealer; (v) the market-making activities are designed to generate revenues from fees, commission, bid/ask spreads or other income and are *not* attributable to appreciation in value of covered financial positions in trading accounts or hedging of these products held in a trading account; (vi) the market-making activities are consistent with the Proposal's Appendix B guidance; and (vii) the compensation arrangements of persons performing the market making-related activities are designed not to reward proprietary risk-taking.

[4] *See e.g.,* Letter from Perry Traquina, President and CEO, Wellington Management Company LLP, to Agencies, dated January 12, 2012, Letter from Amy E. Koch, Director of Fixed Income Trading, Standish Mellon Asset Management Company LLC, to Agencies dated January 19, 2012.

## EXHIBIT AI. IAA Was Lobbying for Proprietary Trading with Misrepresentations for IAA Members

February 13, 2012
Page 4 of 6

### Overbroad Definition of Covered Funds

Section 619 of the Dodd-Frank Act prohibits a "banking entity," which includes any affiliate of an insured depository institution, from acting as a sponsor in a "hedge fund" or a "private equity fund." Section 619 defines the terms "hedge fund" and "private equity fund" to mean an issuer that would be an investment company under the Investment Company Act of 1940, but for Section 3(c)(1) or 3(c)(7) of that Act. The Agencies further expand the statute by encompassing "hedge fund" and "private equity fund" into a broader category called a "covered fund" in the Proposal. A covered fund includes any issuer organized or offered outside the U.S. that would be a covered fund were it organized or offered under the laws, or offered to one or more residents, of the U.S. or states, and any similar fund as the Agencies may determine.

We are concerned that the Agencies have defined "covered fund" too broadly and have inappropriately included non-U.S. retail funds as covered funds. In particular, the proposed rule broadens the statutory language by including as covered funds all foreign equivalents to U.S. covered funds, including many types of regulated, publicly-offered funds (e.g., UCITS funds, UK investment trusts). In addition, the proposed rule would extend to non-U.S. retail funds even if they are not offered or sold in the U.S. or to U.S. persons or do not rely on the Sections 3(c)(1) or 3(c)(7) registration exemptions under the Investment Company Act. We urge the Agencies to exclude such funds from the definition of "covered fund." These publicly offered non-U.S. retail funds are not similar to traditional private funds.[*] Instead, they are the non-U.S. equivalent of registered investment companies, which are not included in the "covered fund" definition. We do not believe the statutory provision intended to capture non-U.S. retail funds, and no policy reason exists to treat non-U.S. regulated funds differently than U.S. regulated investment companies. Therefore, the Agencies should exclude non-U.S. retail funds that are publicly offered outside the U.S. and are subject to substantive regulation in their home jurisdiction where the fund is organized.

### Restrictions on Banking Entities Acting as Sponsors to Covered Funds

Under Section 619 and the Proposal, an investment adviser affiliated with a banking entity (covered banking entity) may not "sponsor" a "covered fund" except under certain limited conditions. In particular, a covered banking entity may organize and offer a covered fund, including acting as a sponsor of the fund, only if certain criteria are met. One of the effects of the overbroad inclusion of foreign funds discussed above is the interplay with these conditions, which may conflict with the current local law in the fund's home jurisdiction.

---

[*] The January 2011 Financial Stability Oversight Council ("FSOC") study recommended that the Agencies consider using their authority to expand the definition of hedge fund and private equity fund to "funds that do not rely on the section 3(c)(1) and 3(c)(7) exclusions, but that engage in the activities or have the characteristics of a traditional private equity fund or hedge fund." *See Study & Recommendations on Prohibitions on Proprietary Trading & Certain Relationships with Hedge Funds & Private Equity Funds*, available at http://www.treasury.gov/initiatives/Documents/Volcker%20sec%20%2061%20study%20final%201%2018%2011%20rg.pdf at 62.

## EXHIBIT AI. IAA Was Lobbying for Proprietary Trading with Misrepresentations for IAA Members

February 13, 2012
Page 5 of 6

For example, one of the criteria is that the covered fund, for corporate, marketing, promotional, or other purposes, may not share the same name or a variation of the same name with the banking entity (or an affiliate or subsidiary of the banking entity). However, application of this name prohibition to foreign funds may directly conflict with non-U.S. regulations or regulatory guidance that require regulated funds to have the same name as the investment manager[6]

Similarly, the conditions include restrictions on covered banking entities and/or their directors and employees investing in covered funds. These restrictions conflict with the laws of many jurisdictions requiring that advisers and/or their directors and employees invest in the funds they manage.[7]

These types of conflicts would effectively prevent firms from organizing and offering non-U.S. funds in many countries where the firm could not comply with both U.S. and local law. Therefore, we request the Agencies affirmatively accommodate these conflicts in the final rules and permit banking entities to comply with the local law in the jurisdiction applicable to the covered fund in question.

\*       \*       \*       \*

---

[6] In certain instances, the U.K. Financial Services Authority has taken the position under Section 6.9.6 of the Collective Investment Schemes Information Guide (http://fsahandbook.info/FSA/html/handbook/COLL/6/9) that the authorized fund must have a name representative of the authorized investment manager to avoid misleading fund investors.

[7] E.g., Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS), Article 29. See also, Annex II para. 1(m), Directive 2011/61/EU of the European Parliament and the Council of 8 June 2011 on Alternative Investment Fund Managers (AIFM) (due for transposition and entry into force by July 21, 2013).

## EXHIBIT AI. IAA Was Lobbying for Proprietary Trading with Misrepresentations for IAA Members

February 13, 2012
Page 6 of 6

We appreciate the Commission's consideration of our comments on the Proposed Rules to implement the provisions in Section 619 of the Dodd-Frank Act. Please do not hesitate to contact Karen L. Barr, IAA General Counsel, or the undersigned at (202) 293-4222 if we may provide any additional information regarding our comments or any other matters.

Sincerely,

Monique S. Botkin
IAA Assistant General Counsel

cc:     The Honorable Mary L. Schapiro, Chairman
        The Honorable Elisse B. Walter, Commissioner
        The Honorable Luis A. Aguilar, Commissioner
        The Honorable Troy A. Paredes, Commissioner
        The Honorable Daniel M. Gallagher, Commissioner

        Ms. Eileen Rominger, Director, Division of Investment Management
        Mr. Robert Plaze, Deputy Director, Division of Investment Management

## EXHIBIT AJ. Prohibitions and Restrictions on Proprietary Trading (Partial)

*Conformed to Federal Register Version*

DEPARTMENT OF THE TREASURY

Office of the Comptroller of the Currency
12 CFR Part 44
Docket No. OCC-2011-0014
RIN: 1557-AD44

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
12 CFR Part 248
Docket No. R-1432
RIN: 7100 AD82

FEDERAL DEPOSIT INSURANCE CORPORATION
12 CFR Part 351
RIN: 3064-AD85

SECURITIES AND EXCHANGE COMMISSION
17 CFR Part 255
Release No. BHCA-1; File No. S7-41-11
RIN: 3235-AL07

Prohibitions and Restrictions on Proprietary Trading and Certain Interests In, and Relationships With, Hedge Funds and Private Equity Funds

AGENCIES: Office of the Comptroller of the Currency, Treasury ("OCC"); Board of

Governors of the Federal Reserve System ("Board"); Federal Deposit Insurance Corporation

("FDIC"); and Securities and Exchange Commission ("SEC").

ACTION: Final Rule.

SUMMARY: The OCC, Board, FDIC, and SEC (individually, an "Agency," and collectively,

"the Agencies") are adopting a rule that would implement section 13 of the BHC Act, which was

added by section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act

("Dodd-Frank Act"). Section 13 contains certain prohibitions and restrictions on the ability of a

i

## EXHIBIT AJ. Prohibitions and Restrictions on Proprietary Trading (Partial)

banking entity and nonbank financial company supervised by the Board to engage in proprietary trading and have certain interests in, or relationships with, a hedge fund or private equity fund.

**DATES:** The final rule is effective April 1, 2014.

**FOR FURTHER INFORMATION CONTACT:**

*OCC:* Ursula Pfeil, Counsel, or Deborah Katz, Assistant Director, Legislative and Regulatory Activities Division, (202) 649-5490; Ted Dowd, Assistant Director, or Roman Goldstein, Senior Attorney, Securities and Corporate Practices Division, (202) 649-5510; Kurt Wilhelm, Director for Financial Markets Group, (202) 649-6360; Stephanie Boccio, Technical Expert for Credit and Market Risk Group, (202) 649-6360, Office of the Comptroller of the Currency, 250 E Street SW., Washington, DC 20219.

*Board:* Christopher M. Paridon, Counsel, (202) 452-3274, or Anna M. Harrington, Senior Attorney, Legal Division, (202) 452-6406; Mark E. Van Der Weide, Deputy Director, Division of Bank Supervision and Regulation, (202) 452-2263; or Sean D. Campbell, Deputy Associate Director, Division of Research and Statistics, (202) 452-3760, Board of Governors of the Federal Reserve System, 20th and C Streets, NW., Washington, DC 20551.

*FDIC:* Bobby R. Bean, Associate Director, bbean@fdic.gov, or Karl R. Reitz, Chief, Capital Markets Strategies Section, kreitz@fdic.gov, Capital Markets Branch, Division of Risk Management Supervision, (202) 898-6888; Michael B. Phillips, Counsel, mphillips@fdic.gov, or Gregory S. Feder, Counsel, gfeder@fdic.gov, Legal Division, Federal Deposit Insurance Corporation, 550 17th Street, NW., Washington, DC 20429.

*SEC:* Josephine J. Tao, Assistant Director, Angela R. Moudy, Branch Chief, John Guidroz, Branch Chief, Jennifer Palmer or Lisa Skrzycki, Attorney Advisors, Office of Trading Practices,

ii

## EXHIBIT AJ. Prohibitions and Restrictions on Proprietary Trading (Partial)

Catherine McGuire, Counsel, Division of Trading and Markets, (202) 551-5777; W. Danforth Townley, Attorney Fellow, Jane H. Kim, Brian McLaughlin Johnson or Marian Fowler, Senior Counsels, Division of Investment Management, (202) 551-6787; David Beaning, Special Counsel, Office of Structured Finance, Division of Corporation Finance, (202) 551-3850; John Cross, Office of Municipal Securities, (202) 551-5680; or Adam Yonce, Assistant Director, or Matthew Kozora, Financial Economist, Division of Economic and Risk Analysis, (202) 551-6600, U.S. Securities and Exchange Commission, 100 F Street NE., Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:**

*Table of Contents*

I.  Background
II.  Notice of Proposed Rulemaking:
III. Overview of Final Rule
      A.  General Approach and Summary of Final Rule
      B.  Proprietary Trading Restrictions
      C.  Restrictions on Covered Fund Activities and Investments
      D.  Metrics Reporting Requirement
      E.  Compliance Program Requirement
IV. Final Rule
      A.  Subpart B – Proprietary Trading Restrictions
            1.  Section ___.3: Prohibition on Proprietary Trading and Related Definitions
                  a.  Definition of "Trading Account"
                  b.  Rebuttable Presumption for the Short-Term Trading Account
                  c.  Definition of "Financial Instrument"
                    d.  Proprietary Trading Exclusions
                        1.  Repurchase and reverse repurchase arrangements and securities lending
                        2.  Liquidity management activities
                        3.  Transactions of derivatives clearing organizations and clearing agencies

iii

# EXHIBIT AK-1. Strangfeld's Compensation for 2013

John Strangfeld (Age: 60)

## Profile

Mr. Strangfeld has served as CEO and President of Prudential Financial since January 2008 and Chairman of the Board since May 2008. Mr. Strangfeld is a Member of the Office of the Chairman of Prudential Financial and served as Vice Chairman of Prudential Financial from 2002 through 2007, overseeing the U.S. Insurance and Investments divisions. Prior to his position as Vice Chairman, Mr. Strangfeld held a variety of senior investment positions at Prudential, both within the U.S. and abroad.

## Prudential Financial Inc

**Compensation for 2013**

| | |
|---|---:|
| Salary | $1,400,000 |
| Bonus | $5,460,000 |
| Restricted stock awards | $3,371,094 |
| All other compensation | $87,923 |
| Option awards | $3,380,246 |
| Non-equity incentive plan compensation | $3,039,573 |
| Change in pension value and nonqualified deferred compensation earnings | $2,451 |
| **Total Compensation** | **$16,741,287** |

**Options Exercised for 2013**

| | |
|---|---:|
| Number of securities underlying options unexercisable | 247,094 |
| Shares acquired on exercise | 354,122 |

**Stock Ownership for 2014**

| | |
|---|---:|
| Number of shares owned | 315,122 |

# EXHIBIT AK-2. Grier's Compensation for 2013

Mark Grier (Age: 61)

## Profile

Mr. Grier has served as Vice Chairman since 2007 and a member of the Office of the Chairman of Prudential Financial since August 2002. From April 2007 through January 2008, he served as Vice Chairman overseeing the International Insurance and Investments division and Global Marketing and Communications. Mr. Grier was Chief Financial Officer of Prudential Insurance from 1995 to 1997 and has served in various executive roles. Prior to joining Prudential, Mr. Grier was an executive with Chase Manhattan Corporation.

## Prudential Financial Inc

**Compensation for 2013**

| | |
|---|---|
| Salary | **$1,190,000** |
| Bonus | **$4,550,000** |
| Restricted stock awards | **$2,776,242** |
| All other compensation | **$83,892** |
| Option awards | **$2,783,730** |
| Non-equity incentive plan compensation | **$2,483,106** |
| Change in pension value and nonqualified deferred compensation earnings | **$734,209** |
| **Total Compensation** | **$14,601,179** |

**Options Exercised for 2013**

| | |
|---|---|
| Number of securities underlying options unexercisable | **203,489** |
| Shares acquired on exercise | **309,007** |

**Stock Ownership for 2014**

| | |
|---|---|
| Number of shares owned | **250,285** |

# EXHIBIT AK-3. Carbone's Compensation for 2013

**Richard Carbone (Age: 66)**

## Profile

Richard J. Carbone has been a director of the Company since August 2013. Mr. Carbone was formerly Chief Financial Officer of Prudential Financial, Inc. from 1997 through 2013, and served as Executive Vice President until retiring from that position in February 2014. Mr. Carbone brings nearly four decades of experience in financial services, having held senior finance office positions in both the banking and securities industries, including Managing Director and Controller of Salomon Brothers and Senior Vice President and Controller of Bankers Trust Company. He began his career at Price Waterhouse & Co. Mr. Carbone received an M.B.A. from St. John's University and is a Certified Public Accountant. He was an officer in the United States Marine Corps from 1969 to 1972. Mr. Carbone is also a director on the Board of a non-profit organization focused on helping disabled adults and indigent children. Mr. Carbone is a member of the E*TRADE Bank board and a member of the Audit Committee, where he is designated an audit committee financial expert, and the Compensation Committee.

## Prudential Financial Inc

**Compensation for 2013**

| | |
|---|---|
| Salary | $700,000 |
| Bonus | $2,500,000 |
| Restricted stock awards | $793,212 |
| All other compensation | $30,526 |
| Option awards | $795,355 |
| Non-equity incentive plan compensation | $927,205 |
| Change in pension value and nonqualified deferred compensation earnings | $366,174 |
| **Total Compensation** | **$6,112,472** |

**Options Exercised for 2013**

| | |
|---|---|
| Number of securities underlying options unexercisable | 58,140 |
| Shares acquired on exercise | 164,319 |

**Stock Ownership for 2013**

| | |
|---|---|
| Number of shares owned | 86,451 |

## E*Trade Financial Corp

**Director Compensation for 2013**

| | |
|---|---|
| Fees earned or paid in cash | $35,000 |
| Stock awards | $35,000 |
| **Total Compensation** | **$70,000** |

## EXHIBIT AL-1. The Estimated Loss of Plaintiffs Is $50,000

Plaintiffs estimated their loss based on their best knowledge. The loss is about $50,000.

Plaintiffs had five chosen investment options and their respective number of shares, on 072011, after Plaintiffs did their 3rd reallocation and when there was no mispriced "junk bonds" in "AST Investment Grad Bond Portfolio" under Plaintiffs' account, according to PAI statement, was shown on the "Statement" row in **Table 1** below.

PAI trade confirmations and statements said that Plaintiffs were charged $1,328.53 of benefit fees before 072011 and had $111,691.77 of contract values on 072011.

Underlying numbers of shares were disclosed in PAI statement and were adjusted by adding back the $1,328.53 of benefit fees, which were charged to pay out greater compensation to agents for selling Prudential VAs before 072011, and a 2.09% of dividends and/or distributions (ps. Based on what S&P 500 paid), which underlying Mutual Fund Companies paid in year 2010 and were reinvested in buying additional shares, as shown on the last two rows in **Table 1** below.

| 072011 | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Statement | 1,666.64852 | 1,957.77137 | 1,855.25018 | 1,731.21824 | 1,600.91686 |
| Add benefit fees | 1,686.47265 | 1,981.05830 | 1,877.31766 | 1,751.81041 | 1,619.95914 |
| Add 2.09% div. | 1,721.71993 | 2,022.46241 | 1,916.55360 | 1,788.42324 | 1,653.81629 |

*Table 1. Number of Shares of Such Five Options Should Be on July 20, 2011*

Assume that the Trust paid 2.09% of dividends/distribution annually. Plaintiffs did the 4th reallocation to replace Option 2 and Option 3 with Option 2a and Option 3a respectively on 011713 due to Plaintiffs' concern on misconducts of PFI et al. Number of shares, which Plaintiffs should have, on 123111, 123112, and 011713 respective; and their respective value on 011713 should be as shown in **Table 2** below.

| Date | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| 123111 | 1,757.70388 | 2,064.73188 | 1,956.60957 | 1,825.80129 | 1,688.38105 |
| 123112 | 1,794.43989 | 2,107.88478 | 1,997.50271 | 1,863.96054 | 1,723.66821 |
| 011713 | 1,794.43989 | 2,107.88478 | 1,997.50271 | 1,863.96054 | 1,723.66821 |

| 011713 | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Unit Price | $14.33988 | $11.11688 | $12.54205 | $17.33118 | $17.83392 |
| Value | $25,732.05 | $25,602.90 | $25,052.78 | $24,157.04 | $24,465.11 |

*Table 2. Numbers of Shares and Values of Those Old Five Options on Specified Dates*

## EXHIBIT AL-1. The Estimated Loss of Plaintiffs Is $50,000

The total account value of $125,009.88 calculated on 011713 was distributed evenly among the new five chosen investment options as shown in **Table 3** below.

| 011713 | Option 1 | Option 2a | Option 3a | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Value | $25,001.98 | $25,001.98 | $25,001.98 | $25,001.98 | $25,001.98 |
| Unit Price | $14.33988 | $10.83564 | $10.07889 | $12.96006 | $14.19363 |
| Share | 1,743.52751 | 2,307.38334 | 2,480.62785 | 1,929.15582 | 1,761.49267 |

### Table 3. Values and Numbers of Shares of Those Old Five Options on 011713

Numbers of shares, which Plaintiffs should have, on 011713, 123113, and 063014 respective, should be as shown in **Table 4** assuming that the Trust paid 2.09% of dividends/distributions annually.

| Date | Option 1 | Option 2a | Option 3a | Option 4 | Option 5 |
|---|---|---|---|---|---|
| 011713 | 1,743.52751 | 2,307.38334 | 2,480.62785 | 1,929.15582 | 1,761.49267 |
| 123113 | 1,779.96723 | 2,355.60765 | 2,532.47297 | 1,969.47518 | 1,798.30787 |
| 063014 | 1,798.56789 | 2,380.22375 | 2,558.93731 | 1,990.05620 | 1,817.10019 |

### Table 4. Numbers of Shares of Those New Five Options on Specified Dates

According to PAI published unit values for 063014, Plaintiffs' account should have a total value of $151,242.27, which is detailed in **Table 5** below.

| 063014 | Option 1 | Option 2a | Option 3a | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Unit Price | $16.47459 | $12.14625 | $12.54527 | $12.96006 | $14.19363 |
| Value | $25,732.05 | $25,602.90 | $25,052.78 | $24,157.04 | $24,465.11 |

### Table 5. Unit Prices and Values of Those New Five Options on 063014

The total value calculated on 063014, which was disclosed in statements from Citigroup and CGMI, was only $117,460.67. The loss estimated is $33,781.60 (i.e., = $151,242.27 - $117,460.67). This can be verified by revoking all unauthorized transactions done.

If mismanagement charges for investment managers; portfolio fees and charges for portfolio managers; ill-got compensations for PFI executives; dividends for PRU shareholders; the funds allocated for contractual intermediaries; the rewards for PFI employees; and the greater compensation paid out to agents for their selling Prudential VAs were disgorged, Plaintiffs' account value would increase about 5%, which means that the loss would be $151,242.27 * 1.05 - $117,460.67 = $41,343.71.

If Plaintiffs were allowed to reverse all benefit fund transfers, the loss would be doubled. The loss of $50,000 is estimated based on Plaintiffs' investment and management skills.

# EXHIBIT AL-2. Plaintiffs' Counter Proposal to PFI and Citigroup

### SETTLEMENT AND RELEASE AGREEMENT

1. The undersigned, John Robert Strangfeld Jr., of Prudential Financial, Inc., and John Havens of Citigroup, Inc., agree to this Settlement and Release Agreement ("Agreement"), concerning:

   Annuity Contract Number E1028928, including any and all Purchase Payment(s), Loss resulted from Prudential's Arbitrage Pricing Model, the 6% Compounded Grow, Dividends of Mutual Funds, 1.15% Annual Benefit Fees to Pay for Greater Compensations and 1.04% loss in Fraud Statements due to Duo/Trio Pricing Systems, Investment Reallocation Hardship incurred during the period of investigating misconducts of Pruco Life Insurance Company ("Pruco") and Citi Personal Wealth Management (CPWM), and time and effort spent in researching, compiling facts and findings, filing and mailing complaints (the "Damages" and "Cost"), which is jointly owned by Michael H. Wu and Christine T. Wu ("Investors") and issued by Pruco.

2. To avoid and resolve any actual or potential dispute regarding the Contract, the undersigned agree to the following:

a) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., will order Pruco to revoke all **Unauthorized Transactions** including Benefit Fund Transfers, Benefit Fees, and Program Rebalances, which are deemed unsuitable trades for all Prudential customers.

b) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., will order Pruco to remove Prudential Insiders' "private Broker-Dealer self-Offering" (i.e., "**AST Investment Grade Bond Portfolio**") from Prudential brochures, Prospectus, and all Prudential contracts.

c) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., will order Pruco to eliminate Prudential "Arbitrage Pricing Model (i.e., **Predetermined Mathematical Formula Scheme)**" from Prudential Variable Annuities software package, which is fraudulent.

d) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., will order Pruco to eradicate Prudential "**Duo Pricing Systems**", and John Havens will order CPWM to eradicate **the 3rd one** from their respective accounting systems.

e) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., and John Havens will order Pruco together with CPWM to credit back all "Risk Transfer" accounts 1.04% of contract base annually and compounded for past years, which was cheated out of all Prudential "Risk Transfer" contracts by Prudential's "**Duo Pricing Systems**" and Citigroup's **3rd Pricing System**.

## EXHIBIT AL-2. Plaintiffs' Counter Proposal to PFI and Citigroup

f) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., will order Pruco to disarm their "**Pyramid Scheme**" organizations, which are documented in the latest Prudential Prospectus and underlying "Settlement and Release Agreement" dated 01/20/2012.

g) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., will order Pruco to pass **dividends of mutual funds plus interests** down to their "Risk Transfer" customers for past years.

h) Upon receipt of this fully executed Agreement, John Robert Strangfeld Jr., will order Pruco to credit "**the 6% compounded growth**" into their customers' contract base for all past years.

3. John Robert Strangfeld Jr., and John Havens, in exchange for the consideration in paragraph 2 above, the adequacy and sufficiency of which they hereby acknowledge, on behalf of themselves, their heirs, executors, administrators, successors, affiliates, subsidiaries, successors, and assigns, hereby completely release and discharge Investors, and promise that Pruco, CGMI, CPMW, and their parent corporations, affiliates, subsidiaries, successors, assigns, subcontractors, divisions, predecessors, and representatives (including, without limitation, its current and former agents, employees, directors, officers, and shareholders) will not conduct any kind of misconducts, known or unknown, now or in the future, regarding Prudential Contracts, specifically including all misconducts that the Released Parties discovered or may failed to discover in connection with the Misconducts done to Prudential Contracts.

4. John Robert Strangfeld Jr., and John Havens acknowledge and agree that neither this Agreement nor the Payment and Damages and other considerations provided in paragraph 2 constitute an admission by the Released Parties of any liability or wrongdoing with respect to the Contract.

5. John Robert Strangfeld Jr., and John Havens acknowledge that they understand and agree that the Released Parties are not providing them with any legal or financial advice with respect to the Contract, the Payment, the Damages and the Costs, or this Agreement and that they may seek their own advice in these areas before signing this Agreement.

6. John Robert Strangfeld Jr., and John Havens hereby agree that they must come forward to make official apologies to their customers, their investors, media, and government regulatory organizations for their not doing the right thing for their customers, their investors, and each other for long history.

All parties understand that nothing in this Agreement will prohibit or restrict any Party (or its

## EXHIBIT AL-2. Plaintiffs' Counter Proposal to PFI and Citigroup

attorney) from responding to any inquiry about this settlement or its underlying facts and circumstance made by the Securities and Exchange Commission (SEC), FINRA or any securities self-regulatory organization.

7. This Agreement may be executed in counterparts. This Agreement contains the entire understanding between Released Parties on the one hand and; John Robert Strangfeld Jr., and John Havens on the other hand regarding the settlement of this matter.

8. JOHN ROBERT STRANGFELD JR. AND JOHN HAVEN HAVE REVIEWED AND UNDERSTAND THIS AGREEMENT AND ENTER INTO IT VOLUNTARILY, AND AGREE THAT ANY AMBIGUITY IN THIS AGREEMENT WILL NOT BE PRESUMPTIVELY CONSTRUCTED AGAINST THE RELEASED PARTIES OR THEM.

DATED : _____ , 2012_    _____
                                      John Robert Strangfeld Jr.


                                      _____
                                      Witness:

DATED : _____ , 2012_    _____
                                      John Havens


                                      _____
                                      Witness:

Consent to this Settlement and Release Agreement:

DATED : _____ , 2012_    By: _____
                                         Michael H. Wu


DATED : _____ , 2012_    By: _____
                                         Christine T. Wu